**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

———————————————————————x
                                                    :
JIANGSU DINGSHENG NEW MATERIALS      :
JOINT-STOCK CO., LTD.; DINGSHENG        :
ALUMINIUM INDUSTRIES (HONG KONG)     :
TRADING CO., LIMITED (DINGSHENG         :
ALUMINIUM INDUSTRIES (HONG KONG)     :     Court No. 23-00264
TRADING CO., LTD.); HANGZHOU            :
DINGSHENG IMPORT & EXPORT CO., LTD.   :
(HANGZHOU DINGSHENG IMPORT AND       :
EXPORT CO., LTD.); HANGZHOU FIVE STAR  :
ALUMINIUM CO., LTD.; HANGZHOU          :
TEEMFUL ALUMINIUM CO., LTD.; INNER    :
MONGOLIA LIANSHENG NEW ENERGY        :
MATERIAL CO., LTD.; and INNER            :
MONGOLIA XINXING NEW ENERGY          :
MATERIAL CO., LTD.,                       :
                                                    :
                     Plaintiffs,                     :
                                                    :
          v.                                         :
                                                    :
UNITED STATES,                              :
                                                    :
                     Defendant,                     :
                                                    :
          and                                        :
                                                    :
ALUMINUM ASSOCIATION TRADE           :
ENFORCEMENT WORKING GROUP AND ITS  :
INDIVIDUAL MEMBERS, *et al.,*              :
                                                    :
                     Defendant-Intervenors.        :
———————————————————————x

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs Jiangsu Dingsheng New

Materials Joint-Stock Co., Ltd., Dingsheng Aluminium Industries (Hong Kong) Trading Co.,

Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.), Hangzhou

Dingsheng Import & Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.),

Hangzhou Five Star Aluminium Co., Ltd., Hangzhou Teemful Aluminium Co., Ltd., Inner

Mongolia Liansheng New Energy Material Co., Ltd., and Inner Mongolia Xinxing New Energy

Material Co., Ltd. (collectively, "Dingsheng") respectfully move for judgment on the agency

record. Plaintiffs challenge certain aspects of the U.S. Department of Commerce's

("Commerce") final results in the antidumping duty ("ADD") administrative review published as

*Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping*

*Administrative Review and Final Determination of No Shipments; 2021-2022*, 88 Fed. Reg.

76,734 (Nov. 7, 2023) ("*Final Results*").

   Plaintiffs request that the Court remand this matter to Commerce with instructions to

recalculate the antidumping duty rate assigned to Plaintiffs. The legal arguments in support of

this motion are detailed in the attached Memorandum of Law in Support of Plaintiffs' Motion for

Judgment on the Agency Record.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022
212-557-4000

*Counsel for Plaintiffs*

Dated: July 29, 2024.

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

———————————————————————— x
:
JIANGSU DINGSHENG NEW MATERIALS :
JOINT-STOCK CO., LTD.; DINGSHENG :
ALUMINIUM INDUSTRIES (HONG KONG) :
TRADING CO., LIMITED (DINGSHENG :
ALUMINIUM INDUSTRIES (HONG KONG) :  Court No. 23-00264
TRADING CO., LTD.); HANGZHOU :
DINGSHENG IMPORT & EXPORT CO., LTD. :  **PUBLIC VERSION**
(HANGZHOU DINGSHENG IMPORT AND :
EXPORT CO., LTD.); HANGZHOU FIVE STAR :
ALUMINIUM CO., LTD.; HANGZHOU :
TEEMFUL ALUMINIUM CO., LTD.; INNER :
MONGOLIA LIANSHENG NEW ENERGY :
MATERIAL CO., LTD.; and INNER :
MONGOLIA XINXING NEW ENERGY :
MATERIAL CO., LTD., :
:
               Plaintiffs, :
:
    v. :
:
UNITED STATES, :
:
               Defendant, :
:
   and :
:
ALUMINUM ASSOCIATION TRADE :
ENFORCEMENT WORKING GROUP AND ITS :
INDIVIDUAL MEMBERS, *et al.,* :
:
               Defendant-Intervenors. :
———————————————————————— x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022

*Counsel for Plaintiffs*

Dated: July 29, 2024

# TABLE OF CONTENTS

STATEMENT PURSUANT TO USCIT RULE 56.2 ................................................................ 1

   A.   Administrative Determination Subject to Appeal ............................................... 1

   B.   Issues of Law & Argument Summary ............................................................... 1

   C.   Reasons for Contesting the Determination ....................................................... 2

STANDARD OF REVIEW .................................................................................................. 2

STATEMENT OF FACTS .................................................................................................... 3

ARGUMENT ....................................................................................................................... 6

   I.   COMMERCE UNLAWFULLY SELECTED ROMANIA INSTEAD OF MALAYSIA, OR ALTERNATIVELY BULGARIA, AS THE PRIMARY SURROGATE COUNTRY 6

      A.   Criteria For Surrogate Country Selection ........................................................ 7

      B.   Commerce Unlawfully Relied on Minor FOPs—Labor and Domestic Insurance—to Select Romania ................................................................. 9

      C.   Commerce Unlawfully Selected Romanian Labor SVs ................................. 12

      D.   Commerce Unlawfully Relied on Alro Financial Data to Support Romania ............. 15

         1.   Commerce Erroneously Found that Alro's Production Experience was Comparable to Dingsheng's Experience While Rejecting Companies Having More Comparable Experiences ................................................................. 15

         2.   Commerce Unlawfully Selected Financial Data Distorted by Countervailable Subsidies ................................................................. 31

         3.   Alro's Data is Insufficiently Disaggregated ............................................. 35

         4.   Alro's Financial Statement Lacks an Auditor's Report ............................. 38

      E.   For Major Movement FOPs, Romanian SV Data Are Unreliable Or Absent ............. 39

         1.   Truck Freight ........................................................................................ 40

         2.   B&H Data ............................................................................................. 42

   II.   COMMERCE'S DECISION DENYING DINGSHENG A DR OFFSET IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ....................................... 43

CONCLUSION .................................................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ancientree Cabinet Inc. v. United States*,
   532 F.Supp.3d 1241 (CIT 2021) .............................................................37

*BGH Edelstahl Siegen GmbH v. United States*,
   600 F.Supp.3d 1241 (CIT 2022) .........................................................31, 32

*Chevron, U.S.A., Inc. v. NRDC, Inc*,
   467 U.S. 837 (1984) ..................................................................................3

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ..................................................................................2

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ...................................................................3

*Jiaxing Bro. Fastener Co. v. United States*,
   751 F.Supp. 2d 1345 (CIT 2010) .............................................................33

*Loper Bright Enterprises v. Raimondo*,
   144 S.Ct. 2244 (June 28, 2024) .......................................................3, 9, 48

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ...................................................................2

*Queen's Flowers de Colom. v. United States*,
   21 CIT 968 (1997) ...............................................................................13, 14

*Save Domestic Oil, Inc. v. United States*,
   357 F.3d 1278 (Fed. Cir. 2004) .................................................................3

*Shantou Red Garden Foodstuff Co. v. United States*,
   880 F.Supp.2d 1332 (CIT 2012) ........................................................10, 11

*SKF USA, Inc. v. United States*,
   263 F.3d 1369 (Fed. Cir. 2001) .................................................................3

*Tianjin Wanhua Co. v. United States*,
   253 F.Supp.3d 1318 (CIT 2017) ........................................................23, 24

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ..................................................................................3

*Wuhan Bee Healthy Co. v. United States*,
    31 CIT 1182 (2007) ...............................................................................39

**Regulations**

19 C.F.R. § 351.408 ..........................................................................10, 11

**Rules**

USCIT RULE 56.2 ...................................................................................1

**Statutes**

19 U.S.C. § 1516a .................................................................................2

19 U.S.C. § 1677 .......................................................................... *passim*

**Administrative Decisions**

*Activated Carbon from China*,
    87 Fed. Reg. 67,671 (Nov. 9, 2022) (final results) .................................42

*Aluminum Foil from China: Final Determination of Sales at Less Than Fair Value*,
    83 Fed. Reg. 9282 (Mar. 5, 2018) (final determination)..........................13

*Aluminum Foil from China*,
    88 Fed. Reg. 29,092 (May 5, 2023) (preliminary results) .....................5, 6

*Aluminum Foil from China*,
    88 Fed. Reg. 76,734 (Nov. 7, 2023) (final results) ....................... *passim*

*Antidumping Duties; Countervailing Duties*,
    61 Fed. Reg. 7,308 (Feb. 27, 1996) ......................................................22

*Brake Rotors from China*,
    72 Fed. Reg. 42,386 (Aug. 2, 2007) (final results) .................................23

*Cased Pencils from China*,
    78 Fed. Reg. 42,932 (July 18, 2013) (final results) ................................37

*Certain Crystalline Silicon Photovoltaic Products from China*,
    79 Fed. Reg. 76,970 (Dec. 23, 2014) (final determination)......................35

*Certain Steel Nails from China*,
    78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results) ...............................37

*Chlorinated Isocyanurates from China*,
    80 Fed. Reg. 4,539 (Jan. 28, 2015) (final results)..................................36

*Circular Welded Carbon-Quality Steel Pipe from Vietnam,*
    81 Fed. Reg. 75,042 (Oct. 28, 2016) (final determination) ....................................................26

*Crystalline Silicon Photovoltaic Cells from China,*
    81 Fed. Reg. 39,905 (June 20, 2016) ....................................................................................9

*Crystalline Silicon Photovoltaic Products from China,*
    79 Fed. Reg. 76,970 (Dec. 23, 2014) (final determination).................................................8

*Cut-to-Length Carbon Steel Plate from China,*
    75 Fed. Reg. 8301 (Feb. 24, 2010) (final results)................................................................25

*Forged Steel Fittings from China,*
    83 Fed. Reg. 50,339 (Oct. 5, 2018) (final determination) ...........................................12, 38

*Forged Steel Fittings from China.*
    86 Fed. Reg. 53,629 (Sep. 28, 2021) (final results) ............................................................31

*Forged Steel Fluid End Blocks from Germany,*
    85 Fed. Reg. 80,011 (Dec. 11, 2020) (final determination)................................................31

*Forged Steel Fluid End Blocks from Italy,*
    85 Fed. Reg. 79,996 (Dec. 11, 2020) (final determination)................................................31

*Frozen Fish Fillets from Vietnam,*
    77 Fed. Reg. 27,435 (May 10, 2012) (final results)............................................................10

*Frozen Warmwater Shrimp from China,*
    74 Fed. Reg. 46,565 (Sept. 10, 2009) (final results)...........................................................29

*Hand Trucks from China,*
    80 Fed. Reg. 33,246 (June 11, 2015) (final results)............................................................23

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    87 Fed. Reg. 35,165 (June 9, 2022) ......................................................................................3

*Kitchen Appliance Shelving and Racks from China,*
    77 Fed. Reg. 21,734 (Apr. 11, 2012) (final results)............................................................23

*Kitchen Appliance Shelving and Racks from China,*
    78 Fed. Reg. 5,414 (Jan. 25, 2013) (final results)..............................................................23

*Passenger Vehicle and Light Truck Tires from China,*
    83 Fed. Reg. 11,690 (Mar. 16, 2018) (final results) ..........................................................48

*Persulfates from China,*
    66 Fed. Reg. 42,628 (Aug. 14, 2001) (final results) ..........................................................23

*Persulfates from China*,
  68 Fed. Reg. 68,030 (Dec. 5, 2003) (final results)....................................................................23

*Polytetrafluoroethylene Resin from China,*
  83 Fed. Reg. 48,590 (Sept. 26, 2018) (final determination) ..................................................29

*Pure Magnesium from China,*
  73 Fed. Reg. 76,336 (Dec. 16, 2008) (final results)..........................................................28, 29

*Steel Nails from China*,
  78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results) .................................................................8

*Steel Nails from China*,
  79 Fed. Reg. 19,316 (Apr. 8, 2014) (final results) ..................................................................23

*Steel Wire Garment Hangers from China*,
  78 Fed. Reg. 28,803 (May 16, 2013) (final results)................................................................26

*Utility Scale Wind Towers from China*,
  77 Fed. Reg. 75,992 (Dec. 26, 2012) (final determination)......................................................8

*Wooden Cabinets and Vanities and Components Thereof from China*,
  85 Fed. Reg. 11,953 (Feb. 28, 2020) (final determination) ....................................................29

**Other Authorities**

Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004).........................................................................7

This Memorandum is filed by Plaintiffs Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd., Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.), Hangzhou Dingsheng Import & Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.), Hangzhou Five Star Aluminium Co., Ltd., Hangzhou Teemful Aluminium Co., Ltd., Inner Mongolia Liansheng New Energy Material Co., Ltd., and Inner Mongolia Xinxing New Energy Material Co., Ltd. (collectively, "Dingsheng") to support their Motion for Judgment on the Agency Record.

## STATEMENT PURSUANT TO USCIT RULE 56.2

### A. Administrative Determination Subject to Appeal

Dingsheng appeals the U.S. Department of Commerce's ("Commerce" or "Department") final results in the fourth administrative review ("AR4") of the antidumping duty ("ADD") order on Aluminum Foil from the People's Republic of China ("China"), for the period of review ("POR") April 1, 2021—March 31, 2022. *Aluminum Foil from China*, 88 Fed. Reg. 76,734 (Nov. 7, 2023), PR213 ("*Final Results*"), Issues and Decision Memorandum, PR210 ("IDM").

### B. Issues of Law & Argument Summary

1. Commerce unlawfully selected Romania as the primary surrogate country in AR4, instead of Malaysia or, alternatively, Bulgaria. Commerce's decision was contrary to its statutory mandate to select surrogate values ("SV") based on the best information available, and also contrary to its own established practice. First, Commerce improperly relied on the fact that Romania data existed for two minor inputs, labor and domestic insurance, while no such data existed for Malaysia and Bulgaria. Second, Commerce unlawfully used Romanian financial statements to value surrogate ratios, notwithstanding that the Romanian company's production experience was vastly different than Dingsheng's experience, whose actual production

1

experience was comparable to Malaysian and Bulgarian companies' experiences. Third,
Commerce's decision belittled the critical facts that the Romanian financial statement was
distorted by countervailable subsidies, insufficiently disaggregated, and lacked an auditor's
report—whereas those from Malaysia and Bulgaria did not have these disqualifying defects.
Finally, Commerce ignored the fact that Romania data for truck freight and brokerage and
handling ("B&H") were unreliable or absent from the record.

    2.  Commerce's denial of Dingsheng's double remedies ("DR") offset was contrary to law.
Dingsheng demonstrated its statutory entitlement for the offset by submitting substantial
evidence establishing the requisite subsidies-to-cost and price-to-cost linkages. Commerce in
response ignored this evidence and denied the offset because the record did not also show a
decreasing monthly price trend of subject merchandise and also showed that Dingsheng's cost
for energy inputs increased during the POR. Evidence of Dingsheng's normal accounting
practices, and in particular its January 2021 meeting, invalidate Commerce's DR offset denial.

    **C.  Reasons for Contesting the Determination**

    Dingsheng's reasons for contesting the *Final Results* are set forth below.

**<u>STANDARD OF REVIEW</u>**

    This Court must hold unlawful any aspect of Commerce's final determination that is
"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19
U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197,
217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).
The substantial evidence standard requires more than mere assertion of "evidence which in and
of itself justified {the determination}, without taking into account contradictory evidence or

evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

The Supreme Court recently overruled *Chevron, U.S.A., Inc. v. NRDC, Inc*, 467 U.S. 837 (1984), which had directed courts to defer to reasonable interpretations of ambiguous statutes by administrative agencies. *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (June 28, 2024), at 1-2, 35. *Loper* underscores the "solemn duty of the Judiciary" to interpret statutes and "say what the law is." *Id*. at 7-8 (internal quotations omitted). Further, *Loper* forecloses this Court from affirming Commerce's decision merely upon finding that the government's statutory interpretations is "reasonable," and for that reason alone, "must" affirm. *Id*. at 19, 23 (doubting whether an "otherwise-reasonable reading of a statute" could ever be "a clear misconstruction"). *Loper* clarified that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best. **In the business of statutory interpretation, if it is not the best, it is not permissible**." *Id*. at 23 (emphasis added).

Finally, "if Commerce had a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004). "An agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## STATEMENT OF FACTS

On June 9, 2022, Commerce initiated AR4 of the ADD order on aluminum foil from China. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg.

35,165, 35,170 (June 9, 2022), PR8. On August 16, 2022, Commerce selected Dingsheng as a replacement mandatory respondent. Commerce Respondent Selection Memoranda (July 29, 2022 & Aug. 16, 2022), CR19/PR42, CR21/PR53. Dingsheng fully participated in AR4, by timely filing complete and accurate responses to Commerce's questionnaires. *See, e.g.*, Dingsheng Section D Questionnaire Response (Oct. 12, 2022), CR54-63/PR89-91 ("DQR").

In September 2022, Commerce solicited surrogate country ("SC") and SV information. Commerce Letter (Sept. 29, 2022), PR79-82 ("Commerce SC/SV Request") at 1-2. Commerce provided a non-exhaustive list of six countries—Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Turkey—at the same level of economic development as China, and requested information on: (1) that list; (2) surrogate country selection; and (3) factors of production ("FOP") valuation. *Id*.

In October 2022, Dingsheng commented that, per established Commerce practice, all six countries are at the same level of economic development as China. Dingsheng Letter (Oct. 6, 2022), PR85. Dingsheng subsequently submitted its surrogate country comments, reiterating that all six countries satisfied the statutory criterion of economic comparability. Dingsheng Letter (Oct. 18, 2022), PR92-93. Dingsheng then established that, based on relevant export-import data, Romania, Turkey, Bulgaria, and Malaysia satisfied the statutory criterion of significant production of comparable merchandise. *Id*. Dingsheng argued that the primary surrogate country should be based on the country that affords the best quality of SV data for material inputs and financial statements of identical merchandise producers. *Id*. Defendant-Intervenors, Aluminum Association Trade Enforcement Working Group and its members (collectively, "Petitioners") agreed. Petitioners Letter (Oct. 18, 2022), PR94. Petitioners named the same four countries that Dingsheng identified, arguing that the country with the best SV data should be selected. *Id*.

In November 2022, Dingsheng provided SV information from Bulgaria to value the FOPs. Dingsheng's First SV Comments (Nov. 21, 2022), PR102-08 ("Dingsheng 11/22 SV"). That day, Petitioners provided SV information from Malaysia to value Dingsheng's FOPs. Petitioners' Preliminary SV Comments (Nov. 21, 2022), PR110-12 ("Petitioners 11/22 SV"). In December 2022, Dingsheng filed rebuttal SV data, including a Bulgarian financial statement to calculate surrogate financial ratios. Dingsheng Final SV Comments (Dec. 1, 2022), PR116-17 ("Dingsheng 12/22 SV"), Exhibits 1-3. In March 2023, Dingsheng provided SV information from Malaysia. Dingsheng Final SV Comments Part 1 (Mar. 29, 2023), PR155-59 ("Dingsheng 3/23 SV") and Petitioners provided Romanian SV information. Petitioners' Final SV Comments (Mar. 29, 2023), PR146-51 ("Petitioner 3/23 SV").

In April 2023, Dingsheng rebutted the Romanian SV information submitted by Petitioners. Dingsheng's Final SV Rebuttal (Apr. 10, 2023), PR179-84 ("Dingsheng 4/23 SV Rebuttal"). Dingsheng submitted comments supporting the choice of Malaysia or, alternatively, Bulgaria, and opposing Romania. Dingsheng Pre-Preliminary Comments and Rebuttal to Petitioners' Pre-Preliminary Comments (Apr. 11, 2023), PR185-86.

On May 5, 2023, Commerce issued its AR4 preliminary results assigning Dingsheng a 32.85% ADD rate. *Aluminum Foil from China* 88 Fed. Reg. 29,092 (May 5, 2023), PR194 ("*Preliminary Results*"); Preliminary Decision Memorandum (Apr. 28, 2023), PR189 ("PDM"). Commerce preliminarily selected Romania as the primary surrogate country. Commerce Preliminary SV Memorandum (Apr. 28, 2023), PR190-91.

In its June 5, 2023 Case Brief, Dingsheng requested that Commerce select Malaysia, or alternatively Bulgaria, as the primary surrogate country. Dingsheng Case Brief (June 5, 2023)

PUBLIC VERSION

CR83/PR198, at 2-41. Furthermore, Dingsheng requested that Commerce grant its claim for a DR offset adjustment. *Id*. at 43-51.

On November 7, 2023, Commerce published its *Final Results*, modifying its *Preliminary Results* by assigning Dingsheng a 32.81% ADD rate. 88 Fed. Reg. at 76,735. Commerce rejected Dingsheng's SC/SV arguments. IDM Comments 1-3. Commerce adhered to its preliminary decision that Romania was the primary surrogate country; continued to value truck freight and B&H expenses with Romanian SV data; valued financial ratios using Romanian Alro's financial statements; and denied Dingsheng's DR offset adjustment. *Id*. Dingsheng subsequently initiated this appeal. Summons (Dec. 7, 2023); Complaint (Jan. 8, 2024).

## ARGUMENT

### I.    COMMERCE UNLAWFULLY SELECTED ROMANIA INSTEAD OF MALAYSIA, OR ALTERNATIVELY BULGARIA, AS THE PRIMARY SURROGATE COUNTRY

In the *Final Results*, Commerce selected Romania over Malaysia and Bulgaria as its primary surrogate country, reasoning "that Romania data represent the best available information to value Dingsheng's FOPs." IDM at 6. Commerce advanced three reasons for preferring Romania:

1. Unlike Romania, "the Malaysian and Bulgarian data for labor and domestic insurance are either non-contemporaneous or unavailable;"

2. "{T}he Romanian freight and brokerage and handling data are contemporaneous with the POR, whereas the Malaysian freight rates on the record were published in 2017." *Id*. at 7. Further, because "like Romania, Bulgarian freight and brokerage data are derived from World Bank data," they are not superior to Romanian SV data; and

3. "Alro. . .'s 2021 financial statements are more specific to Dingsheng's integrated production process than either the Malaysian or Bulgarian companies' financial statements."

*Id*. at 6-7.

6

This decision is unsupported by substantial evidence and is contrary to controlling law and well-established administrative precedent.

### A.    Criteria For Surrogate Country Selection

In non-market economy ("NME") ADD proceedings, Commerce is required by law to value FOPs based on the "best available information" in one or more suitable market economy countries. 19 U.S.C. § 1677b(c)(1)(B). Further, when valuing the FOPs, Commerce "shall utilize, to the extent possible, the prices or costs of {FOPs} in one or more market economy countries that are— (A) at a level of economic development comparable to that of the non-market economy country, and (B) significant producers of comparable merchandise." *Id*. § 1677b(c)(4).

In AR4, Commerce correctly determined that all three candidate countries—Malaysia, Bulgaria, and Romania—satisfy the twin statutory criteria of economic comparability and significant production of comparable merchandise. PDM at 11-13, unchanged in *Final Results*. Consequently, the statute and Commerce's well-established policy required that "the country with the best factors data is selected as the primary surrogate country {because} data quality is a critical consideration affecting surrogate country selection." Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004).

In accordance with this policy, Commerce asked parties to "submit information regarding the selection of a surrogate country" focusing on major inputs and financial statements:

(1) "availability and quality of data within that single country for the **major {FOPs}**" and

(2) "availability and quality of **financial statements** within that country **for producers of merchandise identical** or comparable **to the merchandise subject to this review**."

Commerce's SC/SV Request at 1-2 (emphases added).

7

Commerce's specific identification of financial statements underscores their critical importance in selecting a primary surrogate country. Since financial ratios are applied to the total cost of material, labor and energy, the resulting amount of: (a) overheads, (b) sales, general, and administrative expenses ("SGA") and (c) profit before tax, in the aggregate, form a substantial proportion of the normal value ("NV") build-up—and consequently are a key determinant of the ultimate margin. Therefore, the quality of financial statements constitutes a critical factor in the selection of a primary surrogate country. *Steel Nails from China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) (final results), IDM Comment 1D ("Unlike Ukraine, which upon fuller consideration has no useable financial statements on the record, as discussed below, the Department finds that Thailand has reliable information to value all of the inputs, including two financial statements to calculate the financial ratios, that compose the Respondents' respective {NV} calculations.")

Similarly, the quality of SV data for the major FOPs is a critical factor in the primary surrogate country selection. See *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012) (final determination), IDM Comment 1 ("the Department has selected Thailand as the surrogate country for the final determination because . . . Thailand offers the best available SV data . . . {T}he Department has also found that Thai import data allows the Department to value each respondent's steel plate, which accounts for a significant portion of each company's {NV}, more accurately than either the South African or Ukrainian data because the Thai data is most specific to the size and chemistry of the respondents' steel plate."); *Crystalline Silicon Photovoltaic Products from China*, 79 Fed. Reg. 76,970 (Dec. 23, 2014) (final determination), IDM Comment 2 ("The Department favors one country over another on the basis of {SV} specificity, where a {SV} from one country representing a significant portion of normal value is more specific to a respondent's input.")

In contrast, the data quality of minor FOPs is at best, a secondary consideration in Commerce's surrogate country selection process. *Crystalline Silicon Photovoltaic Cells from China*, 81 Fed. Reg. 39,905 (June 20, 2016) (final results), IDM Comment 1 ("we continue to choose Thailand as the primary surrogate country . . . . Thai {SV} data cover all of the {SVs} that the Department requires with the exception of chlorine, a minor input . . .  chlorine is the only input for which the record does not include Thai surrogate data. However, chlorine is a minor input, accounting for an insignificant portion of direct material costs . . . .").

By following the policy discussed above – relying on financial statements and major inputs and ignoring minor inputs in selecting the primary surrogate country and SVs – Commerce would have adhered to the statutory mandate of relying on the "best available information" to value FOPs. By departing from this policy, Commerce's decision was contrary to law. And, as discussed, in reviewing Commerce's methodology upon which its decision was based, this Court no longer defers to Commerce's analysis; rather this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the "best available information." *See Loper*, 144 S.Ct. 2244.

### B.    Commerce Unlawfully Relied on Minor FOPs—Labor and Domestic Insurance—to Select Romania

Commerce relied on the presence of Romanian SVs for labor and domestic insurance as one of its three pillars to support selecting Romania over Malaysia and Bulgaria. Commerce found that, unlike Romania, "the Malaysian and Bulgarian data for labor and domestic insurance are either non-contemporaneous or unavailable." IDM at 6. Commerce also deemed "Dingsheng's arguments unpersuasive concerning labor and domestic insurance being minor production elements." *Id*. As shown below, this rationale does not withstand scrutiny.

First, labor and domestic insurance are minor inputs. Commerce's final margin log shows that the sum total of direct, indirect, and packing labor accounts for only [  ] percent of Dingsheng's NV build up and domestic insurance accounts for [     ] percent of Dingsheng's U.S. net adjusted sale price.[1] *See* **Attachment** containing Dingsheng's NV build-up in the *Final Results*. Commerce's reliance on these minor inputs is especially egregious in light of the facts that Commerce's other surrogate country selection yardsticks—*i.e.*, financial statements, truck freight, and B&H SV data—reveal that Romanian SV data are inferior to Malaysian and Bulgarian SV data, discussed *infra*. As Commerce found over a decade ago:

> While we note that the Philippine and Indonesian data for the **minor inputs** (i.e., besides whole fish) are more contemporaneous than the Bangladeshi data, the whole fish input and the surrogate financial ratios account for the vast majority of NV and thus are by far the predominant factors in selecting a **surrogate country**. Therefore, we find that the Bangladeshi financial ratios support selecting Bangladesh as the primary **surrogate country**.

*Frozen Fish Fillets from Vietnam*, 77 Fed. Reg. 27,435 (May 10, 2012) (final results), IDM Comment IC(ii) (emphases added).

Accordingly, Commerce's cursory rejection of Dingsheng's arguments—that minor production inputs should not influence the surrogate country selection—is "unpersuasive," IDM at 6, contrary to Commerce's well-established practice, and contrary to law.

Further, to support Romania, Commerce misconstrues its Regulation that "pursuant to 19 CFR § 351.408(c)(2), Commerce has a regulatory preference for valuing all FOPs in a single surrogate country". IDM at 6. This regulation does not require that Commerce limit its choice of the primary surrogate country to only a country that proffers SV data for all FOPs. *Shantou Red Garden Foodstuff Co. v. United States* is instructive:

---

[1] We note that Commerce erroneously applied "0" SV to this FOP. However, even using the Romanian SV for domestic insurance, its margin impact is [        ].

PUBLIC VERSION

> The antidumping statute does not confine the choice of {SV}s to a single
> surrogate country. . . 19 U.S.C. § 1677b(c)(1) (2006). Here, Commerce gave
> effect to what it described as a "practice" of using a single surrogate country, even
> though Commerce, in past cases, has departed from that course of action when it
> has concluded that better data were available from another country that qualified
> as a surrogate country.

880 F.Supp.2d 1332, 1334 (CIT 2012).

Given its longstanding practice and solicitation of SV data in AR4 focusing on financial statements and major FOPs, Commerce's reliance on the fact that Romania alone proffers contemporaneous SVs for labor and domestic insurance (representing merely [ ] percent of the NV buildup and [     ] percent of adjustments from U.S. price) renders its decision to select Romania as the primary surrogate country contrary to law.

Moreover, Commerce's regulation simply provides that "the Secretary normally will value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2) (emphasis added). Read in conjunction with the statutory mandate to select the "best available information" regarding SVs "in a market economy country **or countries**," 19 U.S.C. § 1677b(c)(1) (emphasis added), the regulation does not require that Commerce select all SV data from only one surrogate country, regardless of their quality. Consequently, Commerce's rationale that Romania alone proffered contemporaneous SVs for labor and domestic insurance—both fringe FOPs—does not support its decision. In relying on the presence or absence of data for these minor inputs as a linchpin of its decision, Commerce unlawfully mutated a regulatory preference into an absolute requirement. Commerce also violated the statutory mandate to select the "best available information" for valuing FOPs.

Significantly, Commerce could have correctly selected either Malaysia or Bulgaria as the primary surrogate country, and at the same time relied on Romanian SVs to value labor and domestic insurance under 19 U.S.C. § 1677b(c)(1) and 19 C.F.R. § 351.408(c)(2). In other

words, Romania's selection as a primary surrogate country is not a prerequisite for Commerce to

use Romanian labor and domestic insurance SV data. Therefore, Commerce's rationale that

superior Romanian SVs for minor inputs labor and domestic insurance validated Romania as its

primary surrogate country choice was contrary to law.

### C.    Commerce Unlawfully Selected Romanian Labor SVs

Commerce's finding that Romanian labor SV is superior to Malaysian and Bulgarian

labor SV was based solely on its contemporaneity. However, the underlying Malaysian and

Bulgarian ILO SV data for calendar year 2020 are merely three months removed from the POR.

Petitioners 11/22 SV Attachment MY-4; Dingsheng 11/22 SV Exhibit 4. The record does not

evidence Malaysian or Bulgarian labor costs changed between December 2020 and April 1,

2021, when the POR commenced.

Moreover, when faced with contemporaneity issues, Commerce's normal policy is to

bridge the gap between the SV data and the POR by applying relevant IMF-published inflators,

Petitioners 11/22 SV Attachment MY-4; Petitioners 3/23 SV Excel Tab: "IFS PPI inflator," to

"adjust non-contemporaneous data to the {POR} by appropriately inflating . . . the

data . . . .{since c}ontemporaneity is a correctable issue and does not preclude our consideration

of the available data on the record here." *Forged Steel Fittings from China*, 83 Fed. Reg. 50,339

(Oct. 5, 2018) (final determination), IDM Comment 2. However, Commerce unlawfully failed to

rely on its policy to apply an inflator to 2020 data. Commerce thereby contradicted its own

administrative practice and acted without substantial evidence.

Alternatively, even if Commerce ultimately decided to rely on Romanian labor SV,

Commerce, per its established policy, was mandated to select the most suitable primary surrogate

country, which, on this record, is Malaysia, or alternatively Bulgaria. Either way, the Romanian

12

labor SV data's slightly better contemporaneity should not constitute a linchpin of Commerce's decision to select Romania as the primary surrogate country.

Commerce's decision with respect to labor in AR4 is also inconsistent with its decision on the same issue in the underlying investigation:

> **Zhongji argues that the Bulgarian labor data . . . are preferable to the South African labor data because the Bulgarian data are contemporaneous with the POI**. . . . Although Commerce always attempts to value each FOP with contemporaneous SVs, in some prior cases **Commerce has selected a labor value from the selected surrogate country regardless of there being other values on the record that may have been more contemporaneous to the . . . POR.** The South African labor data on this record reflect wages from the South African manufacturing sector which we continue to find an appropriate metric for valuing labor inputs in the aluminum industry. Furthermore, **we note that the non-contemporaneous labor data in this case are from four years prior to the POI**. Thus, unlike the proposed 20-plus-year-old Indian surrogate data for nitrogen and argon, **we find it reasonable to inflate these data given their relative contemporaneity to the POI. Based upon the foregoing, and consistent with the position we took in *Passenger Tires* and *Transfer Presses*, where Commerce used non-contemporaneous SV data to value labor, we continue to find South African data are an appropriate basis to value labor.**

*Aluminum Foil from China: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 9282 (Mar. 5, 2018), IDM Comment 1 (emphases added).

Commerce fails to reconcile the rejection of Malaysian/Bulgarian labor SV data, which were only three months prior to the POR, with its selection of South African labor SV data that were four years removed from the POI in the investigation. By law, Commerce cannot change its settled position without supplying adequate reasons. As this Court reasoned in *Queen's Flowers de Colom. v. United States*:

> It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . . The rule also . . . 'prohibit{s} the agency from adopting significantly inconsistent policies that result in the creation of 'conflicting lines of precedent governing the identical situation.' . . . Commerce has the flexibility to change its position providing that it explain the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence. Commerce gave no explanation for its departure from its position in Roses and Pocket Lighters. In fact, Commerce did

13

> not acknowledge that an inconsistency exists between those cases and the
> determination here.

21 CIT 968, 976-77 (1997).

Accordingly, Commerce's determination to abandon its prior practice without any explanation is unlawful. In fact, based on the "Al Foil from China Investigation - labor SV selection," because "the non-contemporaneous {Malaysian and Bulgarian} labor data in this case are from {only three months} prior to the {POR,} . . . it {is} reasonable to inflate these data given their relative contemporaneity to the {POR}." *Id*. Consequently, Commerce's selection of Romania, rather than Malaysia or Bulgaria, as the primary surrogate country directly contradicts its practice in this proceeding "regardless of there being . . . {Romanian labor SV} on the record that may have been more contemporaneous to the . . . POR." *Id*.

Likewise, because there is [                    ] domestic insurance amount offset involved in obtaining the U.S. net adjusted sale price, domestic insurance does not impact Dingsheng's margin. Therefore, the absence of Malaysian or Bulgarian SV data for domestic insurance is not a relevant factor in surrogate country selection. Because Commerce improperly employed irrelevant SV data to support its selection of Romania, that decision is unsupported by substantial evidence and controlling precedent.

In sum, Commerce's selection of Romania as the primary surrogate country based on the presence of contemporaneous labor and domestic insurance SV data from Romania was contrary to both agency practice and law.

14

### D.    Commerce Unlawfully Relied on Alro Financial Data to Support Romania

A second linchpin of Commerce's selection of Romania is its finding that "Alro S.A./Alro Group's 2021 financial statements are more specific to Dingsheng's integrated production process than either the Malaysian or Bulgarian companies' financial statements." IDM at 7. As shown below, these findings and conclusions contradict substantial record evidence. In addition, Commerce improperly determined that Alro's financial was undistorted by countervailable subsidies and overlooked its inferior data quality as compared to Malaysian and Bulgarian financial statements. *Id*. at 8. Finally, Commerce inaccurately determined that Alro's financial statement is complete notwithstanding that it is missing an independent auditor's report. *Id*.

### 1.    Commerce Erroneously Found that Alro's Production Experience was Comparable to Dingsheng's Experience While Rejecting Companies Having More Comparable Experiences

Commerce selected Alro's financial statement based on its factual analysis of Dingsheng and Alro production experiences. As discussed below, contrary to Commerce's findings, the production experiences of both the parent company, Alro S.A., and the Alro Group (*i.e.* Alro S.A. and its subsidiaries) are vastly different than Dingsheng's experience. At the same time, Commerce erred by improperly rejecting the financial statements of UACJ in Malaysia and the Elena Group in Bulgaria based on the agency's erroneous conclusion that their production experiences are not comparable to Dingsheng's experience.

Record evidence shows that Dingsheng's finished products consist predominantly of aluminum foil, including in-scope merchandise. DQR Exhibit D-5. Dingsheng purchases key production inputs such as aluminum ingot and aluminum strip. It then melts the ingots in a furnace to produce aluminum liquid, which is purified in a holding furnace. The aluminum liquid

PUBLIC VERSION

then is subjected to a continuous casting process to produce aluminum sheet/strip. *Id*. Exhibits D-1, D-2a, D-3, D-5. Dingsheng converts the purchased or self-produced aluminum sheet/strip to aluminum foil in a manufacturing assembly line consisting of cold rolling machines, foil rolling machines, annealing furnaces, cutting and slitting machines, etc. *Id*.

Notably, Dingsheng is **<u>not</u>** engaged in:

**(1)** ***mining of bauxite; or***

**(2)** ***extraction of alumina from bauxite; or***

**(3)** ***production of primary aluminum products such as aluminum ingot by refining alumina***.

*Id*. Exhibit D-5.

Alro's production experience is not comparable to Dingsheng's. Unlike Dingsheng, Alro is involved in myriad disparate **mining**, **refining**, manufacturing, and **non-manufacturing activities** (*e.g*., marketing, sales, management). It is a quintessentially "**vertically-integrated**" company with its operations tiered "in four segments: Bauxite, Alumina, Primary Aluminium and Processed Aluminium." Petitioners 3/23 SV Attachment RO-7 at 17. The operations of the four business segments are set forth below:

> ➢ "**Bauxite segment** consists of the bauxite mine operated by the Group in Sierra Leone (Africa) and includes SMHL, Global Aluminium and Bauxite Marketing;";

> ➢ "**Alumina segment** consisting of the Group's alumina production operations, is the main raw material for aluminium smelting and includes the alumina refinery, ALUM";

> ➢ "**Primary Aluminium segment** manufactures primary aluminium products such as wire rod, slabs, billets and mainly includes the Anodes section, Electrolysis section, the Casting House and Eco-Recycling Facility."; and

> ➢ "**Processed Aluminium segment** develops flat rolled products ("FRPs") such as plates, sheets, coils and strips, and extruded products." *Id.*

Thus, the Alro Group is, in the true sense, a vertically integrated producer of aluminum products

(but not foil) starting from:

(a) mining of bauxite—bauxites are minerals in the form of rough stones made out of aluminum hydroxide. Dingsheng 4/23 SV Rebuttal Exhibit 6 at 2/6.

to

(b) extraction of alumina from bauxite—

"Bauxite is crushed, dried and ground in special mills where it is mixed with a small amount of water. This process produces a thick paste that is collected in special containers and heated with steam to remove most of the silicon present in bauxites." *Id*.

to

(c) refining of alumina into primary aluminum products by a reduction process—

"At an aluminum smelter, alumina is poured into special reduction cells with molten cryolite at 950℃. Electric currents are then induced in the mixture at 400 kA or above; this current breaks the bond between the aluminum and oxygen atoms resulting in liquid aluminum settling at the bottom of the reduction cell." *Id*. at 3/6.

to

(d) conversion of primary aluminum products to highly processed aluminum products including those used in sophisticated applications such as in aerospace, automotive and marine industries. Petitioner 3/23 SV Attachment RO-7 at 16-20.

Summarized below is the Alro Group's production of bauxite, alumina, primary

aluminum, and processed aluminum products:

**ALRO GROUP**

| Indicator | Q3 2022 | Q3 2021 | Q1-Q3 2022 | Q1-Q3 2021 |
|---|---|---|---|---|
| Primary aluminium production (tonnes) | 35,700 | 73,467 | 154,338 | 219,619 |
| Processed aluminium production (tonnes) | 15,048 | 29,473 | 74,376 | 84,209 |
| Alumina production (tonnes) | 8,918 | 111,729 | 108,405 | 370,220 |
| Bauxite production (tonnes) | 268,187 | 359,375 | 749,756 | 991,551 |

Dingsheng 4/23 SV Rebuttal Exhibit 4C at 5.

PUBLIC VERSION

This chart shows that during Q1-Q3 2021, which overlaps the POR, Alro Group's bauxite production of 991,551 tonnes accounted for approximately 60% of its total production of 1,665,599 tonnes. *See id*. (summing numbers in last column). In contrast, its processed Al production segment—aluminum FRPs (but not foil)—reported 84,209 tonnes, merely 5% of the total production. Therefore, the Alro Group is not only vastly more vertically integrated than Dingsheng, but it also has manufacturing operations skewed towards the production of upstream aluminum products—bauxite, alumina, and primary aluminum products—instead of processed aluminum products.

Alro S.A. (whose financial statement Commerce used in the *Final Results*) refines alumina to produce primary aluminum products and processed aluminum FRPs, but ***Alro S.A. does not produce aluminum foil***.[2] Summarized below is Alro S.A.'s production and sales of primary aluminum and processed aluminum products.

**ALRO S.A.**

| Indicator | Q3 2022 | Q3 2021 | Q1-Q3 2022 | Q1-Q3 2021 |
|---|---|---|---|---|
| Primary aluminium production (tonnes) | 35,700 | 73,467 | 154,338 | 219,619 |
| Processed aluminium production (tonnes) | 8,131 | 22,986 | 54,153 | 65,718 |
| Primary aluminium sales (tonnes) | 21,224 | 37,740 | 72,098 | 120,440 |
| Processed aluminium sales (tonnes) | 11,778 | 22,171 | 53,654 | 65,912 |

The above chart shows that during Q1-Q3 2021, which overlaps the POR, Alro S.A.'s primary aluminum production of 219,619 tonnes accounts for approximately 77% of its total production of 285,337 tonnes. In contrast, its processed aluminum production segment reports 65,718 tonnes, barely 23% of the total production. Thus, in contrast to Dingsheng's production experience—consisting solely of processed aluminum products especially foil—Alro S.A.'s

---

[2] Alro S.A. is not involved in the mining of bauxite or extraction of alumina.

18

production experience is focused on the production of primary aluminum products.

In order to produce primary aluminum products, Alro S.A. refines alumina in electrolysis plants. Dingsheng 4/23 SV Rebuttal Exhibit 4C at 5. To that end, "four production units are required *for the production of electrolytic aluminum* and its further processing into aluminum products." *Id*. Exhibit 4D. In contrast, as noted *supra*, **Dingsheng purchases rather than produces the primary aluminum inputs**, and does not employ any machinery or equipment for the production of primary aluminum inputs.

Alro S.A.'s vertical integration is confirmed by its upstream manufacturing activities for production of primary aluminum inputs, described below:

- **Anode facility**—"producing the anodes necessary for the electrolytic process."

- **Electrolysis Section**—"The Electrolysis Section produces electrolytic aluminium. The electrolytic cell represents the main production unit of this facility. There are 132 electrolytic cells in each of the six pot rooms. At this time five electrolysis pot rooms are in operation."

*Id*.

As such, substantial evidence proves that, as compared to Dingsheng, Alro's production experiences are significantly more vertically integrated and disparate. And, as noted, Alro did not produce any aluminum foil during the POR. In contrast, Malaysian UACJ and Bulgarian Elena are not vertically integrated and produce aluminum foil. Petitioners 11/22 SV Attachments MY-7 & MY-9; Dingsheng 4/23 SV Rebuttal Exhibits 1B-C. The chart below summarizes the main products that Dingsheng, Alro, UACJ, and Elena produce:

PUBLIC VERSION

| Company | Main Products Produced |
|---|---|
| Dingsheng | Aluminum foil |
| Alro S.A. | Aluminum: Wire rods, Billets, Slabs, Ingots, Coils, Sheets, Plates, Profiles |
| Alro Group | Bauxite, Alumina and Aluminum: Wire rods, Billets, Slabs, Ingots, Coils, Sheets, Plates, Profiles |
| UACJ | Aluminum foil |
| Elena | Aluminum foil |

The comparative manufacturing chart below compares the manufacturing operations of Dingsheng, Alro, UACJ, and Elena.

| Company Production Process Comparison | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Company** | **Bauxite Mining** | **Extraction of alumina from bauxite** | **Production of primary Al products** | **Smelting** | **Casting** | **Cold Rolling (Production of Al strip)** | **Foil Rolling (Production of aluminum foil)** |
| **Dingsheng** | NO | NO | NO | YES | YES | YES | YES |
| **Alro S.A.** | NO | NO | YES | YES | YES | YES | NO |
| **Alro Group** | YES | YES | YES | YES | YES | YES | NO |
| **UACJ** | NO | NO | NO | YES | YES | YES | YES |
| **Elena** | NO | NO | NO | NO | NO | YES | YES |

Notwithstanding these facts, Commerce in the *Final Results* claimed that "consistent with our analysis in the *Preliminary Results*, we continue to find that Romanian company, Alro S.A./Alro Group, represents the best available information on the record of this review for calculating surrogate financial ratios." IDM at 7. In doing so, Commerce compounded its erroneous preliminary finding *conflating* Alro's "processed aluminum segment's" production of "{FRPs} such as plates, sheets, coils and strips, and extruded products" with production of aluminum foil. *Id.* at 17, 27. Commerce incorrectly inferred that "Alro S.A. reported production of 86,000 metric tons of processed aluminum foil in 2021, which represents 48.5 percent of the Alro Group's 2021 sales to external customers." PDM at 14-15. This finding is incorrect because the record evidence establishes that **_neither Alro S.A. nor Alro Group produce the identical merchandise, aluminum foil_**. Petitioners 3/23 SV Attachment RO-7.

By contrast, it is undisputed that **_both UACJ and Elena produce aluminum foil_**. Petitioners 11/22 SV Exhibits MY-7 & MY-9; Dingsheng 12/1 SV Exhibits 1B-C. Therefore, UACJ and Elena's financial ratios, unlike Alro's, are reliably representative of Dingsheng's overhead, SGA, and profits.

Commerce policy unambiguously favors the financials of producers of identical over comparable merchandise:

> Given the importance of manufacturing overhead, general expenses and profit in the calculation of normal value, {Commerce} believes it is important to seek information that is as accurate as possible. . . . {P}aragraph (c)(4) expresses a preference for using non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country for valuing manufacturing overhead, general expenses and profit. Because {Commerce} expects that these elements will vary widely across industries, we will attempt to obtain data that is *as specific as possible to the subject merchandise.*

*ADD; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Feb. 27, 1996) (emphasis added).

Longstanding Commerce practice implements this policy:

> With regard to Hitech, information on the record indicates that it does not produce any nails, but rather produces comparable merchandise, i.e., screws and other products. Although it produces comparable merchandise and its financial statements are otherwise usable, consistent with our practice, there is no need to consider using a company that makes only comparable merchandise when there are usable financial statements on the record from companies that produce identical merchandise. Thus, we find that the Hitech financial statements are not the best information on the record for surrogate valuation purposes, given that there are suitable producers of identical merchandise on the record.

*Steel Nails from China*, 79 Fed. Reg. 19,316 (Apr. 8, 2014) (final results), IDM Commet 2; *see*

*Brake Rotors from China*, 72 Fed. Reg. 42,386 (Aug. 2, 2007) (final results), IDM Comment 2.

Commerce reached the same conclusion in *Hand Trucks from China*:

> {W}hile the record indicates that TS Steel is a producer of comparable merchandise, there are financial statements of other Thai producers on the record that demonstrate the production of identical merchandise to New-Tec. It is the Department's practice that when there are financial statements of companies who produce merchandise that is identical to the subject merchandise, we will not use financial statements of producers of comparable merchandise.

80 Fed. Reg. 33,246 (June 11, 2015) (final results), IDM Comments 1; *see Kitchen Appliance Shelving and Racks from China*, 78 Fed. Reg. 5,414 (Jan. 25, 2013) (final results), IDM Commerce 1; *Kitchen Appliance Shelving and Racks from China*, 77 Fed. Reg. 21,734 (Apr. 11, 2012) (final results), IDM Comment 2.A; *Persulfates from China*, 68 Fed. Reg. 68,030 (Dec. 5, 2003) (final results), IDM Comment 1; *Persulfates from China*, 66 Fed. Reg. 42,628 (Aug. 14, 2001) (final results), IDM Comment 5.

Further, Commerce's preference for financial statements of an identical merchandise producer over a comparable merchandise producer is a critical factor in its selection of a primary surrogate country. In *Tianjin Wanhua Co. v. United States*, this Court affirmed this link:

> Although the South African producer made 'comparable merchandise' such as polyethylene film, the Indonesian producer, made 'identical merchandise.' **Relying on a 'preference for selecting the financial statements of a producer of identical merchandise over a producer of comparable merchandise,' Commerce preliminarily selected Indonesia as the primary surrogate**

23

**country** for the administrative review. . . . Commerce issued its Final Results . . . based on Indonesia as the primary surrogate country. . . . The court therefore sustains Commerce's selection of Indonesia.

253 F.Supp.3d 1318, 1324 (CIT 2017) (emphasis added).

Therefore, Commerce's selection of Alro financial data over UACJ and Elena—despite Alro **not** producing aluminum foil while both UACJ and Elena produce aluminum foil—and, consequently, its choosing Romania over Malaysia or Bulgaria—violates its well-established practice and longstanding policy, and, accordingly, is contrary to law.

As the facts above also confirm, Commerce further erred in the *Final Results* in concluding "that Dingsheng, like Alro . . . , is an integrated producer of aluminum products." IDM at 7. In support, Commerce reasoned that Dingsheng "engages in smelting and refining of primary aluminum inputs, followed by casting and cold-rolling operations." *Id*. This conclusion is false. Record evidence shows that Dingsheng, unlike Alro, does not produce primary aluminum products like ingots and upstream aluminum inputs like bauxite and alumina.

Separately, Commerce claimed "Dingsheng's level of vertical integration to be higher than that of either UACJ Malaysia or Elena." *Id*.  In support, Commerce cryptically reasoned that "Elena's manufacturing of aluminum products is limited to downstream household foil" and "UACJ Malaysia engages in no smelting or casting operations, and its production process is limited to rolling and finishing." *Id*. These findings are unsupported by substantial evidence. Once again, Commerce's statements are false.

UACJ's production operations are comparable to Dingsheng's in terms of finished goods produced (*i.e*., aluminum foil), raw materials consumed (*i.e*., aluminum strip or sheet), and non-integrated manufacturing operations. Notably, neither UACJ nor Dingsheng mine bauxite or refine alumina or produce primary aluminum products. Further, record evidence establishes that

PUBLIC VERSION

UACJ, like Dingsheng, employs rolling machines, cutting machines, annealing furnace, etc. to produce aluminum foil. Petitioners 11/22 SV Attachments MY-7 & MY-9. Conversely, UACJ's production process differs from Dingsheng only in secondary respects such as not consuming primary aluminum inputs and using 100% purchased aluminum strip instead of a mix of purchased and self-produced aluminum strip—secondary facts upon which Commerce's selection was not based. In sum, overwhelming evidence establishes that, contrary to Commerce's conclusion, UACJ's production process and level of integration are closely comparable to Dingsheng. Therefore, UACJ's financial ratios, unlike Alro's, reliably represent Dingsheng's overhead, SGA, and profit. Further, Elena's overall production experience (based on its aluminum foil production) is more comparable to Dingsheng than Alro's experience.

Commerce's choice of integrated Alro S.A. over non-integrated UACJ contradicts its well-established practice of using financial statements mirroring a respondent's level of integration. In *Cut-to-Length Carbon Steel Plate from China*, Commerce explained as follows:

> Essar's . . . financial statements are also suitable because Essar is at the same level of integration as Valin Xiangtan. In contrast, Tata is more integrated than Valin Xiangtan because it is a steel company that mines its own inputs, including coal and iron ore. . . . We find the level of vertical integration to be an important distinction among the potential steel companies' financial statements because the costs associated with mining operations would not accurately reflect the costs of Valin Xiangtan. . . . {I}t is the Department's practice to select financial statements of surrogate companies which best approximate the respondent's experience. As such, we have determined not to use Tata's . . . financial statements since Essar purchases its iron ore and coal and is therefore at the same level of integration as Valin Xiangtan.

75 Fed. Reg. 8301, 8303 (Feb. 24, 2010) (final results).

Likewise, in *Circular Welded Carbon-Quality Steel Pipe from Vietnam*, Commerce rejected an integrated financial statement reasoning that:

> Based on the product mix listed in each financial statement, all but one of the financial statements show that the companies are non-integrated producers (for

> Hariom, billets and strips are among the company's products, indicating likely integration). We are also disregarding Hariom's financial statements because Hariom appears to be an integrated producer, while our two respondents are non-integrated (e.g., they buy and do not produce their hot-rolled strip input).

81 Fed. Reg. 75,042 (Oct. 28, 2016) (final determination), IDM Comment 1.

Moreover, Commerce's attempt to distinguish UACJ and, to a lesser extent, Elena, from Dingsheng based on minor production differences contradicts its practice because "for purposes of selecting surrogate producers, . . . the Department is not required to 'duplicate the exact production experience of' an NME producer" *Steel Wire Garment Hangers from China*, 78 Fed. Reg. 28,803 (May 16, 2013) (final results), IDM Comment ID. Commerce's rationale is especially egregious given the dramatic differences, discussed above, between Dingsheng's and Alro's production experiences. Commerce in choosing Alro's financial statement based on a disjunctive analysis failed to conduct a side-by-side comparison of the integration levels of UACJ, Elena, Alro, and Dingsheng.

Further, Alro's product mix is different than Dingsheng's mix. Alro focuses on primary aluminum products while Dingsheng's sole focus is processed aluminum products, especially foil. Moreover, Alro's processed aluminum FRPs of specialized grades with sophisticated end-uses (described below) are not comparable to Dingsheng's aluminum foil:

- "The FRP produces plates (heat treated and non-heat treated) and sheets & coils (cold-rolled, embossed, tread plates, corrugated sheets, clad products)."

- "ALRO is focused on growth in higher premium flat rolled products."

- "The main production is of High value-added products (HVAP), which has grown strongly over the prior decade, and specifically Very High Value Added Products (VHVAP)."

- "HVAP includes S&M Plates, Heat-treated; S&M Sheets, Primary Al; S&M Coils, Slitted."

- "VHVAP includes Hard Plates, Heat-treated; S&M Sheets and Coils, Cladded & Slitted; Hard Sheets."

Dingsheng 4/23 SV Rebuttal Exhibit 4H.

Alro's focus on the production of specialized grades of aluminum products having high-end applications is further evidenced by a slew of national and international certificates and recognitions granted to the company:

➢ ALRO has been certified in accordance with the international quality management standards ISO 9001:2015, EN 9100:2016 (for aerospace and defence industry) and IATF 16949:2016 (for automotive industry) by prestigious certification bodies DQS GmbH (Germany) and SRAC (Romania).

➢ The quality of ALRO products for special applications was certified as well by TUV Süd Industrie Service GmbH (Germany) (for pressure equipment material and CE mark for structural construction material), DNV-GL (Germany), Bureau Veritas (France) (material for marine applications).

➢ ALRO was granted the NADCAP (National Aerospace and Defence Contractor Accreditation Program of Performance Review Institute - SAE) accreditation for heat treatment processes, laboratory testing and non-destructive testing since 2008. Currently ALRO holds NADCAP Supplier Merit (earned extended accreditation) for compliance of its processes with aerospace and defense industry standards. The certificates were awarded by the NADCAP Management Council, following in depth auditing of the respective processes against the specific NADCAP audit criteria.

*Id*. Exhibit 4E.

Further, "ALRO operates a number of other ancillary and service units necessary for supporting the core facilities—the electric current transformation and rectification unit, the metallurgical repairs unit, the pot and furnace repair unit, the spare parts production unit and the in-house transport unit and the warehouses." *Id*. Exhibit 4E. As such, Alro S.A.'s production and sales experiences are vastly different from those of Dingsheng, whose production is narrowly focused on processed aluminum products, especially foil (which Alro does not produce).

Alro S.A.'s financial performance is also potentially distorted by the intertwined

27

operations with its various multinational subsidiaries engaged in diverse economic activities. Unlike the single country operations of Dingsheng, UACJ, and Elena, the Alro Group (*i.e.* Alro S.A. together with its subsidiaries) is a global conglomerate spread across several countries, summarized below.

- Alro S.A. (Romania)—manufacturer of primary aluminum and processed aluminum products (but not foil);
- Alum S.A. (Romania)—producer of alumina;
- Vimetco Trading S.R.L. (Romania)—aluminum products sales company;
- Sierra Mineral Holdings (SMHL) (incorporated in British Virgin Islands ("BVI") with operations in Sierra Leone)—bauxite mining;
- Vimetco Extrusion (Romania)—extrusion business line;
- Conef S.A. (Romania)—holding and management company;
- Global Aluminium Ltd. (incorporated in BVI)—holding company; and
- Bauxite Marketing Ltd. (incorporated in BVI)—marketing.

Petitioners 3/23 SV Attachment RO-7 at 16-17.

Alro Group's financial reporting encompasses business operations in **Sierra Leone** and **BVI**. Record evidence shows that Sierra Leone's 2021 *per capita* GNI is merely \$USD 510, which is far outside of the per capita GNI range (\$USD 9,830–14,170) of the potential surrogate countries. Commerce SC/SV Request: Attachment at 7. Further, the record lacks information about BVI's *per capita* GNI. *Id*. at 8. As such, neither country is economically comparable to Romania. Therefore, Alro's financial ratios applied in the *Final Results* are potentially ***distorted by Alro Group's multi-national operations***. In contrast, the operations of Malaysian UACJ and Bulgarian Elena are confined within a single surrogate country. Therefore, Commerce's choosing Alro is undermined by multinational operations of Alro's myriad subsidiaries.

Commerce's established practice is to reject multinational financial statements in favor of those specific to one surrogate country. In *Pure Magnesium from China*, Commerce explained:

{I}t is inappropriate to use Sterlite's audited financial statements to determine the surrogate financial ratios . . . . *Sterlite is a multinational corporation with operations in a number of countries*. It is the Department's practice to reject such financial statements, where other viable financial statements are on the record.

73 Fed. Reg. 76,336 (Dec. 16, 2008) (final results), IDM Comment 6.A (emphasis added).

Commerce similarly held in *Polytetrafluoroethylene Resin from China*:

CYDSA's financial statements were consolidated only with other Mexican companies whereas Mexichem's financial statements were consolidated with its worldwide operations, which include subsidiaries in Europe, Asia, South America, and the United States. Because of this, we determine that CYDSA's financial statements are more representative of the Mexican economy and production experiences than Mexichem's financial statements.

83 Fed. Reg. 48,590 (Sept. 26, 2018) (final determination), IDM Comment 5.

Likewise, the widely diverse and non-comparable business activities of Alro's subsidiaries potentially distort Alro S.A.'s ratios, rendering it unsuitable to value Dingsheng's ratios. *See, e.g.*, *Frozen Warmwater Shrimp from China*, 74 Fed. Reg. 46,565 (Sept. 10, 2009) (final results), IDM Comment 1 ("Thai Union . . . is a **consolidated financial** statement which contains combined financial information from twenty five **subsidiaries** . . . . Its **subsidiaries** engage in the following business activities: manufacture and sale of canned tuna, vegetables, fruit, and pet food, printing, animal feed, deep-sea fishing fleet operations, food products packaging, the export of frozen shrimp, import/export activities, etc. Accordingly, we find that because **Thai Union's corporate and production experiences are more diverse and less specific to comparable merchandise**, Thai Union does not represent the best information available for the purposes of calculating surrogate financial ratios."); *Wooden Cabinets and Vanities and Components Thereof from China*, 85 Fed. Reg. 11,953 (Feb. 28, 2020), IDM Comment 6 ("four of these financial statements . . .  were from large holding/investment

companies with numerous subsidiaries engaged in various activities that would not necessarily reflect the cost structure of a manufacturer of wood products.")

Likewise, because Alro S.A.'s myriad subsidiaries are engaged in a range of diverse business operations, including upstream mining and refining operations and marketing, sales and management operations of multiple products, its production and sales experiences are widely different than Dingsheng's. Conversely, because UACJ produces identical merchandise, aluminum foil, through similar manufacturing processes as Dingsheng, without any upstream mining or refining operations or non-manufacturing activities, its cost structure and expenses replicate those of Dingsheng. Therefore, selection of a potentially distorted Alro's financial data over undistorted UACJ data contradicts settled Commerce precedent—invalidating Commerce's primary surrogate country choice of Romania.

As Commerce found in *Forged Steel Fittings from China*:

> **{T}he 2019 unconsolidated financial statements for the Bulgarian producer of forged parts, Preskov, are the best available information on the record, as its production experience is similar to that of Both-Well's**. Preskov's products are comparable to the subject merchandise in that its products have **similar physical characteristics** (*i.e.*, forgings of carbon and alloy steel) and **production process** (*i.e.*, heating, cutting, forging, drilling, and machining) as the subject merchandise. . . .

> Although the petitioner argues that the Russian producer of steel pipes, **Chelpipe**, produces comparable merchandise, we find that **its statements are consolidated**, and more than 80 percent of its 2019 revenue came from the sales of its steel pipe production segment, which is an operating segment in the company "representing manufacturing and distribution of pipes and other related products, including activities related to the procurement of scrap and its further utilization as raw materials in manufacturing of steel billets used in seamless pipe production." The revenue from its sales of valves, hot-formed and cold-formed pipeline bends and hubs (*i.e.*, products comparable to the subject merchandise), comprises only 2.6 percent of its 2019 revenue. Further, **Chelpipe's statements are consolidated and include income from its subsidiaries incorporated in the Czech Republic and Ireland.** . . . Therefore, the Bulgarian financial statements for Preskov are the only financial statements on the record suitable for use in calculating surrogate financial ratios. . . . **{W}e continue to use Bulgaria as the SC**, as it is a country

30

at the same level of economic development as China, is a significant producer of comparable merchandise, and **provides the best available information** with complete SVs to value the FOPs, **including usable financial statements**.

86 Fed. Reg. 53,629 (Sep. 28, 2021) (final results), IDM Comment 1 (emphases added).

Likewise, here: (1) "{Alro Group's} statements are consolidated and include income from its subsidiaries incorporated in the {Sierra Leone} and {BVI}"; and (2) "the {2021} unconsolidated financial statements for the {Malaysian} producer of {aluminum foil}, {UACJ}, are the best available information on the record, as its production experience is similar to that of {Dingsheng}'s." *Id*. Consequently, Commerce erred in selecting Alro over UACJ as the surrogate financial statement and, correspondingly, Romania over Malaysia as its primary surrogate country choice.

### 2.    Commerce Unlawfully Selected Financial Data Distorted by Countervailable Subsidies

In preferring Alro's financial data, Commerce overlooked evidence of its distortion by countervailable subsidies; in contrast, UACJ and Elena's financial statements are not so tainted. The record reveals that Alro is on a shortlist of companies which received Romanian government grants under the indirect Emissions Trading Scheme ("ETS") program funded by the European Union (EU). Dingsheng Case Brief at 24. This ETS program has repeatedly been determined to be countervailable in Commerce's countervailing duty (CVD) proceedings. *Forged Steel Fluid End Blocks from Germany*, 85 Fed. Reg. 80,011 (Dec. 11, 2020) (final determination), IDM Comments 10-11; *see Forged Steel Fluid End Blocks from Italy*, 85 Fed. Reg. 79,996 (Dec. 11, 2020) (final determination), IDM Comment 3.

In the *Final Results*, Commerce ignored this evidence, in direct contravention of judicial precedent. In *BGH Edelstahl Siegen GmbH v. United States*, this Court tied the grant of

PUBLIC VERSION

additional free ETS allowances with a beneficiary company's listing on a country's shortlist of "carbon leakage list" companies:

> Under the ETS, . . . {a}ll companies other than power stations are given allowances to cover 44.2% of the emissions of the most efficient companies in each sector ("benchmark installations"). . . . For **certain large companies at significant risk of carbon leakage**, i.e., being unable to cover the higher environmental costs of compliance under the ETS (**"carbon leakage list" companies**), **the state provides additional free allowances** to meet 100% of the allowances needed by the benchmark installations. . . .
>
> **As a company on the carbon leakage list during the period of investigation, BGH received additional freely allocated emissions allowances beyond the standard rate of allocation.** . . .
>
> **If BGH were not on the carbon leakage list, it would have only received 44.2% of the emissions of benchmark installations**. . . . The number of additional allowances BGH received as a result of being on the carbon leakage list is the number of the allowances BGH did not have to purchase and therefore revenue the government did not collect. . . .
>
> Commerce reasonably determined the ETS additional free allowances program is <u>de jure</u> specific because it is expressly limited to a group of companies. . . .  It is reasonably discernible that Commerce determined the restrictions of the carbon leakage list to favor certain enterprises or industries or groups of certain industries or enterprises. <u>See</u> Final Decision Memo. . . ("we find this program is <u>de jure</u> specific . . . because eligibility for this subsidy is limited by law to companies on the carbon leakage list").

600 F.Supp.3d 1241, 1262-63 (CIT 2022) (emphases added). As such, the ETS allowances received by carbon leakage list companies, based on their *de jure* specificity, are countervailable.

Record evidence shows that Alro is listed by the Romanian government on a shortlist of companies entitled to additional free ETS allowances during 2021–2030:

> In line with the Guide issued by the European Commission ("Guidelines on certain State aid measures in the context of the system for GHG allowance trading post-2021"), **ALRO is included in the appendix with the sectors which still qualify for this support scheme and the Company expects that once this scheme is implemented to benefit from this support during the entire period between 2021- 2030**.

Petitioners 3/23 SV Attachment RO-7 at 40 (emphasis added).

32

Record evidence also establishes that as compensation for its 2021 indirect emission costs, Alro received ETS benefits in December 2022:

> In September 2020, the European Commission adopted the new Guide on the emission allowance trading scheme (EUETS) after 2021 "*Guidelines on certain supporting measures in the context of the system for GHG allowance trading post-2021*", which entered into force on 1 January 2021 and applies until 2030, replacing the guide applicable until December 2020. Following the approval of this scheme for Romania by the European Commission . . . for the establishment of a state aid scheme granted to companies in the sectors considered to be exposed to a real risk of carbon dioxide emissions relocation because of the significant indirect costs that they actually bear as a result of the transfer of the costs of greenhouse gas emissions incurred by the energy producers, to the price of electricity. **The Group received the <u>compensation</u> of RON 367,264 thousand <u>for 2021</u> in December 2022.**

Dingsheng 4/23 SV Rebuttal Exhibit 1A at 13. (emphases added).

Alro's 2021 financial statement also discloses the receipt of ETS benefits in 2021:

> **In October 2021, the Group received the amount of RON 396,829 thousand representing the compensation for the indirect emissions costs** embedded in the energy costs incurred in 2020.

Petitioners 3/23 SV Attachment RO-7 at 120 (emphasis added).

Therefore, Alro's 2021 financial statement is undisputedly distorted by the receipt of ETS benefits. The only remaining question is whether this subsidy-distortion is countervailable. Commerce's rationale that Alro's ETS benefits are not in the nature of additional free allowances but are only standard allowances is contradicted by ***Alro's express inclusion in the Appendix containing a shortlist of companies (aka carbon leakage list)***, which makes it eligible for this additional countervailable ETS benefit. Consequently, Alro's resulting ratios of overhead, SGA, and profit are distorted and unreliable.

Under its longstanding policy mandated by Congress, "Commerce shall avoid using any prices which it has reason to believe or suspect may be . . . subsidized prices." *Jiaxing Bro.*

*Fastener Co. v. United States*, 751 F.Supp. 2d 1345, 1352 (CIT 2010). Subsequently in 2015, the

Trade Preferences Extension Act codified Department policy regarding subsidy distorted data:

> (5) DISCRETION TO DISREGARD CERTAIN PRICE OR COST VALUES - In valuing the {FOPs . . . Commerce} may disregard price or cost values without further investigation if the administering authority has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values or if those price or cost values were subject to an antidumping order.

19 U.S.C. § 1677b(c).

As such, Commerce is required by law to reject a financial statement when—based on

substantial evidence—it has reason to suspect that the company received a countervailable

subsidy during the reporting period. Alro not only received ETS subsidies during the reporting

period, but its placement on the carbon leakage list companies confirms that the benefit is

countervailable. Therefore, Commerce unlawfully used Alro data, invalidating its primary

surrogate country choice of Romania.

These critical facts compel Commerce to select Malaysia as the primary surrogate

country. In *Certain Crystalline Silicon Photovoltaic Products from China*, Commerce

summarized its policy as follows.

> {T}he Department determines that South Africa is the appropriate primary surrogate country in this investigation because: . . .  we have reliable data from South Africa that we can use to value the FOPs. . . .
>
> {W}ith regard to the quality of the data for surrogate financial ratios, we find the surrogate financial statements on the record for a South African company to be superior to all of the financial statements for Thai companies … due to evidence that the Thai financial statements may be distorted by subsidies found by the Department to be countervailable. . . . All of the Thai financial statements indicate that the companies received IPA subsidies. . . . **The financial statements for the South African company, Mustek, do not contain evidence of countervailable subsidies. Thus, in this respect, the South African {SV} data on the record is superior to the Thai {SV} data on the record.** . . .

Given the foregoing, **we continue to find that South Africa is the appropriate primary surrogate country**.

79 Fed. Reg. 76,970 (Dec. 23, 2014) (final determination), IDM Comment 2 (emphases added).

In sum, Commerce's reliance on countervailable subsidy-distorted Alro data renders its primary surrogate country choice of Romania unlawful and unsupported by substantial evidence. Conversely, because both UACJ and Elena's data are undistorted by subsidies, their selection supports the choice of Malaysia or Bulgaria over Romania as the primary surrogate country.

### 3.    Alro's Data is Insufficiently Disaggregated

In the *Final Results*, Commerce determined "Dingsheng's argument unavailing that Alro. . .'s 2021 financial statements are less disaggregated with regard to raw materials, labor, and energy than that of UACJ Malaysia's or Elena Group's financial statements." IDM at 8. Commerce argued that "UACJ Malaysia's 2021 financial statements provide no specific breakdown of {cost of goods sold ("COGS")}, whereas Elena Group's 2021 financial statements contain no specific line items relating to both COGS and SG&A." *Id*. Commerce's factual findings are directly contrary to record evidence.

Undisputed evidence shows that Alro's financial statements do not break out the basket category line item, "{COGS} into discrete cost elements, *i.e.* raw materials, labor and energy". Petitioners 3/23 SV Attachment RO-7.

In contrast, UACJ's financial statement Note 5 ("Operating Costs Applicable to Revenue") provides specific breakouts of expenses for all three key cost elements of COGS: (a) raw materials— "Raw materials and consumables used"; (b) labor— "Staff costs"; and (c) energy— "Other operating expenses", which, being a non-depreciation expense, is reasonably allocated to energy. Dingsheng Case Brief Attachment 2 Excel Tab: "UACJ." In addition, UACJ breaks out several expenses under factory overhead and SGA, resulting in reliable financial

35

ratios. *Id*. Therefore, contrary to Commerce's findings, UACJ's data quality is far superior to the insufficiently disaggregated Alro data.

Likewise, Elena's financial statement, under "Expenditure," breaks out expenses for all three key cost elements of COGS: (a) raw materials— "raw materials and supplies"; (b) labor— "Staff costs"; (c) energy—"Other costs", which, being a non-depreciation expense, is reasonably allocated to energy. Dingsheng Case Brief Attachment 2 Excel Tab: "Elena." Elena also breaks out several expenses under factory overhead and SGA, yielding reliable financial ratios.

Commerce's established practice is to reject insufficiently disaggregated financials in favor of financial statements with detailed cost breakouts:

> Siam PVS' statements do not provide the same level of detail as the Aditya statements which include a specific line item for "Raw Materials and Consumables." Rather, Siam PVS' statements include a general line item for "{COGS}, net of the items below," without any specific detail needed to ensure that raw material and energy costs have been captured for purposes of calculating the financial ratios. . . . As a result, the Department cannot rely on Siam PVS' statements given these uncertainties and the potential for understating the denominator used in the calculation of the financial ratios due to the inaccurate identification of specific raw material, labor, and energy costs.

*Chlorinated Isocyanurates from China*, 80 Fed. Reg. 4,539 (Jan. 28, 2015) (final results), IDM Comment 2C.

Likewise, (1) "{UACJ and Elena} statements … include a specific line item for 'Raw Materials and Consumables {used}' {and 'raw materials and supplies'}," respectively; while (2) "{Alro's} statements include a general line item for '{COGS}' {and, therefore, has} . . . the potential for understating {or overstating} the denominator used in the calculation of the financial ratios." *Id*.

Commerce, therefore, erroneously selected Alro, which—besides lacking comparable production experiences and subsidy distortions—is unsuitable due to multiple data quality

defects, resulting in potentially distorted ratios. This incorrect selection, in turn, renders

Commerce's primary surrogate country choice of Romania over Malaysia or Bulgaria

unsupported by substantial evidence and its established practice. This Court's conclusion in

*Ancientree Cabinet Inc. v. United States,* is directly appliable to AR4:

> {T}he court concludes that Commerce acted within its discretion when selecting
> the single, superior Romanian financial statement to the three Malaysian
> statements. **While there are three Malaysian financial statements, as
> Commerce noted, none of them segregate energy costs** and all of them
> ambiguously account for overhead expenses. . . . Sigstrat's financial statement has
> a line item for "production overhead" and an itemized expense for energy
> costs. . . . Commerce acted based on substantial evidence and within its discretion
> to determine that the <u>Romanian financial statement was superior</u> to the
> Malaysian financial statements <u>for purposes of surrogate country selection</u>.

532 F.Supp.3d 1241 (CIT 2021) (emphases added).

Likewise, here: (1) Alro fails to "segregate energy costs"; while (2) "{UACJ and

Elena}'s financial statement{s} ha{ve} a line item for "{raw materials" and "labor"} and an

itemized expense for energy costs {'other operating expenses' or 'other costs'}." *Id*. Therefore,

"{Malaysian or Bulgarian} financial statement{s} {are} superior to the {Romanian} financial

statements for purposes of surrogate country selection." *Id*.

Commerce's well-established practice supports selecting the primary surrogate country

based on the financial statement's data quality.

> ➢ *Cased Pencils from China*, 78 Fed. Reg. 42,932 (July 18, 2013), IDM Comment 1
> ("in evaluating the two countries for purposes of selecting a primary surrogate, we
> have relied on data availability as the deciding factor. . . . **Philippines is the
> better choice because of the superiority of the Philippine financial data** for
> deriving surrogate financial ratios") (emphasis added).

> ➢ *Certain Steel Nails from China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013), IDM
> Comment 1D ("Unlike Ukraine, which upon fuller consideration has no useable
> financial statements on the record, as discussed below, the Department finds that
> Thailand has reliable information to value all of the inputs, including two
> financial statements to calculate the financial ratios, that compose the
> Respondents' respective {NV} calculations.")

In sum, Alro's insufficient disaggregation of COGS invalidates Commerce's selection of Alro data, and, in turn, Romania. Conversely, UACJ's and Elena's superior data quality, yielding accurate ratios, support the selection of Malaysia or Bulgaria.

### 4.    Alro's Financial Statement Lacks an Auditor's Report

Finally, Alro's financial statement is <u>incomplete</u> because it is missing an independent auditor's report affirming the reliability of the data and information reported therein. Petitioners 3/23 SV Attachment RO-7. Commerce nevertheless concluded that because "Note 35 to Alro. . .'s 2021 financial statements details an 'Auditors Fee' and evidences that they were audited by Ernst & Young Assurance Services . . .  Alro. . .'s 2021 financial statements are audited." IDM at 8. Yet even accepting Commerce's finding that Alro was audited, a copy of the Auditor's report is required to determine the accuracy of Alro's financial reporting.

Under Commerce's established practice, the ***absence of an independent auditor's report is a <u>critical flaw</u>*** that impeaches a financial statement, rendering it unreliable and unusable:

> In the *Preliminary Results,* we relied on the Brazilian financial statements of Tupy, a producer of comparable merchandise, to calculate the surrogate financial ratios for Both-Well. Although Tupy's financial statements are consolidated and, like the Mexican financial statements, do not break out {SG&A} expenses, we continue to find that Tupy's financial statements are the best option in this investigation given the critical flaws present in the other financial statements on the record. The Bulgarian financial statements on the record are missing an auditor's report, and, consistent with our practice, are therefore unusable.

*Forged Steel Fittings from China*, 83 Fed. Reg. 50,339 (Oct. 5, 2018) (final determination), IDM Comment 1.

This Court has affirmed Commerce's practice to reject financial statements lacking auditors' reports:

> As Commerce observed, "the Apis statement does not include any auditor notes, nor does it appear to include complete schedules or details on Apis'

38

> operations." . . . . MHPC's statement, on the other hand, "include{s} a complete
> annual report, an auditors report, and complete profit and loss and business
> statements that segregate MHPC's honey and fruit canning businesses."

*Wuhan Bee Healthy Co. v. United States*, 31 CIT 1182, 1205 (2007). In contrast, UACJ and

Elana's financial statements both include an independent auditor's report certifying the accuracy.

Petitioners 11/22 SV Attachments MY-7 & MY-9; Dingsheng 12/22 SV Exhibits 1B-C.

Commerce thus unlawfully used Alro's data lacking an Auditor's report.

In sum, given their critical flaws, Alro's financial statements are unsuitable to value

Dingsheng's financial ratios. In contrast, both Malaysian UACJ and the Bulgarian Elena satisfy

all established criteria for surrogate financial statements, affording high quality options to value

Dingsheng's financial ratios. The absence of a usable Romanian financial statement together

with the availability of reliable statements of companies in Malaysia and Bulgaria provide

compelling reasons why Commerce's selection of Romania over Malaysia or Bulgaria as the

primary surrogate country is unsupported by substantial evidence, inconsistent with established

Commerce policy, and contrary to law.

### E.     For Major Movement FOPs, Romanian SV Data Are Unreliable Or Absent

Relative SV data quality for major FOPs is a paramount consideration in Commerce's

selection of a primary surrogate country. Section I.A, *supra*. Because truck freight and B&H

charges are applied not only to adjust the U.S. sales price (from FOB to ex-factory) but also to

uplift the price of <u>all</u> material inputs (CIF landed price plus cost of port B&H charges and inland

transportation to arrive at the factory gate price) used in the NV build-up, these FOPs are more

important contributors than labor and insurance to the NV build up and the ultimate ADD

margin. Accordingly, for surrogate country selection, SV data for these two FOPs also are more

important factors than insurance and labor.

As shown below, Romanian SV data for truck freight and B&H based on the DOING

BUSINESS IN ROMANIA 2020 report are unreliable, while Malaysian SV data afford the best

option, followed by Bulgarian SV data. Dingsheng Case Brief at 35-40. Commerce's preference

for Romanian SV data over Malaysian or Bulgarian data is unsupported by substantial evidence.

1.  **Truck Freight**

To support Romanian truck freight SV data, Commerce reasoned that "the Romanian

freight . . .  data are contemporaneous with the POR." IDM at 7. This statement is false. The data

on which Commerce relied is not contemporaneous with the POR (April 2020-March 2021)

since the "data collection for the project was completed in May 2019." Petitioners 3/23 SV

Attachment RO-6C at 5.

Moreover, Commerce failed to address Respondent's reliability concerns regarding a

static 650 USD freight reported in the DOING BUSINESS IN ROMANIA reports published from 2016

through 2020. See Dingsheng 4/23 SV Rebuttal Exhibit 8. The Mihai Declaration stated:

> {T}he Report provides a truck freight of 650 USD for transporting 15 tons goods
> in a 20 ft. container from a warehouse in Bucharest to the Hungary border
> crossing. . . . I am aware that even during the period going from 2016 to 2019,
> when the market was relatively stable, prices did vary from year to year. The
> Report excerpts I was provided with state that the **truck transportation prices
> have been constant since 2016 seemingly locked at $650. I believe that this is
> a generalist view not taking into account various factors constantly affecting
> merchandise freight transportation prices**.

*Id*. Exhibit 9 (emphasis added).

The record is devoid of explanation as to how DOING BUSINESS concluded that country-

wide average truck freight prices remained static over five continuous years. Identical data may

simply have been copied and republished year-after-year, which may be a reason why the DOING

BUSINESS publication was discontinued after 2020. Dingsheng 3/23 SV Exhibit 6. Further, the

40

PUBLIC VERSION

reported freight data may not be specific to trucks because in DOING BUSINESS, "the mode of transport is the one most widely used." Petitioners 3/23 SV Attachment RO-6C at 5.

Conversely, Commerce rejected the Malaysian Rani truck freight data, claiming it was "published in 2017." IDM at 7. However, the record contained substantial evidence confirming that the 2017 "rates are still applicable" in 2023. Dingsheng 3/23 SV Exhibit 5A at Exhibit III. As an independent consultant confirmed:

> I sent an email to Rani to check if the figures for the freight schedule were applicable for the year 2023. I obtained written confirmation from Rani that the standard destination rates provided on the website are applicable for 2023.

*Id*. Exhibit 5A ¶ 3.

Commerce's dismissal of Rani data based on alleged non-contemporaneity directly contradicts record evidence that such data, in fact, were contemporaneous, which the agency failed to address. Further, unlike the single route DOING BUSINESS data, Rani data is based on 31 distinct and independent routes, with distances ranging from 16.8–559 Km, covering the entire territory of Malaysia. Petitioners 3/23 SV Attachment RO-6C at 5. Rani thus is superior to DOING BUSINESS ROMANIA for the broad market average and product-specificity criteria.

In a recent ADD proceeding in which Malaysia was selected as the primary surrogate country, Commerce selected Rani data to value truck freight, explaining why it rejected an analogous DOING BUSINESS MALAYSIA 2020 report:

> The data in *Doing Business* are not the best available information on the record to value the mandatory respondents' truck freight because the data are neither POR-contemporaneous nor product-specific. The notes to the data state, "the most recent round of data collection for the project was completed in May 2019." Thus, the data are not contemporaneous with the POR. . . . It is also unclear which mode of transportation was contemplated to conduct this survey, as the notes to the data state that the "case study assumes that the mode of transport is the one most widely used for the chosen export or import product." Therefore, it is unclear from the record whether the data are specific to truck freight or another transportation mode suitable for transporting automotive parts. Therefore, *Doing*

*Business* data are not specific to the input or mode of transportation used by the mandatory respondents.

*Activated Carbon from China*, 87 Fed. Reg. 67,671 (Nov. 9, 2022) (final results), IDM Comment 7. In that case, Commerce found "that the Rani Transport data are the best information on the record with which to value the mandatory respondents' foreign inland freight expenses" because:

> Rani Transport data . . . are based on a price list published by Rani Transport, a Malaysian company that provides trucking services across Malaysia. These data are actual tariffs, not mere approximations or guidelines. The price list is compiled based on Rani Transport's standard destination price rate for trading a standard shipment of goods weighing 20,000 kg from Klang Valley to various destinations by truck in Malaysia. We find this information to be the best available information to value the mandatory respondents' truck freight, as it is contemporaneous, specific to the cost of shipping goods in Malaysia, and representative of a broad market average based on 31 routes across Malaysia.

*Id.*

In sum, to value truck freight, Rani data affords an overwhelmingly superior and reliable choice as compared with DOING BUSINESS ROMANIA. This in turn supports Malaysia as the best primary surrogate country. Finally, DOING BUSINESS BULGARIA freight data also is preferable to DOING BUSINESS ROMANIA since those data are not similarly impeached on this record. Dingsheng 11/22 SV Exhibit 7B.

## 2. B&H Data

Commerce failed to address the fact that DOING BUSINESS ROMANIA did not provide any B&H data in 2020, or in any prior reports dating back to 2016. Dingsheng 4/23 SV Rebuttal Exhibit 8. As such, Commerce valued B&H at zero, resulting in a distortive calculation. In contrast, both Malaysian and Bulgarian DOING BUSINESS reports contain finite and usable B&H SV data. Petitioners 11/22 SV Attachment MY-6C; Dingsheng 11/22 SV Exhibits 7A-B. This fact is another reason undermining the choice of Romania as the primary surrogate country, in favor of preferably Malaysia or, alternatively, Bulgaria.

## II.      COMMERCE'S DECISION DENYING DINGSHENG A DR OFFSET IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Pursuant to 19 U.S.C. § 1677f-1, Commerce "shall . . . reduce the {ADD} by the amount of the increase in the weighted average dumping margin" calculated by Commerce when the following three conditions are satisfied:

(A) a subsidy (other than an export subsidy . . . ) has been provided with respect to the class or kind of merchandise;

(B) such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period, and

(C) {Commerce} can reasonably estimate the extent to which the countervailable subsidy . . . in combination with the use of {NV} . . . , has increased the weighted average dumping margin

Commerce has reasonably concluded that this statutory language requires a respondent to demonstrate:

(1) a subsidies-to-cost link, *i.e.*, impact of subsidies on the cost of manufacture ("COM") and

(2) a cost-to-price link, *i.e.*, the respondent changed the price of goods sold as a result of changes in COM.

Record evidence reveals that Dingsheng satisfied these criteria. *See* Dingsheng's Double Remedies Questionnaire Response (Mar. 3, 2023), CR67/PR130 ("DRQR"). Nevertheless, Commerce denied Dingsheng's DR offset claim by failing to follow controlling law and by improperly interpreting record evidence.

First, Commerce reasoned "that Dingsheng's monthly sales prices of subject merchandise in fact increased during the POR. . . . Therefore, we find that the {statutory} requirement . . . has not been met." IDM at 10. Commerce's rejection of the DR offset merely because prices

increased during the POR is contrary to law. The statutory threshold criteria for the DR offset requires that the "countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period." 19 U.S.C. § 1677f-1(f)(1)(B). Commerce's requirement that the offset is unavailable unless monthly price trends decline through the POR does not conform to this statutory mandate. The price of a product will not decline forever, thereby unreasonably limiting eligibility of the offset to Commerce's periods of review, which do not correspond to business cycles. Moreover, Commerce's construction of ambiguous statutory language does not make sense. Rather than require an absolute decline in prices during the POR, the statute requires that subsidy benefits result in a reduction of prices of subject merchandise which would not have occurred if a subsidy was not provided. This criterion can be fulfilled even when monthly prices increase through the POR, provided subsidies, in fact, "reduced the average price of imports of the class or kind of merchandise during the relevant period." *Id*.

Second, Commerce reasoned that since "Dingsheng's cost for energy inputs increased during the POR. . . . Dingsheng has not demonstrated a link between the {less-than-adequate-remuneration ("LTAR")} subsidies and Dingsheng's COM." IDM at 11. This finding contradicts substantial evidence. To support a subsidies-to-cost link, Dingsheng submitted a summary of average monthly purchase prices of all LTAR inputs—steam coal, primary aluminum, aluminum sheet and strip, and electricity. DRQR Exhibits DR-1–2. It also submitted extracts of its monthly accounting records showing that: (1) the cost of steam, primary aluminum, and aluminum sheet and strip are accounted for in the COM of the finished goods, *Id*. at 5, Exhibit DR-3; and (2) the cost of electricity is accounted for in factory overhead. *Id*. at 5, Exhibit DR-4. These documents reveal that Dingsheng factors in the procurement prices of its LTAR inputs—steam coal, primary

aluminum, aluminum sheet and strip, and electricity—in establishing the COM of the merchandise under consideration. Because the procurement prices of LTAR inputs are depressed on account of LTAR subsidies, the resulting COM is proportionately lowered.

Dingsheng's accounting practices and recordkeeping in its ordinary course of business establish a direct correlation between Dingsheng's LTAR subsidy benefits and its COM. Because all these LTAR subsidies predate the POR and continued during the entire POR, Dingsheng was unable to submit a comparison of its COM with and without these LTAR subsidies. That is why Dingsheng provided Commerce with evidence of a direct link between the procurement prices of the LTAR inputs and the resulting COM. That Dingsheng established a direct link between its "LTAR input purchase prices and its COM" constitutes substantial evidence that there is a direct link between Dingsheng's LTAR subsidies and its COM. Commerce cannot reject a DR offset merely because a company always has received LTAR subsidies. Thus, despite Commerce's findings, Dingsheng satisfied the subsidies-to-cost link.

Third, Commerce reasoned that "with respect to the cost-to-price link, we find . . . that Dingsheng's pricing is governed by market indices and customer negotiation rather than by any fabrication or metal cost pass through formulae." IDM at 11. Again, Commerce misconstrued record evidence; Dingsheng's extensive information addressed the cost-to-price link. DRQR at 2-8, Exhibit DR-5. Dingsheng first explained that it determines the appropriate export price for each product "on a spot sales basis" rather than relying on "public price lists." *Id*. at 1, 3. Specifically, the record reveals that primary factor in establishing Dingsheng's export prices are "direct costs of production, principally raw material costs (especially Aluminum inputs) and energy (electricity) costs." *Id*. at 2.

Dingsheng further explained that "the prices of major inputs - Al ingot, Al Liquid,

Purchased Al Strip - continuously fluctuate according to the prevailing market conditions," and that "the cost analysis is undertaken periodically, and the prices are reviewed based on the changes in cost and other price-related factors." *Id*. at 6. Dingsheng then explained the rationale behind its decisions to decrease or increase the sales price of finished goods caused by the "changes in the cost of production," which, in turn, is triggered by a change in "the direct costs of key raw materials (*i.e.*, Al ingot, Al Liquid, Purchased Al Strip purchase prices and coal)." *Id*. In support, Dingsheng submitted minutes of meetings adopting the sale price revisions based on changes in COM. *Id*. at 6-8, Exhibit DR-5.

For example, in a December 2021 meeting, on account of declining price trends of key raw materials, Dingsheng decided to reduce the price of the subject merchandise sold to its U.S. customers. Specifically, because "the primary aluminum prices declined significantly from October 2021 [                    ] to November 2021 [                         ]" and "further dipped in December 2021 to [                    ]"; "aluminum sheet / strip prices dropped significantly from October 2021 [                    ] to November 2021 [                    ], dipping further in December 2021 to [                    ]"; "coal prices dropped significantly from October 2021 [                    ] to November 2021 [                    ], and dropped further in December 2021 to [                    ]," "Dingsheng decided to lower the prices of the subject merchandise." *Id*. at 8.

The record also confirms that Dingsheng implemented the decisions taken in this meeting. In the U.S. sales database, "for CONNUM [          ], for sales to a customer, the average price in January 2022 was [          ], while the average price in February 2022 declined to [          ]." *Id*. As further corroborating evidence, Dingsheng provided "two invoices of the same product [          ] sold to the same customer [          ] on January 11,

2021 and January 26, 2022." *Id.* at 8, Exhibit DR-5. In the two invoices, "the same product {was} sold on the same sales terms [          ] to the same customer, {and} the price on January 26, 2022 [          ] was lower than on January 11, 2021[          ]." *Id.*

Dingsheng accordingly tied its December 2021 meeting decision to lower sales prices pursuant to declining costs of key raw materials with the consequent reduction in the finished goods sales prices. Thus, Dingsheng's dynamic internal system revises the sale prices in accordance with changes in COM, thereby satisfying the "cost-to-price" linkage. In other words, Dingsheng lowers its US sale prices by an amount equivalent to the sum total of the CVD rates linked to its LTAR purchases of steam coal, aluminum ingot, aluminum liquid, and purchased aluminum sheet/strip. Therefore, the record unambiguously evidences Dingsheng satisfying all statutory criteria for a DR offset.

Commerce's rationale that Dingsheng's sale prices are based on market indices and negotiations instead of COM misconstrues Dingsheng's response. After listing the "Cost of production: the direct costs of production, principally raw material costs (especially Aluminum inputs) and energy (electricity) costs," *i.e.*, the COM as the primary causal factor for a change in the prices, Dingsheng referenced as a secondary causal factor, "prevailing market conditions in the U.S. market" *Id.* at 2. Dingsheng then stated that the U.S. market conditions "are affected by raw material costs." *Id.* As such, both the primary and secondary causes of a price change result from a change in COM. Therefore, Commerce improperly inferred that Dingsheng's price revisions of aluminum foil were linked to other market factors rather than Dingsheng's COM.

Finally, Commerce's unlawful denial of Dingsheng's DR offset contradicts its established practice under similar facts. Commerce granted a respondent's DR offset based on

comparing cost of major inputs and price of finished goods in *Passenger Vehicle and Light Truck Tires from China*, 83 Fed. Reg. 11,690 (Mar. 16, 2018) (final results), IDM Comment 2,

In sum, Commerce's denial of Dingsheng's DR offset was unsupported by substantial evidence and contrary to law. Commerce's construction of the statutory language does not make sense; it effectively denies the offset unless prices continuously decline, a construction of law which could not possibly have been intended by Congress. Commerce's rejection of Dingsheng's evidence contradicts Commerce's mandate to calculate accurate margins by conforming its decisions to statutory language and Congressional intent. And again, in reviewing Commerce's methodology, this Court no longer defers to Commerce's analysis; rather this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the "best available information." *See Loper*, 144 S.Ct. 2244.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court remand for Commerce to reconsider its *Final Results*.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881
-and-
*599 Lexington Ave, Fl 36
New York, NY 10022
212-557-4000

Dated:  July 29, 2024                    *Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 13,965 words, less than the 14,000 word limit.


<u>*/s/ Dharmendra N. Choudhary*</u>
Dharmendra N. Choudhary

*Counsel for Plaintiffs*

Dated: July 29, 2024

PUBLIC VERSION

# ATTACHMENT

PUBLIC VERSION

# THIS ATTACHMENT IS PROPRIETARY IN ITS ENTIRETY