NONCONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                                )
JIANGSU DINGSHENG NEW MATERIALS                 )
JOINT-STOCK CO., LTD., ET AL.,                   )
                                                )
                    Plaintiff,                  )
                                                )
        v.                                      )
                                                )
UNITED STATES,                                  )
                                                )       Court No. 23-00264
                    Defendant,                  )
                                                )
        and                                     )
                                                )
ALUMINUM ASSOCIATION TRADE                      )
ENFORCEMENT WORKING GROUP AND ITS               )
INDIVIDUAL MEMBERS, ET AL.,                      )
                                                )
                    Defendant-Intervenors.      )
_____)

## DEFENDANT INTERVENORS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

JOHN M. HERRMANN
JOSHUA R. MOREY
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP

Counsel to the Aluminum Association Trade Enforcement Working Group and Its Individual Members, et al.

November 27, 2024

NONCONFIDENTIAL

## Table of Contents

**Page**

ADMINISTRATIVE DETERMINATION UNDER REVIEW ....................................... 1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ..................................... 2

STANDARD OF REVIEW ................................................................................. 5

STATEMENT OF FACTS ................................................................................. 6

ARGUMENT ................................................................................................ 12

I.    COMMERCE LAWFULLY SELECTED ROMANIA AS THE
      PRIMARY SURROGATE COUNTRY ...................................................... 12

      A.    Plaintiffs Incorrectly Identify the Standard of Review Applied by
            This Court in Reviewing Commerce's Selection of Surrogate
            Value Information ...................................................................... 13

      B.    The Court Should Deem Waived Any Attempt by Plaintiffs to
            Grapple With This Court's Standard of Review for the First Time
            in a Reply Brief ......................................................................... 14

      C.    Commerce's Selection of Romania as the Primary Surrogate
            Country Is Supported by Substantial Evidence ........................... 15

            1.    Commerce's Criteria for Surrogate Country Selection ............... 16

            2.    Commerce Lawfully Determined Alro S.A.'s Financial
                  Statements Were the Best on the Record for Valuing
                  Surrogate Financial Ratios ........................................... 19

                  a.    Commerce Lawfully Determined Elena Is Not a
                        Producer of Comparable Merchandise and Does Not
                        Have Production Operations That Are Comparable
                        to Dingsheng ...................................................... 20

                  b.    Alro and UACJ Are Both Producers of Comparable
                        Merchandise, but Alro's Level of Integration Is
                        More Similar to Dingsheng Than Is UACJ ................... 22

                        i.     Dingsheng's Production Process ..................... 22

                        ii.    Alro S.A.'s Production Process ....................... 23

                        iii.   UACJ Malaysia's Production Process ............... 24

**Table of Contents (continued)**

Page

3.  Dingsheng's Additional Arguments Regarding Alro S.A.'s Financial Statements Are Irrelevant or Not Supported by Substantial Evidence .................................................................. 26

    a.  Comparable/Identical merchandise ................................. 26

    b.  Dingsheng Failed to Exhaust Its Administrative Remedies Concerning the Countervailability of the ETS Program and Commerce's Determination Is Supported by Record Evidence ....................................... 29

        i.  Dingsheng Failed to Exhaust Its Administrative Remedies ..................................... 29

        ii.  Commerce's Determination Is Supported by Substantial Evidence .......................................... 31

    c.  Alro S.A.'s Financial Statements Are Sufficiently Disaggregated .................................................. 33

    d.  Alro S.A.'s Financial Statements Are Reliable .............. 35

4.  Commerce Lawfully Determined Romanian Labor Data Are Superior to Alternatives and Support the Selection of Romania as the Primary Surrogate Country ..................... 37

5.  The Romanian Truck Freight and B&H Values Are Reliable ............................................................ 40

D.  Plaintiffs' Claim that Commerce Incorrectly Selected the Primary Surrogate Country Based on Minor Inputs Is Wrong ............................. 43

II.  COMMERCE LAWFULLY DENIED DINGSHENG'S REQUEST FOR A DOUBLE REMEDIES ADJUSTMENT ........................................ 44

A.  Legal Background ...................................................... 45

B.  Dingsheng Failed to Demonstrate a Cost-to-Price Link ........................ 46

III.  CONCLUSION ........................................................................ 50

NONCONFIDENTIAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Akzo N.V. v. USITC,
  808 F.2d 1471 (Fed. Cir. 1986)......................................................................6, 13

Baoding Mantong Fine Chemistry Co. v. United States,
  222 F. Supp. 3d 1231 (Ct. Int'l Trade 2017) .......................................................20

China Mfrs. Alliance, LLC v. United States,
  205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) .......................................................38

Clearon Corp. v. United States,
  37 CIT 220 (2013) ...........................................................................................18, 44

Consolidated Edison Co. v. NLRB,
  305 U.S. 197 (1938)...........................................................................................6, 13

Consolo v. Fed. Mar. Comm'n,
  383 U.S. 607 (1966).................................................................................................6

DuPont Teijin Films China Ltd. v. United States,
  7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ...........................................................30

Jacobi Carbons AB v. United States,
  992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014), aff'd, 619 Fed. Appx. 992 (Fed.
  Cir. 2015) .................................................................................................................18

JBF RAK LLC v. United States,
  961 F. Supp. 2d 1274 (Ct. Int'l Trade 2014) ..................................................14, 15

JBF RAK LLC v. United States,
  991 F. Supp. 2d 1343 (Ct. Int'l Trade 2014) ..................................................14, 15

Jiangsu Zhongji Lamination Materials Co. v. United States,
  396 F. Supp. 3d 1334 (Ct. Int'l Trade 2019) .................................................40, 44

Jiangsu Zhongji Lamination Materials Co., (HK) v. United States,
  Ct. No. 21-00138, Slip Op. 23-84 2023 Ct. Intl. Trade LEXIS 88 (June 7,
  2023) ....................................................................................................44, 46, 48

Jiaxing Brother Fastener Co. v. United States,
  822 F.3d 1289 (Fed. Cir. 2016).........................................................17, 18, 28, 38

Jinxiang Infang Fruit & Vegetable Co. v. United States,
   476 F. Supp. 3d 1415 (Ct. Int'l Trade 2020) ........................................................15

Kearns v. Chrysler Corp.,
   32 F.3d 1541 (Fed. Cir. 1994)................................................................................6, 13

Loper Bright Enterprises v. Raimondo,
   144 S. Ct. 2244 (June 28, 2024)...............................................................2, 12, 13, 49

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,
   463 U.S. 29 (1983)...................................................................................................5

Nation Ford Chem. Co. v. United States,
   166 F.3d 1373 (Fed. Cir. 1999)...............................................................................26

Nippon Steel Corp. v. United States,
   458 F.3d 1345 (Fed. Cir. 2006)...............................................................................5

Peer Bearing Co.-Changshan v. United States,
   804 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ........................................................18

SeAH Steel VINA Corp. v. United States,
   269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017), aff'd, Seah Steel Vina Corp. v.
   United States, 950 F.3d 833 (Fed. Cir. 2020) ........................................................28

Seah Steel Vina Corp. v. United States,
   950 F.3d 833 (Fed. Cir. 2020)................................................................................26

SKF USA, Inc. v. United States,
   263 F.3d 1369 (Fed. Cir. 2001)...............................................................................6

Tehnoimportexport, UCF Am. Inc. v. United States,
   783 F. Supp. 1401 (Ct. Int'l Trade 1992) ..............................................................29

Tianjin Wanhua Co. v. United States,
   179 F. Supp. 3d 1062 (Ct. Int'l Trade 2016) ........................................................6

Tri Union Frozen Prods. v. United States,
   163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016) ........................................................17, 18

Universal Camera Corp. v. NLRB,
   340 U.S. 474 (1951)................................................................................................5

Vicentin S.A.I.C. v. United States,
   503 F. Supp. 3d 1255 (Ct. Int'l Trade 2021), aff'd, 42 F.4th 1372 (Fed. Cir.
   2022) .......................................................................................................45, 46, 47

NONCONFIDENTIAL

Zhejiang Dunan Hetian Metal Co. v. United States,
  652 F.3d 1333 (Fed. Cir. 2011)................................................................13, 14

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................5, 13, 14

19 U.S.C. § 1677b(c) ..................................................................................31

19 U.S.C. § 1677b(c)(1)(B) ....................................................................16, 49

19 U.S.C. § 1677f-1(f)(1) ...........................................................................45

19 U.S.C. § 1677j(b) ...................................................................................23

19 C.F.R. § 351.408(c)(2) ..........................................................................18

19 C.F.R. § 351.408(c)(3) ..........................................................................20

**Administrative Determinations**

Aluminum Foil from the People's Republic of China:
  Preliminary Decision Memorandum for the Circumvention Inquiry with
  Respect to the Republic of Korea (Mar. 15, 2023) ....................................23

Antidumping Duties; Countervailing Duties,
  61 Fed. Reg. 7,308 (Dep't Commerce Feb. 27, 1996) ...........................18, 40

Certain Aluminum Foil From the People's Republic of China:
  Final Determination of Sales at Less Than Fair Value, 83 Fed. Reg. 9,282
  (Dep't Commerce Mar. 5, 2018), and accompanying IDM (Feb. 26, 2018) ..........................39

Certain Aluminum Foil From People's Republic of China:
  Final Results of Antidumping Duty Administrative Review and Final
  Determination of No Shipments; 2021–2022, 88 Fed. Reg. 76,734 (Dep't
  Commerce Nov. 7, 2023) ("Final Results") and the accompanying Issues and
  Decision Memorandum (Nov. 1, 2023) ("IDM") ........................................ *passim*

Certain Aluminum Foil From People's Republic of China:
  Preliminary Results of Antidumping Duty Administrative Review, Partial
  Rescission of Antidumping Duty Administrative Review, and Preliminary
  Determination of No Shipments; 2021–2022, 88 Fed. Reg. 29,092 (Dep't
  Commerce May 5, 2023) ("Preliminary Results") ....................................7, 10

Certain Circular Welded Carbon Quality Steel Line Pipe from the People's
Republic of China: Final Determination of Sales at Less Than Fair Value, 74
Fed. Reg. 14,514 (Dep't Commerce Mar. 31, 2009), and accompanying IDM
(Mar. 23, 2009) ....................................................................................................27

Certain Frozen Fish Fillets From the Socialist Republic of Vietnam:
Final Results of the New Shipper Review, 77 Fed. Reg. 27,435 (Dep't
Commerce May 10, 2012), and accompanying IDM (May 3, 2012) .....................43

Certain Preserved Mushrooms from the People's Republic of China:
Final Results and Final Partial Rescission of the Sixth Administrative Review,
71 Fed. Reg. 40,477 (Dep't Commerce July 17, 2006), and accompanying
IDM (July 5, 2006) ..............................................................................................17

Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure
Pipe from Romania: Final Results of Antidumping Duty Administrative
Review, 68 Fed. Reg. 12,672 (Dep't Commerce Mar. 17, 2003) and
accompanying IDM (Mar. 10, 2003) ....................................................................27

Certain Steel Nails From the People's Republic of China:
Final Results of the Fourth Antidumping Duty Administrative Review, 79
Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014), and accompanying IDM
(Mar. 31, 2004) ...................................................................................................26

Circular Welded Carbon-Quality Steel Pipe from the People's Republic of China:
Notice of Final Determination of Sales at Less Than Fair Value, 67 Fed. Reg.
36,570 (Dep't Commerce May 24, 2002), and accompanying IDM (May 15,
2002). ...................................................................................................................27

Common Alloy Aluminum Sheet From the People's Republic of China:
Final Results of Antidumping Duty Administrative Review; 2020-2021, 87
Fed. Reg. 54,975 (Sept. 8, 2022), and accompanying IDM (Aug. 31, 2024). .........33

Decision Memorandum for the Final Affirmative Determination of Sales at Less
Than Fair Value in the Investigation of Aluminum Extrusions from the
People's Republic of China (Sept. 26, 2024), ref'd in Aluminum Extrusions
From the People's Republic of China: Final Affirmative Determination of
Sales at Less Than Fair Value, 89 Fed. Reg. 80,506 (Dep't Commerce Oct. 3,
2024) ....................................................................................................................33

Decision Memo From USDOC to Assistant Secretary for E&C Pertaining to
Interested Parties Prelim Issues and Decision Memo (Apr. 28, 2023) ("PDM") ....7, 10, 11, 17

Issues and Decision Memorandum for the Final Affirmative Circumvention
   Determination of the Antidumping Duty Order on Certain Aluminum Foil
   from the People's Republic of China with Respect to the Kingdom of
   Thailand (Nov. 17, 2023) ("Circ. Final IDM")...................................................................23

Persulfates from the People's Republic of China:
   Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg.
   6,836 (Dep't Commerce Feb. 9, 2005), and accompanying (Feb. 2, 2005)
   ("Persulfates from China IDM")...............................................................................20, 27

Raw Honey From India:
   Final Determination of Sales at Less Than Fair Value and Final Negative
   Determination of Critical Circumstances, 87 Fed. Reg. 22,188 (Dep't
   Commerce Apr. 14, 2022), and accompanying IDM (Apr. 7, 2022), aff'd, Am.
   Honey Producers Ass'n v. United States, 653 F. Supp. 3d 1329, 1335-37 (Ct.
   Int'l Trade 2023)...........................................................................................................36

This response brief is filed on behalf of the Aluminum Association Trade Enforcement Working Group and its individual members JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products, LLC (collectively, "Defendant-Intervenors"), in opposition to Plaintiffs' Motion for Judgment on the Agency Record and Memorandum of Law in support of the same (ECF No. 26) ("Dingsheng Br.") submitted on behalf of Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd.; Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.); Hangzhou Dingsheng Import & Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.); Hangzhou Five Star Aluminium Co., Ltd.; Hangzhou Teemful Aluminium Co., Ltd.; Inner Mongolia Liansheng New Energy Material Co., Ltd.; and Inner Mongolia Xinxing New Energy Material Co., Ltd. (collectively, "Dingsheng" or "Plaintiffs"). As set forth below, Defendant-Intervenors urge this Court to reject Plaintiffs' claims and sustain the underlying agency determination in its entirety.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

The administrative determination under review is the U.S. Department of Commerce's ("Commerce" or the "Department") final results in the fourth administrative review ("AR4") of the antidumping duty order on certain aluminum foil from the People's Republic of China ("China"). See Certain Aluminum Foil From People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021–2022, 88 Fed. Reg. 76,734 (Dep't Commerce Nov. 7, 2023) (PR213)[1] ("Final Results"), and the

---

[1]    Documents in the administrative record are cited by their confidential and/or public record number (i.e., "(CR__)" and "(PR__)") provided in the Index to the Administrative Record filed with the Court on Feb. 20, 2024 (ECF No. 19).

accompanying Issues and Decision Memorandum (Nov. 1, 2023) (PR210) ("IDM").  The period
of review ("POR") is April 1, 2021 through March 31, 2022.

**ISSUES PRESENTED AND SUMMARY OF ARGUMENT**

Dingsheng claims the Final Results are unlawful because Commerce:

1.  Selected Romania as the primary surrogate country; and

2.  Failed to grant Dingsheng a double remedies adjustment.

Dingsheng's claims are wrong.

**Surrogate Country Selection**

First, Dingsheng identifies the wrong standard for this Court's review of Commerce's
analysis of the "best available information" to value Dingsheng's factors of production
("FOPs").  Dingsheng challenges Commerce's factual determinations, which must be "supported
by substantial evidence."  Contrary to Dingsheng's claim, this standard is unchanged by Loper
Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (June 28, 2024).  Further, Dingsheng's brief
copies large portions of its administrative case brief without significant modification and without
addressing the Court's standard of review.  The Court should deem waived any attempts by
Dingsheng to grapple with the Court's standard of review in the first instance in its reply brief.

Second, contrary to Dingsheng's claims, Commerce's selection of Romania was not
based on surrogate information for "minor" FOPs.  Commerce selected Romania, in part, based
on a determination that the financial statements of Alro S.A. – a Romanian producer of
comparable merchandise – are the best available information to calculate surrogate financial
ratios.  All parties agree the surrogate information Commerce selected to calculate financial
ratios is an important aspect of Commerce's comparative analysis of surrogate information in
Romania, Bulgaria, and Malaysia.  Thus, if the Court sustains Commerce's determination that

Alro S.A.'s financial statements are the best available information for calculating financial ratios, the Court should also sustain Commerce's selection of Romania as the primary surrogate country.

Third, Commerce correctly determined that Alro S.A. has the most comparable level of integration to Dingsheng's level of integration because both producers engage in melting and refining of aluminum and alloying materials, casting aluminum into semi-finished aluminum articles, and cold rolling aluminum to a coiled aluminum product. In contrast, and contrary to Dingsheng's misrepresentation of the record, Elena Group (Bulgaria) does not produce comparable merchandise or engage in any of the production processes for aluminum foil, and UACJ Malaysia only engages in the final production step – rolling aluminum strip to a final foil gauge. Commerce also properly rejected Dingsheng's claims that Alro S.A. engages in bauxite mining and alumina refining, as those operations are performed by other related entities whose operations are not reflected in the financial statements Commerce used to calculate financial ratios. Thus, Commerce properly determined that Alro S.A.'s level of integration and production operations most closely mirror those of Dingsheng.

Fourth, while Dingsheng raised generally the possibility of Alro S.A. receiving subsidies, it did not raise before Commerce the specific argument it makes before this Court regarding additional allowances under the Emissions Trade Scheme ("ETS") program. The Court should, therefore, find Dingsheng failed to exhaust its administrative remedies. Regardless, Commerce's determination that Alro S.A.'s financial statements are not distorted by subsidies is supported by record evidence.

Fifth, Commerce properly rejected Dingsheng's claim that Alro S.A.'s financial statements are insufficiently disaggregated to calculate financial ratios. Commerce has relied on

Alro S.A.'s financial statement to calculate financial ratios in several antidumping proceedings involving aluminum products. Moreover, the deficiencies Dingsheng alleges are also present in the Elena and UACJ Malaysia financial statements, meaning the alternative financial statements are not superior in terms of their functionality for calculating financial ratios.

Sixth, Commerce's determination that the Alro S.A. financial statements are audited and reliable is supported by substantial evidence, as is Commerce's determination that Alro S.A.'s financial statements constitute the best available information for calculating financial ratios.

Seventh, Commerce's determination that Romanian labor and domestic insurance information is superior to alternatives in other countries is supported by substantial evidence. As an initial matter, the record does not support Dingsheng's claim that labor is a "minor" input. Commerce also reasonably determined that because Romanian labor data were contemporaneous with the POR and Malaysian and Bulgarian labor rates were not, Romanian labor data are the best available. Commerce correctly determined that Romania is the only country to provide surrogate domestic insurance rates.

Eighth, Commerce also properly rejected Dingsheng's claims that Romanian truck freight and brokerage and handling data were inferior to the alternatives. Romanian data for these expenses are from the same source as the Bulgaria data (i.e., Doing Business), and Commerce reasonably determined the Malaysian data are not superior because they are less contemporaneous.

In sum, because each of Commerce's subsidiary factual bases for selecting Romania as the primary surrogate country is supported by substantial evidence, Commerce's selection of Romania as the primary surrogate country is also supported by substantial evidence.

### Double Remedies Adjustment

Commerce properly rejected Dingsheng's request for a double remedies adjustment. Dingsheng failed to demonstrate a cost-to-price link, consistent with Commerce's factual findings under similar scenarios in other proceedings. It is a respondent's burdened to demonstrate a cost-to-price link as a necessary element for eligibility for a double remedies adjustment. As Dingsheng failed to satisfy this criterion, Commerce properly denied Dingsheng's request for an adjustment.

### STANDARD OF REVIEW

This Court will sustain the Final Results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a mere scintilla.'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)). Substantial evidence has also been described as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)). In order to satisfy the standard of review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). When reviewing agency determinations, this Court will evaluate whether the agency action is reasonable given the record as a whole and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp., 340 U.S. at 488; see also Nippon Steel Corp., 458 F.3d at 1350-51.

This is a limited standard of review that only tests whether a determination is supported by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citation omitted). The applicable standard of review does not allow a court to substitute its judgment for that of Commerce (see Akzo N.V. v. USITC, 808 F.2d 1471, 1487 (Fed. Cir. 1986) (citing Citizens to Preserve Overton Park, 401 U.S. 402, 416 (1971)), nor does it allow the parties to retry factual issues before a court de novo (see Kearns v. Chrysler Corp., 32 F.3d 1541, 1548 (Fed. Cir. 1994)).   An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.   See, e.g., Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).   Plaintiff is required to demonstrate that its preferred evidentiary finding is the only reasonable outcome on the administrative record, "not simply that {its preferred finding} may have constituted another possible reasonable choice."   Tianjin Wanhua Co. v. United States, 179 F. Supp. 3d 1062, 1071 (Ct. Int'l Trade 2016) (citing Globe Metallurgical, Inc. v. United States, 865 F. Supp. 2d 1269, 1276 (Ct. Int'l Trade 2012)).

Further, if Commerce has a consistent practice for addressing similar situations, it must either apply that practice or provide a reasonable explanation for deviating from it.   See SKF USA, Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("'An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'") (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)).

## STATEMENT OF FACTS

At the outset of the underlying segment, the Department selected two Chinese respondents for mandatory analysis – Huafon Nikkei Aluminum Corp. ("Huafon") and Jiangsu Zhongji Lamination Materials Co., Ltd and its affiliates.   See Memo from USDOC to Office

DIR/EC Pertaining to Interested Parties Respondent Selection Memo (CR20)(PR42).  Following Huafon's notifying Commerce that it would not participate in the segment, Commerce selected Dingsheng as a mandatory respondent.  Memo from USDOC to Office Director Pertaining To Interested Parties Second Respondent Selection (CR21)(PR53).  Petitioners subsequently withdrew their request for a review of Zhongji.  See Certain Aluminum Foil From People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2021–2022, 88 Fed. Reg. 29,092 (Dep't Commerce May 5, 2023) (PR194) ("Preliminary Results"), and accompanying Decision Memo From USDOC to Assistant Secretary for E&C Pertaining to Interested Parties Prelim Issues and Decision Memo at 3 (Apr. 28, 2023) (PR189) ("PDM").  As a result, Dingsheng was the sole mandatory respondent to participate in Commerce's administrative review.

On September 29, 2022, the Department placed on the administrative record a list of six countries —Romania, Panama, Costa Rica, Malaysia, Bulgaria, and Turkey— that it considered to be at the same level of economic development as China (and equivalent in terms of their economic comparability) and requested that interested parties submit information and comments on: (1) the list of economically comparable countries; (2) surrogate country ("SC") selection; and (3) surrogate value ("SV") information to value Dingsheng's FOPs consumed in producing aluminum foil.  Letter from USDOC to Interested Parties Pertaining to Interested Parties Surrogate Values Letter at 1-2 (PR79-82).

Dingsheng submitted comments on Commerce's list of countries it considered to be economically comparable to China and urged the agency not to restrict itself to the six countries identified on the list, but Dingsheng's comments did not identify any specific alternative

countries.  <u>See</u> Letter from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Economically Comparable Countries Cmts (PR85).

In response to Commerce's request for information on surrogate country selection, Defendant-Intervenors submitted export data for merchandise classified under Harmonized Tariff Schedule ("HTS") subheadings 7607.11 and 7607.19 (classifications providing for aluminum foil) for each of the countries identified on Commerce's list, as well as an excerpt of the annual report of a Romanian producer of merchandise that is comparable to aluminum foil. <u>See</u> Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Surrogate Country Cmts at 4-5, Exhibits 1-2 (PR94) ("Petitioners' SC Comments").  Based on these data, Petitioners noted that there appeared to be significant production of merchandise comparable to aluminum foil in Romania, Turkey, Bulgaria, and Malaysia.  <u>See id.</u> at 5 (PR94). Dingsheng submitted import and export data for merchandise classified under HTS subheadings 7606.11, 7606.12, 7607.11, 7607.19, 7606.91, and 7606.92 and asserted that based on these data, Romania, Turkey, Bulgaria, and Malaysia were all significant producers of merchandise comparable to aluminum foil.  <u>See</u> Letter From Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Surrogate Country Cmts at 4-5 (PR92-93) ("Dingsheng's SC Comments").

Petitioners and Dingsheng submitted surrogate value information that collectively related to three countries (<u>i.e.</u>, Bulgaria, Malaysia, and Romania) on Commerce's list of countries at the same level of economic development as China.  <u>See generally</u> Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Surrogate Value Submission at 2-4 (PR110-12) ("Petitioners' 11/21/22 SV Comments"); Letter from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Surrogate Value

NONCONFIDENTIAL

Submission (PR102-08) ("Dingsheng's 11/21/22 SV Comments"); Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Final SV Cmts (Mar. 29, 2023) (PR146-51) ("Petitioners' 3/29/23 SV Comments"); Letter from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Surrogate Value Cmts I (Mar. 29, 2023) (PR155-59).

Based on these submissions, the record contained complete surrogate value information for Malaysia and Romania, but Dingsheng also submitted certain information from other countries not considered by Commerce to be economically comparable to China (including Indonesia) for certain FOPs where it failed to submit relevant Bulgarian information. <u>See</u> Dingsheng's 11/21/22 SV Comments at Exhibit 1 (PR102-08).

On March 3, 2023, Dingsheng submitted a response to Commerce's double remedies questionnaire asserting that it was eligible for such an adjustment. <u>See</u> Response from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Double Remedies QR (Mar. 3, 2023) (CR94-96)(PR130) ("Dingsheng DRQR"). In particular, Dingsheng claimed its export prices were set based on its cost of production, prevailing market conditions in the United States, expected profit, and existing relationships with its customers. <u>See</u> <u>id.</u> at 2 (CR94-96)(PR130). Dingsheng also noted its managers from various departments met to consider price adjustments, that there were no thresholds for when a change in costs would mandate a price adjustment, and that market conditions played a role in price adjustments. <u>See</u> <u>id.</u> at 2-3, 6-7 (CR94-96)(PR130).

In advance of the <u>Preliminary Results</u>, Petitioners submitted comments urging Commerce to select Romania as the primary surrogate country and to rely on Romanian information to value Dingsheng's FOPs. <u>See</u> Letter from Kelley Drye & Warren LLP to Sec of Commerce Pertaining

to Petitioners Pre-Preliminary Cmts (Apr. 7, 2023) (PR166-77) ("Petitioners' Pre-Preliminary Comments"). Dingsheng submitted comments arguing that Malaysia or, alternatively, Bulgaria, was the most appropriate primary surrogate country. See Letter from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Pre-Preliminary Cmts (Apr. 11, 2023) (PR185-86).

On May 5, 2023, Commerce issued its Preliminary Results in which it selected Romania as the primary surrogate country, denied Dingsheng's request for a double remedies adjustment, and calculated a 32.85 percent dumping margin for Dingsheng. See Preliminary Results, 88 Fed. Reg. at 29,094 (PR194), and accompanying PDM at 14, 23 (PR189).

Regarding surrogate country selection, Commerce preliminarily determined that Bulgaria, Malaysia, Romania, and Turkey were all economically comparable to China and significant producers of merchandise that is comparable to aluminum foil. See PDM at 12-13 (PR189). As a result, in accordance with its well-established practice, Commerce compared the available surrogate value information for each surrogate country to determine which provided the "best available information" to value Dingsheng's FOPs. See id. at 13 (PR189). Commerce stated the record contained Romanian surrogate value information for all FOPs identified by Dingsheng, but was incomplete with respect to Malaysian or Bulgarian surrogate value information. See id. at 14 (PR189). Commerce also preliminarily determined that the Romanian flat-rolled aluminum producer Alro S.A./Alro Group had a more similar level of integration relative to Dingsheng's operations than did UACJ Malaysia ("UACJ") or Elena Group ("Elena") – and, as a result, that the Alro S.A./Alro Group 2021 financial statements were the best available information for valuing surrogate financial ratios. See id. (PR189). Based on these

circumstances, Commerce determined that Romania provided the best available information for valuing FOPs.  See id. at 15 (PR189).

Commerce also denied Dingsheng's request for a double remedies adjustment based on its preliminary determination that Dingsheng failed to (1) demonstrate that subsidies resulted in a change to its cost of manufacture ("COM") during the relevant period, (2) establish how any of the four subsidies identified by Dingsheng impacted the COM, and (3) demonstrate that its COM is linked to the price of its aluminum foil.  See id. at 23 (PR189).  Commerce found that the record demonstrated Dingsheng's price of its aluminum foil was linked to periodic fluctuations in aluminum foil prices, rather than to Dingsheng's COM.  See id. (PR189).

On June 5, 2023, Dingsheng submitted an administrative case brief urging Commerce to select Malaysia, or alternatively Bulgaria, as the primary surrogate country and to grant it a double remedies adjustment.  See Brief from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Case Brief, at 2-41, 43-51 (June 5, 2023) (CR173-77)(PR198) ("Dingsheng Admin. Br.").

On June 20, 2023, Petitioners submitted a rebuttal case brief demonstrating that Romania provided the best available information for valuing Dingsheng's FOPs and should be selected as the primary surrogate country.  See Brief from Kelley Drye & Warren LLP to Sec of Commerce Pertaining to Petitioners Rebuttal Brief at 4-36 (June 20, 2023) (CR178)(PR204).  Petitioners also argued that Dingsheng had not demonstrated it was eligible for a double remedies adjustment.  See id. at 36-44 (CR178)(PR204).

On November 7, 2023, Commerce published its Final Results and calculated a 32.81 percent dumping margin for Dingsheng.  See Final Results at 76,736 (PR213).  Commerce continued to select Romania as the primary surrogate country, and in doing so continued to find

that Romania provided the best available information for valuing Dingsheng's FOPs.  See IDM

at 6-8 (PR210).  Commerce also determined that Dingsheng did not demonstrate it was eligible

for a double remedies adjustment.  See id. at 10-11 (PR210).  Dingsheng subsequently

commenced this action challenging the Final Results.  See Summons (ECF No. 1) (Dec. 7,

2023); Complaint (ECF No. 10) (Jan. 8, 2024).

## ARGUMENT

I.    **COMMERCE LAWFULLY SELECTED ROMANIA AS THE PRIMARY SURROGATE COUNTRY**

Dingsheng challenges Commerce's selection of Romania as the primary surrogate

country and identifies a laundry list of complaints with the agency's analysis of the

administrative record.  See Dingsheng Br. at 6-42.  Before addressing Dingsheng's arguments,

there are two threshold issues the Court should address.  First, Dingsheng wrongly invokes Loper

Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (June 28, 2024), as applicable to this Court's

standard for reviewing Commerce's selection of the best available information to value a

respondent's FOPs.  Second, Dingsheng's brief to this Court simply copies and pastes large

portions of its administrative case brief and fails to address the standard of review relied on by

this Court in reviewing the Final Results.  As discussed in Sections I.A. and I.B., the Court must

apply the appropriate standard of review – which is unchanged by Loper – with respect to

Commerce's analysis of what surrogate information is the best available for valuing a

respondent's FOPs.  The Court should also not permit Dingsheng to revise arguments in its reply

brief to address properly this Court's standard of review, as it has waived that opportunity by

failing to raise and address the standard of review properly in its opening brief.

NONCONFIDENTIAL

**A.      Plaintiffs Incorrectly Identify the Standard of Review Applied by This Court in Reviewing Commerce's Selection of Surrogate Value Information**

In Section I of its opening brief to this Court, Dingsheng argues that Commerce unlawfully selected Romania as the primary surrogate country.  See Dingsheng Br. at 6-42.  In framing its argument, Dingsheng states that "this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the 'best available information.'"  Id. at 9 (citing Loper, 144 S. Ct. 2244).  Dingsheng's invocation of Loper in this context is wrong.

Dingsheng does not challenge Commerce's interpretation of a statute in Section I, and instead challenges Commerce's factual findings and evaluation of record evidence.  The standard of review for Commerce's evaluation of record evidence is unchanged by Loper and continues to be governed by the long-standing substantial evidence standard set out in 19 U.S.C. § 1516a(b)(1)(B)(i).  See Consolidated Edison Co., 305 U.S. at 229 (1938).  The substantial evidence standard does not permit this Court to substitute its judgment for that of Commerce (see Akzo N.V., 808 F.2d at 1487 (Fed. Cir. 1986) (citing Citizens to Preserve Overton Park, 401 U.S. at 416 (1971)), nor does it allow a party to retry factual issues before a court de novo (see Kearns, 32 F.3d at 1548 (Fed. Cir. 1994)).  In analyzing Dingsheng's claims challenging Commerce's selection of the surrogate country and identification of the best available information to value Dingsheng's FOPs, the Court's duty is "'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting Goldlink Indus. Co. v. United States, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006)).  As discussed below,

NONCONFIDENTIAL

Commerce's selection of Romania as the primary surrogate country and determination that Romania is the source of the best available information to value Dingsheng's FOPs are supported by substantial evidence because a reasonable mind could conclude that Commerce chose the best available information. See id.

**B.    The Court Should Deem Waived Any Attempt by Plaintiffs to Grapple With This Court's Standard of Review for the First Time in a Reply Brief**

In its opening brief filed with this Court, Dingsheng copied without any significant modifications large portions of its administrative case brief without addressing the relevant standard of review applied by this Court in analyzing Commerce's Final Results. For example, Dingsheng's arguments regarding the comparability of its production experience to that of Alro S.A. is largely lifted from its administrative brief and largely fails to consider the standard of review applied by this Court. Compare Dingsheng Br. at 15-31 (ECF No. 26) with Dingsheng Admin. Br. at 8-24 (CR173-77)(PR198). By copying these arguments directly from its administrative case brief without adapting them for consideration by this Court, Dingsheng fails to address whether Commerce's decision is unsupported by substantial evidence or otherwise not in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(i); see also JBF RAK LLC v. United States, 991 F. Supp. 2d 1343, 1355 (Ct. Int'l Trade 2014) ("Arguments made before the administrative agency may, of course, be restated in a judicial proceeding but must conform to the different requirements of each process…" while "recycled" arguments taken "verbatim" from an administrative case brief are deemed waived); JBF RAK LLC v. United States, 961 F. Supp. 2d 1274, 1282-83 (Ct. Int'l Trade 2014) (waiving issue where respondent "simply recycled its argument from its administrative case brief" ("almost verbatim"), "never address{ing} Commerce's findings and conclusions in the Issues and Decision Memorandum… just

repeat{ing} the same arguments made prior to the Final Results without any consideration of Commerce's response and rejection of those very same arguments in the Final Results").

This Court should deem waived any attempt by Dingsheng to restructure its arguments to address the applicable standard of review in its reply brief.  Any argument not raised in a principal summary judgment brief is waived.   Indeed, this Court has sustained Commerce's findings in proceedings where a plaintiff has merely replicated its administrative case brief before the Court.  See Jinxiang Infang Fruit & Vegetable Co. v. United States, 476 F. Supp. 3d 1415, 1416-18 (Ct. Int'l Trade 2020); JBF RAK LLC, 991 F. Supp. 2d at 1355; JBF RAK LLC, 961 F. Supp. 2d 1282-83.  Thus, to the extent Plaintiffs attempt to re-work their arguments in a reply to address appropriately Commerce's Final Results and this Court's standard of review, the Court should deem those arguments waived.

### C.    Commerce's Selection of Romania as the Primary Surrogate Country Is Supported by Substantial Evidence

All parties agree that Romania is economically comparable to China and a significant producer of comparable merchandise.  See Petitioners' SC Comments at 5 (PR94); Dingsheng's SC Comments at 4-5 (PR92-93).   In addition, while Dingsheng challenges several aspects of Commerce's comparative analysis of surrogate information in Romania, Malaysia, and Bulgaria, all parties agree that financial statements are a significant and important factor in the non-market economy normal value build up, and the country that offers the best available financial statements should carry significant weight in the surrogate country selection process.   See Dingsheng Br. at 8 ("Commerce's specific identification of financial statements underscores their critical importance in selecting a primary surrogate country.").

One of Commerce's bases for selecting Romania as the primary surrogate country is that it offered "the best available information on the record of this review for calculating surrogate financial ratios." <u>IDM</u> at 7 (PR210). Given that all parties agree the financial statements are of critical importance to the Department's primary surrogate country selection, should this Court determine substantial evidence supports Commerce's finding that "Romanian company, Alro S.A./Alro Group, represents the best available information on the record of this review for calculating surrogate financial ratios," the Court should also sustain Commerce's selection of Romania as the primary surrogate country. Defendant-Intervenors, therefore, will first demonstrate Commerce's determination that Romania provides the best available information for valuing surrogate financial ratios is supported by substantial evidence. <u>See</u> Sections I.C.2.-3. And, while Dingsheng's remaining arguments are also wrong (as set forth in Sections I.C.4.-5., I.D.), the Court can find that based on Commerce's analysis of the financial statements alone, Commerce's selection of Romania as the primary surrogate country is supported by substantial evidence.

### 1. <u>Commerce's Criteria for Surrogate Country Selection</u>

In antidumping proceedings involving merchandise from a non-market economy ("NME") country, the statute requires Commerce to value a respondent's FOPs "based on the best available information regarding the values of such factors." 19 U.S.C. § 1677b(c)(1)(B). The statute directs Commerce to utilize, to the extent possible, the prices or costs of FOPs in one or more market economy countries that are at a level of economic development comparable to that of the NME country and significant producers of comparable merchandise. <u>See</u> <u>id.</u> § 1677b(c)(4).

Here, Commerce determined that Bulgaria, Malaysia, and Romania met the § 1677b(c)(4) criteria, and that the record contained complete or virtually complete surrogate value data, including surrogate financial statements, from all three countries.  See IDM at 6 (PR210); PDM at 11-13 (PR189).  When multiple countries meet the § 1677b(c)(4) criteria, Commerce's established practice is to compare the availability and quality of surrogate value data for each country to determine the most appropriate surrogate country.  See Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004) ("Policy Bulletin 04.1") ("{I}f more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.").

In evaluating the availability and quality of surrogate value information, Commerce considers several factors, including whether the surrogate values are: (1) publicly available, (2) contemporaneous with the POR, (3) representative of a broad market average, (4) tax- and duty-exclusive, and (5) specific to the inputs being valued.  See Policy Bulletin 04.1; Jiaxing Brother Fastener Co. v. United States, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (citing Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014)).  There is no hierarchy among these criteria.  See, e.g., Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review, 71 Fed. Reg. 40,477 (Dep't Commerce July 17, 2006), and accompanying IDM at Comment 1 (July 5, 2006).  Commerce's preference is to satisfy the breadth of these selection criteria.  See, e.g., Tri Union Frozen Prods. v. United States, 163 F. Supp. 3d 1255, 1268-69, 1275 (Ct. Int'l Trade 2016).  Commerce weighs the available information with respect to each input value and make a product-specific and case-specific decision as to what constitutes the "best" available surrogate

NONCONFIDENTIAL

value for each input.  See id.  These are case and fact specific determinations.  See, e.g., id. at 1268-75.

Commerce also has a strong regulatory preference for valuing all FOPs in a single surrogate country, a preference that has been repeatedly affirmed by this Court and the U.S. Court of Appeals for the Federal Circuit ("CAFC").  See 19 C.F.R. § 351.408(c)(2); Jacobi Carbons AB v. United States, 992 F. Supp. 2d 1360, 1376 (Ct. Int'l Trade 2014), aff'd, 619 Fed. Appx. 992 (Fed. Cir. 2015) ("Courts have found that Commerce's single surrogate country preference is strong and must be given significant weight." (citing Clearon Corp. v. United States, 37 CIT 220 at 228 (2013) ("Thus, the court must treat seriously the Department's preference for the use of a single surrogate country.")).  Commerce's preference for valuing inputs in a single country was implemented in part to prevent "parties from 'margin shopping'; i.e., to prevent parties from arguing that the Department combine input prices from different surrogates to achieve the highest or lowest valuations of those inputs."  Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,345 (Dep't Commerce Feb. 27, 1996).  This preference is reasonable because the reliance on information from one surrogate country limits the amount of distortion introduced into Commerce's calculations because a domestic producer would be more likely to purchase a product available in its own country.  See Clearon, 37 CIT at 229.  Further, Commerce's well-established practice of valuing all FOPs in one country is reasonable when data from multiple countries are equally usable.  See Jiaxing Brother Fastener Co., 822 F.3d at 1302; Peer Bearing Co.-Changshan v. United States, 804 F. Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011) ("The preference for use of data from a single surrogate country could support a choice of data as the best available information where the other available data

upon a fair comparison, are otherwise seen to be fairly equal.") (citation and internal quotation omitted).

**2.      Commerce Lawfully Determined Alro S.A.'s Financial Statements Were the Best on the Record for Valuing Surrogate Financial Ratios**

In the Final Results, Commerce determined that the 2021 financial statements of Alro S.A., a Romanian producer of merchandise comparable to aluminum foil, were the best available information for calculating surrogate financial ratios.  See IDM at 7 (PR210).  In challenging Commerce's use of Alro S.A.'s 2021 financial statements Dingsheng argues that:

1. Commerce erroneously determined that Alro S.A.'s production experience was more comparable to Dingsheng's production experience than the production experiences of UACJ Malaysia and Elena.  See Dingsheng Br. at 15-31.

2. Commerce ignored evidence that Alro S.A.'s financial statements are distorted by countervailable subsidies.  See Dingsheng Br. at 31-35.

3. Commerce wrongly analyzed the disaggregation of costs and expenses in each surrogate company's financial statements for purposes of calculating financial ratios.  See Dingsheng Br. at 35-38.

4. Commerce wrongly relied on the accuracy of the Alro S.A. financial statements despite the absence of an auditor's report.  See Dingsheng Br. at 38-39.

Contrary to Dingsheng's assertions, Commerce considered, disagreed with, and addressed these arguments in the IDM.  Thus, Dingsheng's arguments are nothing more than a baseless request that this Court to reweigh the evidence, a request that is contrary to the applicable standard of review.  As detailed below, Commerce's finding that the financial statements of Alro S.A. were the best available information for calculating surrogate financial ratios is reasonable, supported by substantial evidence, and in accordance with law.

In selecting the best available information to calculate financial ratios, Commerce prefers financial statements from producers of identical or comparable merchandise. See 19 C.F.R. § 351.408(c)(3). Commerce considers whether the available financial statements are contemporaneous with the POR, whether production experiences of the surrogate and respondent(s) are similar, and whether the financial statements are publicly available. See, e.g., Persulfates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 70 Fed. Reg. 6,836 (Dep't Commerce Feb. 9, 2005), and accompanying IDM at 5 (Comment 1) (Feb. 2, 2005) ("Persulfates from China IDM") (citing Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China, 69 Fed. Reg. 70,997 (Dep't Commerce Dec. 8, 2004), and accompanying IDM at Comment 9F (Nov. 29, 2004); Baoding Mantong Fine Chemistry Co. v. United States, 222 F. Supp. 3d 1231, 1241 (Ct. Int'l Trade 2017).

### a. Commerce Lawfully Determined Elena Is Not a Producer of Comparable Merchandise and Does Not Have Production Operations That Are Comparable to Dingsheng

Dingsheng submits two charts in its opening brief that purport to summarize the products produced by each entity for which there is a financial statement on the record, as well as each entity's production processes, but lack any citations to the administrative record. See Dingsheng Br. at 20-21.

Regarding Elena, the sole Bulgarian entity for which there is a financial statement on the record, Dingsheng's chart is wrong in several respects. In rejecting Elena's financial statement, Commerce explained that "Elena Group's manufacturing of aluminum products is limited to downstream household foil and lids for aluminum containers." IDM at 7 (PR210). Indeed, Elena neither produces comparable merchandise nor engages in any of the significant

manufacturing operations that constitute Dingsheng's manufacturing processes, including the melting and refining of aluminum and alloying materials, casting aluminum into semi-finished aluminum articles, and cold rolling aluminum to a final gauge or thickness.

Despite explicit record evidence that Elena produces neither identical nor comparable merchandise, or engages in any of the manufacturing processes Dingsheng engages in to produce aluminum foil, Dingsheng asserts that Elena produces "aluminum foil" and is involved in "rolling" aluminum strip and foil. Dingsheng Br. at 20-21. Contrary to Dingsheng's representations, Elena's financial statements and other record evidence make clear that Elena has *no* rolling operations whatsoever and that it merely purchases aluminum foil to produce downstream boxed aluminum foil and aluminum lids for containers of yogurt and food products. See Letter from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Surrogate Value Cmts I, at Exhibit 1C (PR116-17) ("Dingsheng 12/2/22 Submission"). With respect to its operations involving household aluminum foil, Elena's website indicates the company installed a production line for unwinding and packing that aluminum foil, thereby confirming that Elena purchases aluminum foil and packs it for use by the ultimate consumer. See id. Further, to produce laminated foil, such as lids for yogurt, Elena utilizes a "foil lacquering line with three sections through which thermo lacquers are applied, as well as primer for printing purposes." Id. Like its operations involving household foil, Elena's lacquered foil production begins with the subject merchandise and does not involve any of the manufacturing steps performed by Dingsheng.

Thus, not only is Commerce's finding that Elena does not produce comparable merchandise or engage in any of the manufacturing processes performed by Dingsheng supported by substantial evidence, but Dingsheng's characterization of Elena's operations is

erroneous.  As a result, with respect to Bulgaria, the record does not contain a financial statement for a producer of merchandise that is comparable to aluminum foil, or a manufacturer with any production process that is comparable to Dingsheng.

> **b.  <u>Alro and UACJ Are Both Producers of Comparable Merchandise, but Alro's Level of Integration Is More Similar to Dingsheng Than Is UACJ</u>**

Commerce determined that Alro S.A.'s and Dingsheng's production experiences were more similar in terms of their level of integration relative to UACJ's production experience.  <u>See</u> <u>IDM</u> at 7-8 (PR210).  Dingsheng, like Alro S.A., is an integrated producer of flat-rolled aluminum products.  Both entities melt primary aluminum, cast the molten aluminum, and then roll the aluminum to final sheet or foil gauges.  <u>See id.</u> at 7 (PR210); Dingsheng Br. at 15-16; Response from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Sec D QR, at Exhibit D-3 (PR89-91) ("Dingsheng DQR"); Petitioners' 3/29/23 SV Comments at Attachment RO-7 (pdf pg. 314) (PR146-51).  In contrast, as discussed below, UACJ *purchases* aluminum foil or sheet and further rolls it to aluminum foil gauges.  UACJ does not melt or cast aluminum, the more intensive aspects of the aluminum foil production processes.  Accordingly, Commerce's determination that Dingsheng's production experience is most similar to Alro S.A.'s is both reasonable and supported by substantial evidence.

> **i.  <u>Dingsheng's Production Process</u>**

Dingsheng's integrated production processes begin with the melting of primary aluminum and alloying elements to reach a specific chemistry (or alloy), casting the molten aluminum into semi-finished alloyed aluminum, rolling the semi-finished cast aluminum to sheet/strip gauges, and then further rolling the sheet/strip to foil gauges, and finishing the jumbo

rolls by slitting, annealing, etc. See Dingsheng Br. at 15-16; Dingsheng DQR at Exh. D-3 (PR89-91). Indeed, Dingsheng sells some of the aluminum sheet it produces without further rolling it to a thinner, foil gauge. See Dingsheng DQR at Exh. D-5 (listing aluminum sheet as one of Dingsheng's products) (PR89-91).

### ii.    Alro S.A.'s Production Process

Similarly, Alro S.A. melts and casts aluminum, and then rolls the cast aluminum into plates, sheets, and coils (i.e., flat-rolled products or FRPs). See Petitioners' 3/29/23 SV Comments at Attachment RO-7 (pdf pg. 314). Accordingly, both Dingsheng and Alro S.A. are integrated producers of flat-rolled aluminum products, including aluminum sheet. Further, the processing operations performed by both Alro S.A. and Dingsheng share the same major steps for aluminum foil production (i.e., melting, casting, and rolling to the final gauge). See Circ. Final IDM at 12-13.[2] Dingsheng's processing of aluminum foil differs from Alro S.A.'s production process only in that Dingsheng performs additional rolling to process the sheet to thinner gauge foil, an operation that Commerce has determined is minor or insignificant in comparison to the initial melting, casting, and rolling production stages. See id.

---

[2]    In a recent circumvention inquiry conducted pursuant to 19 U.S.C. § 1677j(b) (analyzing whether completing or assembling aluminum foil in Thailand from aluminum sheet or foil manufactured in China is minor or insignificant), Commerce determined that Dingsheng's processes for completing aluminum foil in Thailand, which involved rolling aluminum strip into aluminum foil (the only production process Dingsheng and UACJ have in common) was minor or insignificant as compared with Dingsheng's processes for manufacturing aluminum strip in China, which include melting primary aluminum, casting the molten aluminum, and rolling cast aluminum to final sheet/strip gauges (the production processes that Dingsheng and Alro S.A. have in common). See Aluminum Foil from the People's Republic of China: Preliminary Decision Memorandum for the Circumvention Inquiry with Respect to the Republic of Korea, at 13 (Mar. 15, 2023); Issues and Decision Memorandum for the Final Affirmative Circumvention Determination of the Antidumping Duty Order on Certain Aluminum Foil from the People's Republic of China with Respect to the Kingdom of Thailand, at 11-13 (Nov. 17, 2023) ("Circ. Final IDM").

Dingsheng wrongly claims that Alro is engaged in upstream bauxite mining and extraction of alumina, thereby making Alro's production process more integrated than Dingsheng's process. See Dingsheng Br. at 18. As Commerce explained, the agency calculated financial ratios based on the financial statements of Alro S.A. (i.e., an entity that is not involved in bauxite mining or alumina extraction) – and not based on the financial statements of the Alro Group, which includes entities engaged in mining bauxite and extracting alumina. See IDM at 7 (PR210). Dingsheng grudgingly concedes as much, but continues to press its argument despite Commerce lawfully rejecting it. See Dingsheng Br. at 18 n.2 (stating that "Alro S.A. is not involved in the mining of bauxite or extraction of alumina"). Accordingly, Dingsheng's arguments concerning the Alro Group's upstream production of bauxite and alumina (see Dingsheng Br. at 16-18), and the fact that "neither UACJ or Dingsheng mine bauxite or refine alumina" are irrelevant to Commerce's determination that Alro S.A.'s financial statements are the best available information on the record from which to calculate surrogate financial ratios. See Dingsheng Br. at 24.

### iii.    UACJ Malaysia's Production Process

While UACJ (unlike Elena) does produce comparable or identical merchandise, UACJ's production process differs significantly from Dingsheng's process in terms of the level of integration, as UACJ engages only in rolling operations and not in melting or casting aluminum. See IDM at 7 (PR210) ("UACJ Malaysia engages in no smelting or casting operations, and its production process is limited to rolling and finishing."). This is confirmed by the description of UACJ's equipment on its website, which describes the company's "Main equipment" as involving an "aluminum foil rolling machine" and various machines for conducting finishing

processes (e.g., cutting, annealing).  See Petitioners' 11/21/22 SV Comments at Attachment MY-9 (PR110-12).

Dingsheng's chart purporting that UACJ Malaysia smelts and casts aluminum is factually inaccurate.  See Dingsheng Br. at 21.  Contrary to Dingsheng's claim, none of the machines identified on UACJ's website – an aluminum foil rolling machine, a polymerizer, a separator, a cutting machine, and an annealing furnace – is capable of melting or casting aluminum.  See Petitioners' 11/21/22 SV Comments at Attachment MY-9 (PR110-12).  As such, Commerce's determination that "UACJ Malaysia engages in no smelting or casting operations, and its production process is limited to rolling and finishing" is supported by substantial evidence.  IDM at 7 (PR210).

Dingsheng also claims that UACJ's production process differs from Dingsheng only in "secondary respects" and "secondary facts upon which Commerce's selection was not based." Dingsheng Br. at 25.  Dingsheng's claim is disingenuous.  As discussed above, UACJ's production process differs significantly from Dingsheng's operations, as Commerce correctly determined.  Moreover, Commerce's analysis of the varying levels of integration of Alro S.A., UACJ, and Dingsheng was *the first and primary reason* underlying Commerce finding that Alro S.A.'s financial statements were the best available information for calculating surrogate financial ratios.  Specifically, Commerce stated:

> Alro S.A./Alro Group's 2021 financial statements are more specific to Dingsheng's integrated production process than either the Malaysian or Bulgarian companies' financial statements. Dingsheng's questionnaire responses indicate that it engages in smelting and refining of primary aluminum inputs, followed by casting and cold-rolling operations.  Therefore, the record demonstrates that Dingsheng, like Alro S.A./Alro Group, is an integrated producer of aluminum products.  We also continue to find Dingsheng's level of vertical integration to be higher than that

of either UACJ Malaysia or Elena Group. Elena Group's manufacturing of aluminum products is limited to downstream household foil and lids for aluminum containers. Similarly, UACJ Malaysia engages in no smelting or casting operations, and its production process is limited to rolling and finishing.

IDM at 7 (citations omitted) (PR210).

As each of Commerce's factual findings regarding the levels of integration of Dingsheng, Alro S.A., and UACJ is supported by substantial evidence, Commerce's selection of Alro S.A.'s financial statements as the best available information for calculating surrogate financial ratios is also supported by record evidence.

### 3. Dingsheng's Additional Arguments Regarding Alro S.A.'s Financial Statements Are Irrelevant or Not Supported by Substantial Evidence

#### a. Comparable/Identical merchandise

Dingsheng argues Commerce cannot calculate surrogate financial ratios with Alro S.A.'s financial statements because it does not produce identical merchandise (i.e., aluminum foil). See Dingsheng Br. at 22-24. Dingsheng's argument is contrary to the statute. While Commerce must weigh the merits of relying on a financial statement of a producer of comparable versus identical merchandise among other considerations, Commerce's mandate is to use the best information available on the record, which it determined was Alro S.A.'s financial statements. See Seah Steel Vina Corp. v. United States, 950 F.3d 833, 841 (Fed. Cir. 2020) (citing 19 U.S.C. § 1677b(c)(1)).

Commerce has wide discretion in determining the best available financial statements on the record, a fact-intensive determination. See, e.g., Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (Commerce is afforded "wide discretion" to value FOPs in NMEs.). In some cases, Commerce determines that the financial statements of producers of

identical merchandise are the best available information relative to producers of comparable merchandise.  See, e.g., Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review, 79 Fed. Reg. 19,316 (Dep't Commerce Apr. 8, 2014), and accompanying IDM at Comment 2 (Mar. 31, 2004) ("Thus, we find that the Hitech financial statements are not the best information on the record for surrogate valuation purposes, given that there are suitable producers of identical merchandise on the record.").  In others (such as here), Commerce rejects the financial statements of producers of identical merchandise because their production process is not as similar to the respondent's production process as producers of comparable merchandise.  See, e.g., Persulfates from China IDM at 5 (acknowledging Commerce's general preference for using financial statements of producers of identical over comparable merchandise but explaining that because "the significant difference in size, scale, and production process between Gurajat and Degussa-AJ would distort the factory overhead and SG&A ratios if Gujarat's production experiences were applied to Degussa-AJ . . . the decision to reject the financial statements of Gujarat" a producer of identical merchandise "is consistent with the Department's preference to match surrogate companies' production experience with the respondent's production experience.") (citations omitted); see also Certain Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 74 Fed. Reg. 14,514 (Dep't Commerce Mar. 31, 2009), and accompanying IDM at Comment 13 (Mar. 23, 2009); Certain Small Diameter Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Romania: Final Results of Antidumping Duty Administrative Review, 68 Fed. Reg. 12,672 (Dep't Commerce Mar. 17, 2003), and accompanying IDM at Comment 2 (Mar. 10, 2003); Circular Welded Carbon-Quality Steel Pipe from the People's Republic of China: Notice of Final Determination of Sales at Less

Than Fair Value, 67 Fed. Reg. 36,570 (Dep't Commerce May 24, 2002), and accompanying IDM at Comment 5 (May 15, 2002).

The U.S. Court of International Trade has also recognized there is no statutory requirement for Commerce to rely on the financial statements of producers of identical (as opposed to comparable) merchandise in calculating surrogate financial ratios. For example, in Jiaxing Brother, the Court noted that there is "no support for any preference between identical versus comparable merchandise" as "{t}he statute does not speak to this distinction." Jiaxing Brother Fastener Co., 751 F. Supp. 2d at 1353 (Ct. Int'l Trade 2010) (citing 19 U.S.C. § 1677b(c)). Further, "Commerce's regulation does not forbid treatment of identical and comparable merchandise as equivalent." Id. (citing 19 C.F.R. § 351.408(c)(4)).

In SeAH Steel I, the Court sustained Commerce's selection of a financial statement for a producer of identical merchandise, but made clear the decision was based on the specific facts of that case and the product at issue:

> Here, Commerce faced imperfect options, and "no superior option{s}." Remand Results 22-23. And Commerce mentioned earlier that, given the "unique nature" of OCTG, it was particularly important to use financial statements from a producer of identical merchandise. I&D Mem. 18. It was reasonable for Commerce to prioritize a company that produces OCTG, even if the company is integrated at a different level. The court will not second-guess Commerce's reasonable exercise of its "wide discretion" to choose from among "imperfect options."

SeAH Steel VINA Corp. v. United States, 269 F. Supp. 3d 1335, 1350 (Ct. Int'l Trade 2017), aff'd, Seah Steel Vina Corp. v. United States, 950 F.3d 833, 840-41 (Fed. Cir. 2020). The opposite is true here, with Commerce emphasizing level of integration over identical merchandise, and the Court should not substitute its own judgment for Commerce's weighing of the evidence.

NONCONFIDENTIAL

In sum, Commerce had two reasonable, but imperfect, options: (1) Alro S.A., a producer of comparable merchandise with a similar level of integration, or (2) UACJ, a producer of identical merchandise with a dissimilar level of integration. "When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly." Tehnoimportexport, UCF Am. Inc. v. United States, 783 F. Supp. 1401, 1407 (Ct. Int'l Trade 1992). The standard of review does not allow this Court to reweigh the record evidence and disturb Commerce's reasonable decision.

> **b.** **Dingsheng Failed to Exhaust Its Administrative Remedies Concerning the Countervailability of the ETS Program and Commerce's Determination Is Supported by Record Evidence**

Dingsheng argues Commerce was "required by law to reject" Alro S.A.'s financial statements and ignored Dingsheng's evidence that allegedly demonstrates these financial statements indicate that Alro S.A./Alro Group received the additional ETS allowances that Commerce found countervailable in Fluid End Blocks from Germany. See Dingsheng Br. at 31, 34 (citing Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination, 85 Fed. Reg. 80,011 (Dep't Commerce Dec. 11, 2020), and accompanying IDM (Dec. 7, 2020) ("Fluid End Blocks from Germany")). As discussed below, Dingsheng's arguments are wrong.

> **i.** **Dingsheng Failed to Exhaust Its Administrative Remedies**

Dingsheng failed to exhaust its administrative remedies concerning its arguments before this Court regarding ETS subsidies. See Dingsheng Br. at 31-35. In the underlying administrative proceedings, Dingsheng did not argue that Alro S.A. received the *additional*

allowances under the ETS schemes that Commerce determined were countervailable.  See Dingsheng Admin. Br. at 24-32 (CR173-77)(PR198).  Instead, Dingsheng argued to Commerce that "Alro's financials contain evidence of receipt of Romanian government grants under the indirect Emissions Trading Scheme (ETS) program funded by the European Union (EU)."  Id. at 24 (CR173-77)(PR198).

As Commerce explained in the IDM, and as this Court has also determined, "{t}he finding in Fluid End Blocks from Germany was not a broad finding of the countervailability of the ETS overall."  IDM at 8 (PR210) (citing BGH Edelstahl Siegen GmbH v. United States, 600 F. Supp. 3d 1241, 1262-64 (Ct. Int'l Trade 2022)).  Dingsheng did not mention, let alone argue, that Alro S.A. received the additional allowances Commerce has determined to be countervailable.  See Dingsheng Admin. Br. at 24-32 (CR173-77)(PR198).

If Dingsheng had raised these arguments in its administrative case brief, Commerce would have been able to consider them, but Dingsheng failed to do so.  As such, this Court should not allow Dingsheng to raise this argument for the first time in this action.  See DuPont Teijin Films China Ltd. v. United States, 7 F. Supp. 3d 1338, 1354 (Ct. Int'l Trade 2014) (holding that where a party had failed to make a particular argument to Commerce, that party failed to exhaust its administrative remedies and so waived that argument).

Regardless, as discussed below, Commerce's determination that there is no evidence Alro S.A./Alro Group received the additional ETS allowances that Commerce found countervailable in Fluid End Blocks from Germany is supported by substantial evidence.

   ii. **Commerce's Determination Is Supported by Substantial Evidence**

Dingsheng claims Commerce ignored evidence that allegedly demonstrates Alro S.A.'s financial statements are distorted by countervailable subsidies.  See Dingsheng Br. at 31. Contrary to Dingsheng's claim, Commerce clearly addressed Dingsheng's arguments, explaining that "there is no evidence that Alro S.A./Alro Group received the additional ETS allowances that Commerce found countervailable in Fluid End Blocks from Germany." IDM at 8 (PR210).  For the reasons discussed below, Commerce's determination is supported by substantial evidence.

As an initial matter, Dingsheng incorrectly identifies the standard Commerce applies in determining whether to disregard surrogate information that is distorted by countervailable subsidies, claiming that "Commerce is required by law to reject a financial statement when— based on substantial evidence—it has reason to believe or suspect that the company received a countervailable subsidy during the reporting period."  Dingsheng Br. at 34.  Dingsheng's formulation is contrary to the statute's plain language, which states that Commerce "may" disregard prices or costs if Commerce "has determined that broadly available export subsidies existed or particular instances of subsidization occurred with respect to those price or cost values."  19 U.S.C. § 1677b(c).  Thus, the statute clearly provides Commerce with discretion regarding whether to disregard surrogate value information, and it does not require Commerce by law to reject such information, as Dingsheng claims.

Further, Dingsheng's arguments do not undermine Commerce's determination that "there is no evidence that Alro S.A./Alro Group received the additional ETS allowances that Commerce found countervailable in Fluid End Blocks from Germany." IDM at 8 (PR210). Specifically, Dingsheng argues that Alro S.A. "was *entitled* to additional free ETS allowances

during 2021–2030" and "eligible for this additional countervailable ETS benefit."  Dingsheng

Br. at 32-33 (emphasis added).  Commerce, however, determined there is no record evidence

demonstrating that Alro S.A. benefited from additional free ETS allowances, or that these

additional free ETS allowances are reflected in the financial statements from which Commerce

calculated the surrogate financial ratios.  The only evidence identified by Dingsheng (i.e., that

"the Group received the amount of RON 396,829 thousand representing the compensation for the

indirect emissions costs embedded in the energy costs incurred in 2020") does not indicate that

this amount was tied to additional ETS allowances that Commerce found countervailable in

Fluid End Blocks from Germany.

Further, Alro S.A.'s financial statements demonstrate that the company did not benefit

from any additional free ETS allowances under the ETS scheme.  The Alro Group and Alro S.A.

were able to sell $CO_2$ emission certificates because of its investments in energy efficiency:

> In 2020, the **Group and the Company sold $CO_2$ emission
> certificates** of RON 73,668 thousand at the Group level and RON
> 12,523 thousand at the Company level and included them under
> Income from sale of emission rights, benefiting from the increase
> in the price of CO2 emission certificates.  **The Group and the
> Company were in the position to have a surplus of emission
> certificates as it made numerous efforts to invest in energy
> efficiency in the latest years**.

Petitioners' 3/29/23 SV Comments at Attachment RO-7 (p. 120 of the financial statements)

(emphasis added) (PR146-51).  Accordingly, Commerce's determination that there is no

evidence that Alro S.A./Alro Group received the additional ETS allowances that Commerce

found countervailable in Fluid End Blocks from Germany is supported by substantial evidence.

      c.      **Alro S.A.'s Financial Statements Are Sufficiently Disaggregated**

Dingsheng contends that Alro S.A.'s financial statements are insufficiently disaggregated for purposes of calculating surrogate financial ratios. See Dingsheng Br. at 35-38. Dingsheng's arguments are wrong for several reasons.

First, Commerce has repeatedly relied on Alro's financial statements to calculate financial ratios, demonstrating they are sufficiently detailed. For example, in the second administrative review of the antidumping duty order on common alloy aluminum sheet from China – another proceeding involving a flat-rolled aluminum product that can be the input for aluminum foil – Commerce determined that Alro S.A.'s financial statements were sufficiently detailed to calculate financial ratios, stating:

> {W}e disagree that Alro S.A.'s financial statement is insufficiently detailed to calculate accurate financial ratios. The overhead ratio is calculated as the overhead cost divided by the sum of material, labor, and energy costs. Further, the selling, general and administrative (SGA) expense ratio and the profit ratio include all material, labor, and energy expenses in the denominator of their calculations. Because there is no ratio that includes only a subset of material, labor, and energy costs, the inability to further break down these expenses into individual categories does not impact the accuracy of the financial ratios.

Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020-2021, 87 Fed. Reg. 54,975 (Sept. 8, 2022), and accompanying IDM at 21 (Aug. 31, 2024). Commerce provided the same explanation in determining to rely on Alro S.A.'s financial statements in the less-than-fair-value investigation of aluminum extrusions from China. See Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Aluminum Extrusions from the People's Republic of China, at 23-25 (Sept. 26, 2024), ref'd in Aluminum Extrusions

From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 89 Fed. Reg. 80,506 (Dep't Commerce Oct. 3, 2024) (final determ.).  Accordingly, Commerce's determination that Alro S.A.'s financial statements are sufficiently detailed to calculate surrogate financial ratios is consistent with its reliance on those same financial statements in at least two other proceedings.

Second, Dingsheng's claim that Alro S.A.'s financial statements are insufficiently disaggregated because they do not segregate energy costs should be rejected.  See Dingsheng Br. at 36-37.  Elena's and UACJ's financial statements also fail to segregate energy costs, making this claimed deficiency applicable to all three financial statements before Commerce.  Dingsheng itself notes that UACJ does not have a separate breakout for energy costs, claiming instead that "Other operating expenses" must be specific to energy because "being a non-depreciation expense,{'other operating expenses'} is reasonably allocated to energy."  Dingsheng Br. at 35. Dingsheng makes the same claim regarding Elena's financial statements, arguing that "Other costs" must be separately disaggregated energy costs, again speculating that "being a non-depreciation expense, {'other costs'} is reasonably allocated to energy."  Id. at 36. Dingsheng's speculation, however, is not record evidence.  Accordingly, any perceived deficiency in the Alro S.A. financial statements is equally applicable to Dingsheng's preferred financial statements.

Third, Alro S.A.'s financial statements are at least as detailed as Elena's or UACJ's financial statements.  UACJ's financial statements and the accompanying notes do not contain a specific break-out of the company's COGS (i.e., Cost of Goods Sold) reported in its Profit & Loss ("P&L") statement.  See Petitioners' 11/21/22 SV Comments at Exhibit MY-7 (PR110-12). While Elena's 2021 P&L statement contains line items for raw materials and supplies and staff

NONCONFIDENTIAL

costs, it does not contain specific line items for COGS and SG&A.  See Dingsheng 12/2/22

Submission at Exhibits 1A-1B (PR116-17).  Commerce correctly determined the same, stating:

"UACJ Malaysia's 2021 financial statements provide no specific breakdown of COGS, whereas

Elena Group's 2021 financial statements contain no specific line items relating to both COGS

and SG&A."  IDM at 8 (PR210).  Additionally, as discussed above, neither UACJ's nor Elena's

financial statements have a breakout for energy costs.  Accordingly, Commerce's determination

that the Alro S.A. financial statements are sufficiently disaggregated to calculate financial ratios

is supported by substantial evidence and consistent with the agency's reliance on these financial

statements in many other aluminum-related proceedings.

### d.    Alro S.A.'s Financial Statements Are Reliable

Dingsheng argues Alro's financial statements are unreliable because they are missing an

independent auditor's report.  See Dingsheng Br. at 38.  Commerce disagreed that Alro S.A.'s

financial statements are unaudited, a decision that is supported by substantial evidence.  See IDM

at 8 (PR210).

Specifically:

> The financial statements included in this report are audited and
> present the individual and consolidated financial results of ALRO
> and ALRO Group that have been prepared in accordance with the
> Ministry of Public Finance Order no. 2844/2016, with subsequent
> amendments, which is in accordance with the International
> Financial Reporting Standards (IFRS) adopted by the European
> Union (EU), except for IAS 21 The Effects of Changes in Foreign
> Exchange Rates regarding the functional currency, except for the
> provisions of IAS 20 Accounting for government Grants regarding
> the recognition of revenues from green certificates, except for the
> provisions of IFRS 15 Revenue from Contracts with Customers
> regarding the revenue from taxes of connection to the distribution
> grid.

Petitioners' 3/29/23 SV Comments at Attachment RO-7 (pdf pg. 301) (PR146-51).   Further,

Alro's 2021 Annual Report contains "Statement of the Persons in Charge" (prepared by the

company's Board of Directors), which confirms that "the consolidated financial statements of

Alro and its subsidiaries and the separate financial statements of Alro for the year ended 31

December 2021 are audited."  Id. (pdf pg. 400).   Further, Note 35 of Alro's 2021 financial

statements (entitled "Auditor's fee") demonstrates that the company's principal auditor for fiscal

years 2020 and 2021 was Ernst & Young Assurance Services SR.  See id. (pdf pg. 400).   Based

on this record information, Commerce reasonably concluded that the "Alro S.A./Alro Group's

2021 financial statements are audited."  IDM at 8 (PR210).

Further, Commerce has previously relied on financial statements that lack an auditor's

report when the financial statements otherwise indicate they were audited and reliable.  For

example, in a less-than-fair-value investigation of raw honey from India, Commerce determined

that a respondent's financial statements were reliable despite the lack of an auditor's report based

on other indicia of reliability and the Court sustained that determination.  See Raw Honey From

India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of

Critical Circumstances, 87 Fed. Reg. 22,188 (Dep't Commerce Apr. 14, 2022), and

accompanying IDM at 32 (Apr. 7, 2022), aff'd, Am. Honey Producers Ass'n v. United States,

653 F. Supp. 3d 1329, 1335-37 (Ct. Int'l Trade 2023).  Because Commerce determined that Alro

S.A.'s financial statements are the best available information, and that evidence on the record

demonstrates the financial statements were audited and reliable, Commerce's decision rely on

Alro S.A.'s financial statements is lawful.

*       *       *

In sum, Commerce's determination that Alro S.A.'s financial statements are the best available information for calculating surrogate financial ratios for Dingsheng is supported by substantial evidence.  Contrary to Dingsheng's claim, Elena Group does not produce comparable merchandise or engage in any of the manufacturing processes conducted by Dingsheng.  UACJ Malaysia is a producer of aluminum foil, but only engages in the final manufacturing step performed by Dingsheng (i.e., rolling), which Commerce has determined is minor or insignificant compared to the remainder of the aluminum foil production process.  In contrast, Alro manufactures comparable merchandise and engages in the same production processes as Dingsheng – melting and refining aluminum, casting molten aluminum into semi-finished merchandise, and cold rolling semi-finished aluminum into aluminum sheet – the processes Commerce has determined represent a significant portion of the value of the merchandise.  Last, Commerce addressed and reasonably rejected each of Dingsheng's claims regarding Alro's financial statement.  Given that all parties agree financial statements are a critical aspect of Commerce's surrogate country selection analysis, and that Commerce's selection of the Alro financial statements as the best available information is lawful, the Court should sustain Commerce's selection of Romania as the primary surrogate country.

**4.    Commerce Lawfully Determined Romanian Labor Data Are Superior to Alternatives and Support the Selection of Romania as the Primary Surrogate Country**

Dingsheng claims Commerce's reliance on the superiority of Romanian labor as a basis for selecting Romania as the primary surrogate country is unlawful.  See Dingsheng Br. at 9-14. Dingsheng first claims that labor is only a "minor" input (see id. at 9-12), and then it claims Commerce departed from an established practice of relying on non-contemporaneous labor data and inflating it to the POR.  See id. at 12-14.  Each of Dingsheng's claims is wrong.

Regarding Dingsheng's initial argument that labor is a minor input, Commerce evaluated all of the surrogate information from each of the potential surrogate countries and found that Romanian financial statements, labor, and domestic insurance were all superior to alternative Bulgarian and Malaysian data for these FOPs.  See IDM at 6-8 (PR210).  Moreover, Dingsheng reported approximately [      ] FOPs with five aluminum direct material inputs, including primary aluminum (ingots and liquid aluminum), scrap, and aluminum strip accounting for [      ] percent of Dingsheng's normal value.  See Dingsheng Br. at Attachment 1.  There is no dispute that the surrogate information from Romania, Bulgaria, and Malaysia is equivalent with respect to these five factors.  Thus, Commerce's reliance on other factors, such as financial ratios and labor, to determine the country that provides the best available information is reasonable.  Further, the fact that labor accounts for [      ] of the remaining [      ] percent of Dingsheng's normal value indicates labor is not a "minor" value.  See id.

Dingsheng's claim that Commerce unlawfully determined Romanian labor data are superior Bulgarian and Malaysian information on the basis of contemporaneity is also wrong.  Contemporaneity is one of Commerce's criteria for assessing the quality of surrogate information.  See Policy Bulletin 04.1; Jiaxing Brother Fastener Co., 822 F.3d at 1293 (Fed. Cir. 2016); China Mfrs. Alliance, LLC v. United States, 205 F. Supp. 3d 1325, 1359 (Ct. Int'l Trade 2017) ("Commerce regards contemporaneousness with the POR as important to its ensuring it is valuing factors of production as accurately as possible.") (citing Jinan Yipin Corp. Ltd. v. United States, 800 F. Supp. 2d 1226, 1292 n.76 (Ct. Int' Trade 2011).  Thus, Commerce's evaluation of the data on the basis of contemporaneity is consistent with its policy and well-established practice.

In addition, Dingsheng wrongly claims that "Commerce's normal policy is to bridge the gap between the {surrogate value} data and the POR by applying relevant IMF-published inflators." Dingsheng Br. at 12. Commerce only inflates data when there are no other contemporaneous data on the record, or when the non-contemporaneous data are the best information available on the record for some other reason. Commerce does not simply inflate all non-contemporaneous data, as Dingsheng suggests. Indeed, if Dingsheng had provided a complete quotation in its brief, Commerce's actual policy would be clear:

> Finally, although Commerce does not prefer non-contemporaneous data, it will use that data when it is the best available information (and will adjust non-contemporaneous data to the POI by appropriately inflating or deflating the data). Contemporaneity is a correctable issue and does not preclude our consideration of the available data on the record here. In light of Commerce's preference for a single primary surrogate country, that the Bulgarian natural gas import data is neither aberrational nor unreliable, and that the Bulgarian import data can be deflated for the POI, we continue to find that the Bulgarian natural gas import data fulfills our SV criteria.

Id. (citing Forged Steel Fittings From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 83 Fed. Reg. 50,339 (Dep't Commerce Oct. 5, 2018) (final determ), and accompanying IDM at 13 (Oct. 1, 2018)).

Dingsheng has not alleged, nor could it, that the Malaysian or Bulgarian labor data are superior to the Romanian labor data. Rather than supporting Dingsheng's argument, Forged Steel Fittings from China confirms that Commerce's Final Results are supported by substantial evidence. Accordingly, contrary to Dingsheng's assertions, Commerce has not "unlawfully failed to rely on its policy to apply an inflator to 2020 data" or "contradicted its own administrative practice and acted without substantial evidence." Dingsheng Br. at 12.

Dingsheng also claims Commerce's failure to inflate Bulgarian or Malaysian labor rates is inconsistent with Commerce's determination in the underlying investigation, but this argument is also wrong.  In the less-than-fair-value investigation that resulted in the antidumping order that underlies the administrative review at issue in this action, Commerce inflated labor data from the primary surrogate country (South Africa) despite the existence of contemporaneous labor data from Bulgaria on the record.  See Certain Aluminum Foil From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 83 Fed. Reg. 9,282 (Dep't Commerce Mar. 5, 2018), and accompanying IDM at 12 (Feb. 26, 2018).  This is consistent with Commerce's well-established preference for relying on data from a single surrogate country to reduce distortions and prevent margin-shopping.  See, e.g., Antidumping Duties; Countervailing Duties, 61 Fed. Reg. at 7,345.  Indeed, the Court sustained Commerce's selection of South Africa as the primary surrogate country, and thus affirmed Commerce's reliance on less contemporaneous (but inflated) data from the primary country instead of contemporaneous data from an alternative surrogate country.  See Jiangsu Zhongji Lamination Materials Co. v. United States, 396 F. Supp. 3d 1334, 1346-51 (Ct. Int'l Trade 2019) ("Jiangsu Zhongji I").

The facts at issue in Jiangsu Zhongji I are inapposite, as Commerce here relied on both contemporaneous data and data from the primary surrogate country to value labor.  Accordingly, Commerce has not unlawfully "abandon{ed} its prior practice without any explanation." Dingsheng Br. at 13-14.

### 5.    The Romanian Truck Freight and B&H Values Are Reliable

The Romanian truck freight and brokerage and handling ("B&H") data Commerce relied on in the Final Results are reliable.  Despite Dingsheng's claims, freight and B&H are not "major" FOPs by Dingsheng's own standards, as they are less significant than labor and

insurance. Further, record evidence demonstrates that the Romanian freight and B&H data utilized by Commerce are at least as reliable as the Malaysian or Bulgarian data.

As a threshold matter, Dingsheng's unsupported claim that freight and B&H are "major" FOPs is incorrect. Dingsheng bases its surrogate country argument, in part, on the fact that labor and insurance only account for [          ] percent, respectively, of Dingsheng's U.S. net adjusted sale price. See Dingsheng Br. at 10. Notably, Dingsheng provides no citation or calculation for freight and B&H as a percentage of Dingsheng's U.S. net adjusted sale price, instead arguing (again, without citation or supporting data) that "these FOPs are more important contributors than labor and insurance to the {normal value} build up." Dingsheng Br. at 39. Dingsheng is wrong.

Record evidence demonstrates that the inland freight associated with the transportation of all direct raw materials to Dingsheng's factory accounts for [     ] percent of Dingsheng's weighted average normal value, while the inland freight associated with the transportation of the merchandise under consideration sold in the United States from Dingsheng's factory to the port of export accounts for [     ] percent and [     ] percent of Dingsheng's weighted average net U.S. sale price and normal value, respectively. See **Attachment 1** hereto. B&H and domestic insurance each represent [     ] percent of Dingsheng's U.S. net adjusted sale price. See id. By Dingsheng's own metrics, foreign inland freight accounts for a much smaller portion of the weighted average normal value than labor, while B&H and domestic insurance are immaterial to the calculation of normal value and the U.S. net adjusted price. Accordingly, freight and B&H are less important factors than labor and insurance for surrogate country selection. That is, if Commerce's Final Results are sustained concerning surrogate country selection based on the

superior Romanian financial statements and equal or similar quality data for major FOPs, any error regarding freight or B&H (of which there is none) is harmless.

Further, the Romanian freight and B&H data that Commerce relied on in the Final Results are reliable. Dingsheng's assertion that Commerce "failed to address the fact that DOING BUSINESS ROMANIA did not provide any B&H data in 2020" is wrong. Dingsheng Br. at 42. Commerce addressed this directly in reaching the Final Results, stating

> Moreover Dingsheng's argument that Romanian brokerage and handling is zero does not call into question the reliability of Romanian sourced SVs for either Dingsheng's primary aluminum production inputs, nor for the viability of Romanian-sourced financial ratios which Commerce utilized in this proceeding.

IDM at 7 (PR210). Dingsheng's inability to distinguish between a value reported as zero and a value that has not been reported does not make the Commerce's analysis unreasonable or unsupported by substantial evidence.

Further, Dingsheng advocates for the Bulgarian Doing Business report as a reliable alternative, which also indicates a "0" in most of its brokerage and handling fields. See Dingsheng's 11/21/22 SV Comments at Exhibits 7B (PR102-08). Moreover, Dingsheng misrepresented the brokerage and handling expenses on exports reported in the Bulgaria 2020 Doing Business report. Specifically, Dingsheng reports a total of USD 237.60 per container for B&H expenses for exports, while Bulgaria's 2020 Doing Business report identifies a total of USD 107 per container for B&H expenses for exports. See id. (PR102-08). Dingsheng has not reconciled how the Romanian Doing Business report is unreliable on the one hand, while the Bulgarian Doing Business report is somehow reliable making the same assumptions.

Finally, record evidence demonstrates that the Romanian freight and B&H data are at least as reliable as the Malaysian or Bulgarian data. The Romanian and Bulgarian data were

gathered in 2019 and are both from the Doing Business report series and, thus, are of equal quality. See id. (PR102-08); Petitioners' 11/21/22 SV Comments at Exh. MY-6B (PR110-12); IDM at 7 (PR210) (stating that "with regard to Bulgaria, we note that, like Romania, Bulgarian freight and brokerage data are derived from World Bank data"). As Commerce explained, the Malaysian data, which were published in 2017, were even older. See IDM at 7 (PR210); Petitioners' Pre-Preliminary Comments at Attachment 2 (pdf pg. 25-27) (PR166-77).

### D. Plaintiffs' Claim that Commerce Incorrectly Selected the Primary Surrogate Country Based on Minor Inputs Is Wrong

Dingsheng argues that Commerce relied on the fact that Malaysia and Bulgaria were missing information for "minor" FOPs – specifically, labor and domestic insurance – as one of the "pillars" and "a linchpin of Commerce's decision to select Romania as the primary surrogate country." Dingsheng Br. at 9, 13. Dingsheng misunderstands Commerce's Final Results, in which the agency determined that "the record contains complete or virtually complete {surrogate value} data, including surrogate financial statements, from Bulgaria, Malaysia, and Romania." IDM at 6 (PR210). Commerce did not select Romania solely because Malaysia or Bulgaria was missing "minor" FOPs. With data for the direct material inputs accounting for a significant percentage of normal value being equal or similar in terms of quality and completeness, Commerce reasonably considered the quality and availability of other FOPs in selecting the primary surrogate country. See Section I.C.4. (noting that direct aluminum input materials, which are of equal quality, account for [    ] percent of normal value).

In addition, Frozen Fish Fillets from Vietnam – a case Dingsheng claims supports its argument that Commerce cannot rely on less significant FOPs in identifying the primary surrogate country – is inapposite. In Frozen Fish Fillets from Vietnam, Commerce determined

that Bangladeshi data for whole fish (the most significant input) and Bangladeshi financial statements were superior – and, accordingly, selected Bangladesh as the surrogate country despite more contemporaneous Philippine and Indonesian data for the minor inputs.  See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of the New Shipper Review, 77 Fed. Reg. 27,435 (Dep't Commerce May 10, 2012) (final results), and accompanying IDM at Comment IC(ii) (May 3, 2012).  Here, the data for aluminum inputs are of equal quality, and Commerce determined the surrogate financial statements, labor, and domestic insurance data from Romania are superior.  Accordingly, Dingsheng's reliance on Frozen Fish Fillets from Vietnam is misplaced.

Lastly, Commerce has a regulatory and judicially-affirmed preference for valuing all FOPs in one country.  See, e.g., Clearon Corp. v. United States, 37 CIT 220, 228 (2013).  Dingsheng is required to demonstrate that its preferred surrogate country is the only reasonable surrogate country on the record.  Dingsheng has failed to meet this burden and instead has highlighted why Commerce's Final Results are reasonable and should be affirmed.

II.    **COMMERCE LAWFULLY DENIED DINGSHENG'S REQUEST FOR A DOUBLE REMEDIES ADJUSTMENT**

Dingsheng claims it is entitled to a double remedies adjustment.  See Dingsheng Br. at 43-48.  Dingsheng is wrong.  The Court has denied Dingsheng's same arguments in an appeal of this same issue in a prior administrative review.  See Jiangsu Zhongji Lamination Materials Co., (HK) v. United States, Ct. No. 21-00138, Slip Op. 23-84 at 29-39, 2023 Ct. Intl. Trade LEXIS 88 at *24-33 (June 7, 2023) ("Jiangsu Zhongji II").

A.      **Legal Background**

Pursuant to 19 U.S.C. § 1677f-1, Commerce "shall . . . reduce the antidumping duty by the amount of the increase in the weighted average dumping margin" calculated by Commerce when the following three conditions are satisfied:

> A.  a subsidy (other than an export subsidy) has been provided with respect to the class or kind of merchandise;
>
> B.  such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period, and
>
> C.  Commerce can reasonably estimate the extent to which the countervailable subsidy, in combination with the use of normal value, has increased the weighted average dumping margin.

See 19 U.S.C. § 1677f-1(f)(1).  As Dingsheng notes, Commerce has reasonably concluded that this statutory language requires a respondent to demonstrate:

> 1.  a subsidies-to-cost link, i.e., an impact of subsidies on the cost of manufacture ("COM"); and
>
> 2.  a cost-to-price link, i.e., the respondent changed the price of goods sold as a result of changes in COM.

See Dingsheng Br. at 43; see also Vicentin S.A.I.C. v. United States, 503 F. Supp. 3d 1255, 1263 (Ct. Int'l Trade 2021) (finding that, in administering 19 U.S.C. § 1677f-1(f)(1), Commerce requires the producer or exporter to demonstrate both a "subsidies-to-cost link" and a "cost-to-price link"), aff'd, 42 F.4th 1372 (Fed. Cir. 2022).

Commerce properly denied Dingsheng's request for a double remedies adjustment because Dingsheng did not demonstrate (1) that a countervailable subsidy reduced the average price of imports of the class or kind of merchandise during the relevant period; (2) a subsidies-to-cost link; and (3) a cost-to-price link.    See IDM at 10 (PR210).    Dingsheng claims it

demonstrated it met all three criteria.  <u>See</u> Dingsheng Br. at 43-47.  Because record evidence and precedent make clear Plaintiffs failed to established a cost-to-price link, the Court need only address this issue to sustain Commerce's determination.

     **B.**    <u>**Dingsheng Failed to Demonstrate a Cost-to-Price Link**</u>

     <u>Jiangsu Zhongji II</u> easily disposes of Dingsheng's argument.  In <u>Jiangsu Zhongji II</u>, an appeal of the first administrative review conducted pursuant to the antidumping duty order on certain aluminum foil from China, the Court sustained Commerce's final results and more specifically Commerce's denial of Jiangsu Zhongji's request for a double remedies adjustment, stating:

> The two admissions cited above are enough to support the Department's conclusion.  **First, the company admits that it does not necessarily adjust prices when the inputs' costs change. Second, the company admits that its pricing changes based on the London Market Exchange ingot price**, which presumably has nothing to do with any countervailable subsidies provided by the Chinese government.  **In other words, whether "the average price of imports" to the United States was reduced is apparently a matter of whether Zhongji's management decides to adjust prices.**  The Department's conclusion that the company failed to demonstrate eligibility for a double remedies adjustment is therefore supported by substantial evidence.

<u>Jiangsu Zhongji II</u>, Slip Op. 23-84 at 39, 2023 Ct. Intl. Trade LEXIS 88 at *32-33.

     This Court has also confirmed in other proceedings that prices that are based on international market prices plus a specified premium demonstrate that there is not cost-to-price link:

> Commerce cites LDC's explanation at verification that LDC's U.S. affiliate agreed to U.S. sales of biodiesel that were "generally priced based on New York Mercantile Exchange ({"NYMEX"}) heating oil futures prices plus some specified premium{. . .}"

> If a company prices its U.S. sales based on external price movements, a reasonable mind can conclude that the company is not incorporating the benefit of a domestic subsidy.

Vicentin S.A.I.C., 503 F. Supp. 3d at 1267-68 (Ct. Int'l Trade 2021).  The CAFC affirmed the same, stating:

> Commerce cited evidence that biodiesel export prices are set based on international prices for heating oil with a fixed premium, rather than based on volatile feedstock costs, and that the price of Argentinian biodiesel tracked prices from other countries rather than responding to changes in the Argentinian subsidy.  This amounts to substantial evidence that "there is no significant link between the subsidy and U.S. prices."

Vicentin S.A.I.C., 42 F.4th at 1381-82 (Fed. Cir. 2022).

Here, Dingsheng confirmed that it provided its customers with fabrication prices and also material prices during the POR, as is customary in the flat-rolled aluminum industry.  See Response from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec of Commerce Pertaining to Dingsheng Sec AC Supp QR at 4 (CR98-105)(PR133).  Specifically, [

] See id. at Exh. SA-6.  For example, [

] See id. (PDF-62).    Similarly, [

] Id. (PDF-84) (emphasis in original); see also id., Exhibit SA-6 (PDF-89) (including a copy of [

]).  Because [

-47-

] Dingsheng has not demonstrated and cost-to-price link.

Further, Dingsheng also confirms that "'whether "the average price of imports' to the United States was reduced is apparently a matter of whether {Dingsheng}'s management decides to adjust prices." Jiangsu Zhongji II, Slip Op. 23-84 at 39, 2023 Ct. Intl. Trade LEXIS 88 at *32-33. Just like the plaintiff in Jiangsu Zhongji II, Dingsheng does not necessarily adjust prices when the inputs' costs change. Instead, it considers (1) the cost of production, (2) the prevailing market conditions in the United States, (3) expected profit, and (4) the existing relationship with the customer. See Dingsheng DRQR at 2 (CR94-96)(PR130). Three of these factors are entirely unrelated to the cost of production or any government subsidy. Dingsheng's attempts to argue that prevailing market conditions in the United States are somehow affected by its raw material costs are unsupported, nonsensical, and defy logic. See Dingsheng Br. at 47. Further, "{Dingsheng's} sales manager normally makes the final decision regarding the sales price adjustments." See Dingsheng DRQR at 2 (CR94-96)(PR130). Thus, just like the Plaintiff in Jiangsu Zhongji II, "the company admits that it does not necessarily adjust prices when the inputs' costs change."

Further, and again like the plaintiff in Jiangsu Zhongji II, Dingsheng "does not have a formal threshold for changes in the cost item that would lead to adjustment of prices" because any price adjustments result from management discussions. Jiangsu Zhongji II, Slip Op. 23-84 at 38-39, 2023 Ct. Intl. Trade LEXIS 88 at *32-33; Dingsheng DRQR at 6 (CR94-96)(PR130). Specifically, when asked if it had a threshold for changes in cost to changes in price, Dingsheng responded "{t}here is no such threshold." Id. (CR94-96)(PR130). "As noted, the cost analysis is undertaken periodically, and sales prices are revised accordingly. The company adjusts prices

based on several factors such as the direct and indirect costs, market conditions and customer requirements." Id.

Accordingly, Dingsheng has not demonstrated the required cost-to-price link, and Commerce's Final Results are supported by substantial evidence.

*       *       *

Dingsheng closes Section II of its brief by reiterating that "in reviewing Commerce's methodology, this Court no longer defers to Commerce's analysis; rather this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the 'best available information.'" Dingsheng Br. at 48 (citing Loper, 144 S. Ct. 2244). The "best available information" statutory mandate, however, is not applicable to Dingsheng's double remedies argument – instead it is applicable to the valuation of surrogate values in antidumping proceedings involving merchandise from NME countries. See 19 U.S.C. § 1677b(c)(1)(B). Further, Loper is not applicable to Commerce's factual finding that Dingsheng failed to demonstrate a cost-to-price link, a necessary element for a double remedies adjustment. Dingsheng's arguments concerning the cost-to-price link do not involve any statutory interpretation. Because this link is a necessary element of a double remedies adjustment, and Commerce's determination that Dingsheng failed to demonstrate a cost-to-price link is supported by substantial evidence and therefore lawful, this Court need not reach the purported statutory ambiguity raised by Dingsheng.

NONCONFIDENTIAL

III.    **CONCLUSION**

For the reasons contained herein, the Court should reject Plaintiffs' claims and sustain the underlying agency determination in its entirety.

Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
JOSHUA R. MOREY
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  November 27, 2024

# ATTACHMENT 1

**THE BUSINESS PROPRIETARY ATTACHMENT IS NOT SUSCEPTIBLE TO SUMMARIZATION AND THEREFORE IS NOT PROVIDED WITH THIS PUBLIC VERSION**

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**


Pursuant to the Court of International Trade Standard Chambers procedures, setting the word limitation of Response Briefs to 14,000 words, counsel for the Aluminum Association Trade Enforcement Working Group and its individual members JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products, LLC, (collectively, "Defendant-Intervenors") certifies that the attached Response Brief contains 13,952 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft 365 - Enterprise.


Respectfully submitted,

/s/ John M. Herrmann
JOHN M. HERRMANN
JOSHUA R. MOREY
MATTHEW G. PEREIRA
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Defendant-Intervenors


Dated:  November 27, 2024