**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JIANGSU DINGSHENG NEW MATERIALS JOINT-STOCK CO., LTD., *et al.*, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )    Court No. 23-00264 |
| UNITED STATES, | )<br>)<br>) |
| Defendant, | )<br>) |
| and | )<br>) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP and ITS INDIVIDUAL MEMBERS, *et al.*, | )<br>)<br>)<br>) |
| Defendant-Intervenors. | )<br>)<br>) |

## <u>ORDER</u>

On consideration of plaintiffs' motion for judgment on the administrative record,

defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the motion is denied and, it is further

ORDERED that judgment is entered for the United States.

Dated: _____
          New York, NY                    _____
                                                            JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JIANGSU DINGSHENG NEW MATERIALS JOINT-STOCK CO., LTD., *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP and ITS INDIVIDUAL MEMBERS, *et al.*, )<br><br>Defendant-Intervenors. ) | Court No. 23-00264 |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
JONZACHARY FORBES
Attorney
Department of Commerce
Office of the Chief Counsel
for Enforcement and Compliance
U.S. Department of Commerce

CHRISTOPHER BERRIDGE
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 353-0537
Christopher.Berridge@usdoj.gov

November 27, 2024

*Attorneys for Defendant*

# **TABLE OF CONTENTS**

**PAGES**

DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD ...................................................…...1

STATEMENT PURSUANT TO RULE 56.2 ....................................................................2

    I.    Administrative Determination Under Review ..............................................2

    II.    Issue Presented For Review ........................................................................2

STATEMENT OF FACTS ...........................................................................................2

    I.    Preliminary Results ....................................................................................4

    II.    Final Results ...............................................................................................6

SUMMARY OF THE ARGUMENT ................................................................................8

ARGUMENT.................................................................................................................9

    I.    Standard Of Review ...................................................................................9

    II.    Commerce's Determination to Select Romania as the Primary
           Surrogate Country is Supported by Substantial Evidence and
           in Accordance with Law ..........................................................................11

           A. Legal Framework for Surrogate Country and Surrogate
               Value Selection ..................................................................................11

           B. Dingsheng's Arguments Regarding Commerce's Selection of a
               Primary Surrogate Country do not Raise a Statutory Interpretation
               Questions Affected by *Loper Bright* ..................................................12

           C. Commerce's Determination to Select Romania as the Primary
               Surrogate Country is Supported by Substantial Evidence and
               in Accordance with Law .....................................................................14

           D. Commerce Properly Found the Alro S.A./Alro Group's
               Financial Statement Provided the Best Available Information ...........18

    III.    Commerce Properly Declined to Make a Double Remedies
           Adjustment.................................................................................................25

CONCLUSION .......................................................................................................…...28

**CASES**                                                                                      **PAGES**

*Al Ghurair Iron & Steel LLC v. United States,*
    65 F.4th 1351 (Fed. Cir. 2023) ............................................................................ 10

*Am. Silicon Techs. v. United States*,
    261 F.3d 1371 (Fed. Cir. 2001) ........................................................................... 10

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    102 F.4th 1252 (Fed. Cir. 2024) ............................................................... 10, 11, 13

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,*
    5 F.4th 1367 (Fed. Cir. 2021) ............................................................................. 13

*Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*,
    419 U.S. 281 (1974)............................................................................................ 21

*Carbon Activated Tianjin Co. v. United States*,
    2547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ..................................................... 17

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)………………………………………………………………12, 13

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*,
    66 F.4th 968 (Fed. Cir. 2023) ............................................................................ 14

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938)........................................................................................... 10

*Crawfish Processors Alliance v. United States*,
    483 F.3d 1358 (Fed. Cir. 2007) .......................................................................... 10

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000) .......................................................................... 13

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)………………………………………………...9, 10, 13

*Goldlink Indus. Co. v. United States*,
    431 F.Supp.2d 1323 (Ct. Int'l Trade 2006) ......................................................... 10

*Hyundai Elec. & Energy Sys. Co. v. United States*,
    15 F.4th 1078 (Fed. Cir. 2021) ................................................................... …..10

*In re Nuvasive, Inc.*,
  842 F.3d 1376 (Fed. Cir. 2016) ........................................................ 21

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992) .............................................................. …..10

*Jiaxing Brother Fastener Co. v. United States*,
  11 F. Supp. 3d 1326 (Ct. Int'l Trade 2021) ........................... 18

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024)……………………………………………………...8, 9, 12, 13

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ...........................................10

*QVD Food Co. v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011) ............................................9, 10

*Smith-Corona Group v. United States*,
  713 F.2d 1568 (Fed. Cir. 1983) ...........................................13

*SolarWorld Americas, Inc. v. United States*,
  1273 F. Supp. 3d 1254 (Ct. Int'l Trade 2021) ....................... 21

*Tri Union Frozen Prods., Inc. v. United States*,
  227 F. Supp. 3d 1387 (Ct. Int'l Trade 2017) ........................ 17

*United States v. Eurodif S.A.*,
  3555 U.S. 305 (2009).........................................................9, 10

*Vincentin S.A.I.C. v. United States*,
  503 F.Supp.3d 1255 (Ct. Int'l Trade 2021) ........................... 26

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) .......................................................... 9, 12

19 U.S.C. § 1673 .............................................................................. 11

19 U.S.C. § 1675(c) ......................................................................... 14

19 U.S.C. § 1677b ............................................................................. 8

19 U.S.C. § 1677b(c) ....................................................................... 25

19 U.S.C. § 1677b(c)(1) ............................................................ 11, 17

19 U.S.C. § 1677b(c)(1)(B) ................................................................ 12, 13

19 U.S.C. § 1677b(c)(4) ......................................................................... 3

19 U.S.C. § 1677b(c)(4)(A) ................................................................... 4

19 U.S.C. § 1677b(c)(4)(B) ................................................................... 4

19 U.S.C. § 1677f-1(f) ......................................................................... 25

19 U.S.C. § 1677f-1(f)(1) ................................................................... 26

19 U.S.C. § 1677f-1(f)(1)(B) ............................................. 6, 7, 25, 26, 27

19 U.S.C. § 1677f-1(f)(1)(C) ............................................................. 25

19 U.S.C. § 1677f-1(f)(1)-(2) ........................................................... 4, 5

19 U.S.C. § 3513(a)(2) ....................................................................... 14

19 U.S.C. § 3512(d) ........................................................................... 14

## REGULATIONS

19 C.F.R. § 351.408(c)(2) .............................................................. 11, 17

# ADMINISTRATIVE DETERMINATIONS

*Aluminum Foil from China: Final Determination of Sales at Less Than Fair Value*,
   83 Fed. Reg. 9282 (Mar. 5, 2018) .................................................................................. 16

*Certain Aluminum Foil from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*,
   83 Fed. Reg. 17,362 (April 19, 2018) .............................................................................. 2

*Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Administrative Review and Final Determination of No Shipments; 2021-2022*,
   88 Fed. Reg. 76,734 (Dep't of Commerce Nov. 7, 2023).............................................. 2, 7

*Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments, 2021-2022*,
   88 Fed. Reg. 29,092 (Dep't of Commerce May 5, 2023) .................................................. 4

*Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020-2021*,
   87 Fed. Reg. 54,975 (Dep't of Commerce Sept. 8, 2022) ......................................... 22, 28

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   87 Fed. Reg. 35,165 (Dep't of Commerce June 9, 2022) .................................................. 2

*Forged Steel Fluid End Blocks from the Federal Republic of Germany:  Final Affirmative Countervailing Duty Determination*,
   85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020) ................................... 7, 22, 23

# OTHER DOCUMENTS

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act
   H.R. Doc. No. 103-316 (SAA) (1994).............................................................................. 14

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JIANGSU DINGSHENG NEW MATERIALS JOINT-STOCK CO., LTD., *et al.*, | ) )  ) |
| Plaintiffs, | ) ) |
| v. | ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP and ITS INDIVIDUAL MEMBERS, *et al.*, | ) ) ) |
| Defendant-Intervenors. | ) ) ) |

Court No. 23-00264

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court's Rules, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiffs, Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd, *et al.* (collectively, Dingsheng). ECF No. 26 (Dingsheng Br.). Dingsheng was a mandatory respondent in the antidumping duty administrative review of certain aluminum foil from China and now challenges the final results issued by the United States Department of Commerce (Commerce). Because Commerce's final results are supported by substantial evidence and in accordance with law, the Court should deny Dingsheng's motion and enter judgment in favor of the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     Administrative Determination under Review**

Dingsheng challenges the final results issued in the antidumping duty administrative review of certain aluminum foil from the People's Republic of China (China). *See Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Administrative Review and Final Determination of No Shipments; 2021-2022*, 88 Fed. Reg. 76,734 (Dep't of Commerce Nov. 7, 2023) (Final Results) (P.R. 213), and accompanying Issues and Decision Memorandum (IDM) (P.R. 210).[1]  The period of review is April 1, 2021, through March 31, 2022.

**II.     Issues Presented for Review**

1.   Whether Commerce's determination to select Romania as the primary surrogate country is supported by substantial evidence and consistent with Commerce's practice.

2.   Whether Commerce's determination to deny Dingsheng's double remedies offset is supported by substantial evidence and in accordance with law.

**STATEMENT OF FACTS**

On April 19, 2018, Commerce published the antidumping duty order on aluminum foil from China. *See Certain Aluminum Foil from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 83 Fed. Reg. 17,362 (April 19, 2018).  On June 9, 2022, Commerce published its notice of initiation of the 2021-2022 administrative review of the order.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (Dep't of Commerce June 9, 2022) (P.R. 8).

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review.  Administrative Record Index, ECF No. 19.

On July 29, 2022, Commerce initially selected Shanghai Huafon and the Zhongji single entity[2] as mandatory respondents in the administrative review. *See* Respondent Selection Memorandum (July 29, 2022) (C.R. 20, P.R. 42). However, on August 1, 2022, Shanghai Huafon informed Commerce that it did not intend to participate in the administrative review, and therefore, Commerce selected Dingsheng as an additional mandatory respondent on August 16, 2022. *See* Second Respondent Selection Memorandum (Aug. 16, 2022) (C.R. 22, P.R. 53).

On September 29, 2022, Commerce placed a memorandum on the record containing a list of potential surrogate countries and invited parties to comment on the selection of a primary surrogate country as well as to submit surrogate value information. *See* Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information (Sept. 29, 2022) (P.R. 79-82). The list of potential surrogate countries determined to be at the same level of economic development as China within the meaning of 19 U.S.C. § 1677b(c)(4) based on per capita gross national income (GNI) included in relevant part Romania, Malaysia, and Bulgaria. (P.R. 82). Between October 2022 and April 2023, the Aluminum Trade Enforcement Working Group and its individual members, the domestic petitioners, and Dingsheng submitted surrogate country selection comments, surrogate value information, and rebuttal comments. *See, e.g.*, Petitioners Surrogate Country Comments (Oct. 18, 2022) (P.R. 94); Dingsheng Surrogate Country Comments (Oct. 18, 2022) (P.R. 92); Petitioners Pre-Preliminary Comments (Apr. 7, 2023) (P.R. 166); Dingsheng Pre-Preliminary Comments (Apr. 11, 2024) (P.R. 185).

---

[2] Commerce treated the following companies as a single entity for purposes of this review: Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd.; Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.); Hangzhou Dingsheng Import&Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.); Hangzhou Five Star Aluminium Co., Ltd.; Hangzhou Teemful Aluminium Co., Ltd.; Inner Mongolia Liansheng New Energy Material Co.; and Inner Mongolia Xinxing New Energy Material Co., Ltd. (collectively, Dingsheng).

Dingsheng also submitted a Double Remedies Questionnaire Response on March 3, 2022, identifying four countervailable subsidies that might be applicable during the period of review that would require Commerce to consider whether to reduce the antidumping duty pursuant to 19 U.S.C. § 1677f-1(f)(1)-(2).  *See* Dingsheng Double Remedies Questionnaire Response (Mar. 3, 2022) (P.R. 130).

**I.  Preliminary Results**

On May 5, 2023, Commerce published its preliminary results in the 2021-2022 administrative review of the antidumping duty order on aluminum foil from China.  *See Certain Aluminum Foil from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments, 2021-2022,* 88 Fed. Reg. 29,092 (Dep't of Commerce May 5, 2023) (Preliminary Results) (P.R. 194), and accompanying Issues and Decision Memorandum (PDM) (P.R. 189).

In the preliminary results, Commerce determined that it considered Romania, Bulgaria, and Malaysia to all be at the same level of economic development as China, and therefore equally comparable for purposes of 19 U.S.C. § 1677b(c)(4)(A).  PDM at 11.  Further, after reviewing export information provided by parties, Commerce also determined that each country was a significant producer of comparable merchandise for purposes of 19 U.S.C. § 1677b(c)(4)(B).  *Id.* at 11-13.  Having found that multiple countries satisfied the statutory threshold requirements for selection as a surrogate country, Commerce next reviewed data availability and reliability of each country consistent with Policy Bulletin 04.1, which describes Commerce's surrogate value selection policies.  *Id.* at 13-15 (citing Non–Market Economy Surrogate Country Selection Process (2004) (Policy Bulletin 04.1)).  Commerce determined that

Dingsheng had submitted nearly complete surrogate value information to value factors of

production for Bulgaria and Malaysia, including financial statements from two Bulgarian

producers (Alcomet AD and Elena Group) and one Malaysian producer (UACJ Malaysia). *Id.* at

13. Petitioners submitted complete surrogate value data to value factors of production, including

the consolidated and unconsolidated financial statements of a Romanian producer, Alro

S.A./Alro Group. *Id.* at 14.

After reviewing the data, Commerce preliminary found that the Romanian surrogate

value data are the best information available on the record for valuing factors of production. *Id.*

Commerce preliminarily found that the record contained complete, publicly available, and

contemporaneous Romanian data that represented a broad market average, were tax and duty-

exclusive, and were also specific to the inputs used by Dingsheng to produce aluminum foil

during the POR. *Id.* Further, the Romanian labor data were more contemporaneous than either

Bulgaria or Malaysia, and also contained domestic insurance data that was missing for Bulgaria

and Malaysia. *Id.* In reviewing the various financial statements, Commerce found the Romanian

Alro S.A./Alro Group's 2021 financial statements to be the best available information on the

record for valuing financial ratios because they are more contemporaneous than the 2019

Bulgarian Alcomet statement and more specific to the level of integration of the respondent,

Dingsheng, than the Bulgarian Elena Group statement or the Malaysian UACJ statement. *Id.* at

14-15. Accordingly, Commerce preliminarily selected Romania as the primary surrogate

country for purposes of this administrative review. *Id.* at 15.

With respect to a double remedies adjustment under 19 U.S.C. § 1677f-1(f)(1)-(2),

Commerce preliminary determined that Dingsheng had failed to demonstrate in its accounting

records a subsidies-to-cost link, that is, subsidy impact on cost of manufacturing, and a cost-to-

price link, that is, that the respondent's prices changed due to changes in the cost of manufacturing. Therefore, Commerce found that the record did not support making an adjustment in accordance with 19 U.S.C. § 1677f-1(f)(1)(B).

In the Preliminary Results, Commerce calculated a weighted average dumping margin of 32.85 percent for Dingsheng. *See* Preliminary Results, 88 Fed. Reg. at 29,024.

Following the publication of the Preliminary Results, Dingsheng filed an administrative case brief with Commerce on June 5, 2023, and petitioners filed a rebuttal case brief on June 20, 2023. *See* Dingsheng Admin. Case Br. (June 5, 2023) (P.R. 198); Petitioners Rebuttal Case Br. (June 20, 2023) (P.R. 204).

## II. Final Results

On November 7, 2023, Commerce published its Final Results. *See* Final Results (P.R. 213). In the Final Results, Commerce continued to select Romania as the primary surrogate country for purposes of valuing factors of production in the administrative review, finding that the Romanian data were more contemporaneous than the Bulgarian data and more specific than the Malaysian data. IDM at 6-8. Commerce found unavailing arguments that it should not take into consideration data quality or availability of surrogate values for items that comprise a lessor proportion of Dingsheng's reported normal value, such as labor and domestic insurance. *Id.* at 6. Commerce also found that neither the Bulgaria nor the Malaysia freight and brokerage data to be superior to the Romania data. *Id.* at 7. Importantly for purposes of financial statement considerations, Commerce continued to find that the Romanian Alro S.A./Alro Group was more specific to the experience of Dingsheng because both are integrated producers of aluminum products, whereas the Bulgarian Elena Group and UACJ Malaysia are both less vertically integrated. *Id.* Commerce also determined that the Alro S.A./Alro Group financial statements

did not indicate the presence of subsides determined to be countervailable in prior Commerce countervailing duty proceedings. *Id.* at 8. Specifically, Commerce recognized that although record evidence indicated that Alro S.A/Alro Group had participated in the European Union Emission Trading Scheme (ETS), Commerce has not found the ETS *alone* to be countervailable *Id.* Instead, in *Fluid End Blocks from Germany*, Commerce determined whether additional freely allocated credits that the *government of Germany provided to certain German companies* beyond the ETS were countervailable. *Id.* (citing *Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020), and accompanying IDM at Comments 10 and 11).

Commerce also continued to find that Dingsheng had not shown that a double remedies adjustment was warranted, concluding that no evidence on the record suggests that Dingsheng's average unit values for aluminum foil decreased during the period of review due to countervailable subsidies, and in fact, record evidence indicates that Dingsheng's monthly sales prices of subject merchandise in fact increased. *Id.* at 10. Commerce additionally continued to find that Dingsheng has not demonstrated a subsidies-to-cost link or a cost-to-price link which would satisfy the requirement under 19 U.S.C. § 1677f-1(f)(1)(B). *Id.*

In the Final Results, Commerce calculated a weighted average dumping margin of 32.81 percent for Dingsheng after making certain minor revisions from the Preliminary Results described in the IDM. [3] *See* Final Results, 88 Fed. Reg. at 76,735.

---

[3] Though not at issue in this brief, Commerce made a slight adjustment to the weighted average dumping margin because it revised its Preliminary Results differential pricing calculations during the Final Results using the average-to-average method rather than an alternative comparison method used in the Preliminary Results.

# SUMMARY OF THE ARGUMENT

Commerce's determination to select Romania as the primary surrogate country is supported by substantial evidence and in accordance with law. In accordance with 19 U.S.C. § 1677b, Commerce properly considered competing available information from Romania, Bulgaria, and Malaysia and reasonably determined that Romania provided better overall surrogate values and, further, that the Romanian financial statement more closely matched the integrated nature of Dingsheng's production experience as opposed to the financial statements from the Malaysian and Bulgarian companies. Commerce explained why the alleged deficiencies in the Romanian data that Dingsheng advanced during the administrative proceedings either did not exist, such as the existence of countervailable subsidies that Commerce has found in prior proceedings, or did not outweigh Commerce's focus on more closely matching the level of integration of Dingsheng. As such, Commerce's determination to select Romania as the primary surrogate country is supported by substantial evidence.

Dingsheng argues that the Supreme Court's ruling in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) requires this Court to perform its own analysis of what constitutes the best available information under the statute. Dingsheng Br. at 3, 9. However, no statutory interpretation question in this case is implicated by *Loper Bright*; Dingsheng is not advancing a question of law regarding what the term "best available information" means because Commerce applied the correct standard for determining the best available information (that is, better than other available information on the record). Instead, Dingsheng is improperly requesting the Court to reweigh evidence, arguing that Commerce should have weighed certain factual information differently and chosen Malaysia or Bulgaria instead of Romania. Such

exercise is a question of fact that is reviewable under the substantial evidence standard under 19 U.S.C. § 1516a(b)(1)(B) and is not affected by *Loper Bright*.

Additionally, Commerce's determination to decline making a double remedies adjustment pursuant to 19 U.S.C. § 1677f-1(f)(1) is supported by substantial evidence and in accordance with law. Commerce properly found that import data did not show a reduction in the price of imports of the class or kind of merchandise during the period of review, concluding that no evidence on the record suggests that Dingsheng's average unit values for aluminum foil decreased during the period of review, and in fact, that record evidence indicates that Dingsheng's monthly sales prices of subject merchandise increased. Further, Commerce found that Dingsheng had not demonstrated either a subsidy-to-cost link or a cost-to-price link that would be additionally required to make a double remedies adjustment. Although Dingsheng claims that these findings are not supported by substantial evidence, Dingsheng does not demonstrate a lack of evidence considered by Commerce but, instead, again asks the Court to reweigh in Dingsheng's favor the evidence that Commerce reviewed. Dingsheng Br. at 43-47. Accordingly, Commerce reasonably determined not to make a double remedies adjustment for Dingsheng in this administrative review. Commerce's Final Determination should be sustained.

## ARGUMENT

### I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in

applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). When an issue is inherently fact-intensive, the Court will set aside Commerce's finding only if the evidence is "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Thus, the substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Further, "Commerce is not bound by its prior determinations," *Al Ghurair*, 65 F.4th 1351, 1360 (Fed. Cir. 2023), and "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021).

Moreover, "{e}ven if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence." *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Fujitsu*, 88 F.3d at 1044). And "the Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citations and internal quotations omitted) (second alteration in original).

Finally, when the statute uses terms that are general but not ambiguous, Commerce has "considerable discretion in determining whether particular facts meet that standard" and that

"Congress delegated the task of making that determination to Commerce, based on the circumstances of each case," indicates "implied delegation of adjudicative authority to the agency." *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1260-61 (Fed. Cir. 2024) (finding that such conclusions are independent and distinct from the now overruled *Chevron*-doctrine).

## II.  Commerce's Determination to Select Romania as the Primary Surrogate Country is Supported by Substantial Evidence and in Accordance with Law

Commerce's determination to select Romania as the primary surrogate country for purposes of the 2021-2022 review is supported by substantial evidence and in accordance with law.  Commerce provided a reasoned analysis of certain factors that it found weighed in favor of selecting Romania over Bulgaria and Malaysia, and Dingsheng's arguments to the contrary improperly request that the Court reweigh record evidence.

### A.  Legal Framework for Surrogate Country and Surrogate Value Selection

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.  When an antidumping duty proceeding involves a nonmarket economy country, Commerce determines normal value by valuing the factors of production in a surrogate country pursuant to 19 U.S.C. § 1677b(c)(1).  In selecting surrogate values, Commerce must, "to the extent possible," use "the best available information" from a market economy country or countries that are economically comparable to the nonmarket economy country and are "significant producers of comparable merchandise."  *Id.* § 1677b(c)(1), (4).  Commerce generally values all factors of production in a single surrogate country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2).  Further, Commerce has broad discretion to determine what constitutes "the best available information"

for the selection of surrogate values.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

### B.  Dingsheng's Arguments Regarding Commerce's Selection of a Primary Surrogate Country do not Raise a Statutory Interpretation Question Affected by *Loper Bright*

As an initial matter, Dingsheng contends that in reviewing Commerce's determination of what constitutes the best available information on the record, this Court no longer defers to Commerce's analysis; but rather this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the "best available information." Dingsheng Br. at 9 (citing *Loper Bright*, 144 S. Ct. 2244).  This argument is misguided.  *Loper Bright* addresses the issue of whether an agency's *statutory interpretations* of ambiguous statutes are entitled to judicial deference.  However, there is no real dispute over the statutory interpretation of what "best available information" means under 19 U.S.C. § 1677b(c)(1)(B), namely that the information Commerce relies on must be available on the record of the proceeding and better than (even if marginally) than other available information.  Dingsheng does not contend that Commerce's interpretation of the term "best available information" under 19 U.S.C. § 1677b(c)(1)(B), which we articulated above, is not the best reading of the statute or is otherwise incorrect.  Instead, Dingsheng is challenging whether Commerce's application of facts to that standard and its ultimate conclusion is supported by substantial evidence.  Such exercise is a question of fact governed by the standard established at 19 U.S.C. § 1516a(b)(1)(B) and is not a question of statutory interpretation that *Loper Bright* addresses.

Although *Loper Bright* overruled *Chevron*[4] deference to agency interpretations of silent or ambiguous statutes under the APA, it does not disturb the Federal Circuit's longstanding

---

[4] *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

recognition that Commerce's determinations in antidumping and countervailing duty matters are entitled to deference *distinct* from *Chevron*, due to the Act's complex and technical nature. *See Asemesa*, F.4th 1252, 1260-61; *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.,* 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (recognizing "deference {that} is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise"); *Fujitsu*, 88 F.3d at 1039 (Fed. Cir. 1996) (same); *Smith-Corona Group v. United States*, 713 F.2d 1568, 1582 (Fed. Cir. 1983) (holding that "review of the statute reveals tremendous deference to the expertise of {} Commerce in administering the antidumping law"); *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("Commerce's special expertise makes it the 'master' of the anti-dumping law, entitling its decisions to great deference"). Further, the Supreme Court explained that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion {and} Congress has often enacted such statutes." *Loper Bright*, 144 S. Ct. at 2263. Such statutes include those that "empower an agency to prescribe rules to fill up the details of a statutory scheme or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Id.* (cleaned up). Thus, even if this Court decides it is necessary to interpret what "best available information" means, the text of 19 U.S.C. § 1677b(c)(1)(B) authorizes Commerce's discretion. Statutory terms that are "general in nature" "indicat{e} that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *Asemesa*, 102 F.4th at 1259.

Indeed, the statutory scheme reinforces that Congress intended to delegate significant discretion to Commerce in its implementation of the antidumping duty laws. For example, in the

Uruguay Round Agreements Act (URAA), which enacted 19 U.S.C. § 1675(c), Congress

expressly approved the Statement of Administrative Action accompanying the Uruguay Round

Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), designated the SAA an "authoritative

expression by the United States concerning the interpretation and application of" the URAA.  19

U.S.C. § 3512(d).  Similarly, the URAA delegated authority to "Commerce to adopt 'such

regulations as may be necessary to ensure that any provision of {the URAA}, or amendment

made by {the URAA}, that takes effect on the date any of the Uruguay Round Agreements

enters into force with respect to the United States is appropriately implemented on such date.'"

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 66

F.4th 968, 977 (Fed. Cir. 2023) (quoting 19 U.S.C. § 3513(a)(2)) (bracketing by Court).

Accordingly, the Court should reject Dingsheng's attempt to portray its run-of-the-mill

challenge to the sufficiency of evidence as a statutory interpretation question that is plainly a

question of fact to be reviewed under the substantial evidence standard.

### C. Commerce's Determination to Select Romania as the Primary Surrogate Country is Supported by Substantial Evidence and in Accordance with Law

Dingsheng argues that Commerce acted "unlawfully" in concluding that the non-

contemporaneous or unavailable labor and domestic insurance data for Bulgaria and Malaysia

weighed in favor of selecting Romania as a primary surrogate country.  Dingsheng Br. at 7-12.

However, there is nothing in the law, whether the statute or Commerce's regulations, that

prevents Commerce from considering the data quality and availability of certain factors of

production that may not constitute a substantial portion of a respondent's normal value build up.

Rather than furnishing law that supports its challenge, Dingsheng contends that Commerce has

an administrative policy of disregarding "minor" factors of production in selecting a surrogate

country.  Dingsheng Br. at 9.

The administrative cases that Dingsheng cites do not stand for that proposition. Those cases establish that Commerce will normally *weigh* surrogate values for major inputs or financial statements more than those for minor inputs. *Id.* at 8-9. Commerce did not weigh labor and domestic insurance data more than other major inputs or financial statement considerations in this administrative review. Commerce highlighted that, when Commerce is tasked with selecting "the best" available information, it is proper to consider quality and availability of all factors, including minor factors when they are different between multiple close options. Indeed, this is why Commerce found unpersuasive Dingsheng's argument that these data may not even be considered or influence Commerce's analysis. *See* IDM at 6. The Court should likewise find Dingsheng's argument unconvincing. At most, Dingsheng's citations to past administrative decisions establish that Commerce has recognized that in its analysis certain factors may be afforded more weight than others, not that Commerce acts unlawfully by simply considering certain factors that may weigh in favor of selecting a certain surrogate country.

Dingsheng contends further that Commerce improperly relied on the fact that the Romanian labor surrogate value data were more contemporaneous than either the Malaysian or Bulgarian data. Dingsheng Br. at 12-14. Dingsheng does not dispute that the Romanian labor data are more contemporaneous, but instead argues that, because the Malaysian and Bulgarian data are slightly less contemporaneous, Commerce improperly cited that as a reason to find the Romanian data better-suited. *Id.* As a threshold matter, the labor data for Bulgaria on the record are 2007 International Labor Organization (ILO) data and are significantly less contemporaneous than the Romanian data (which are from the period of review, 2021). *See* Dingsheng Surrogate Value Submission (Nov. 21, 2022) at Exhibit 4 (P.R. 102). The Malaysian data were far more contemporaneous than the Bulgarian data but as Dingsheng admits, still fell outside the period of

review, unlike the Romanian data.  Dingsheng Br. at 13.  Regardless, Commerce is entrusted with selecting the *best* available information, which is inherently a comparative endeavor wherein Commerce must weigh available datasets against others, and therefore it is not unlawful or arbitrary for Commerce to rely on the fact that certain data are *more* contemporaneous than other data, regardless the degree of temporal differences.

Dingsheng cites to the final determination of the investigation resulting in the current antidumping duty order to contend that Commerce is unreasonable to rely in part on contemporaneity when it inflated labor data in the past.  Dingsheng Br. at 13 (citing *Aluminum Foil from China: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 9282 (Mar. 5, 2018) (*Investigation Final Determination*), and accompanying IDM at Comment 1).  However, this passage from the investigation only highlights that Commerce must weigh many factors in selecting a primary surrogate country.  In the investigation, Commerce found that nitrogen and argon inputs were significant components of the normal value calculation for one of the mandatory respondents and that there was no available Bulgaria data and the India data were 20 years old.  Commerce found that this weighed in favor of selecting South Africa. *Investigation Final Determination* IDM at 8-9.  Further, South Africa had publicly available information for valuing ocean freight, and Bulgaria did not.  *Id.* at 9.  Therefore, for purposes of the non-contemporaneous labor data consideration, Commerce found that those other factors and others weighed more in favor of continuing to select South Africa.  *Id.* at 12.

Contrary to Dingsheng's argument, the selection process for the investigation does not establish that Commerce may not consider contemporaneity or that Commerce acts arbitrarily when determining that contemporaneity weighs in favor of selecting one country over another. What examination of that process establishes is that Commerce permissibly considers many

factors when weighing which surrogate country ultimately provides the best available information. In fact, the *Investigation Final Determination* serves to underscore why selecting Bulgaria with its 2007 ILO data would be problematic in this case, even using an inflator. *Investigation Final Determination* IDM at 12 ("While Commerce may inflate certain data to be contemporaneous with the {period of investigation}, we find that inflating {surrogate value} data from such a long period before the {period of investigation} (*i.e.*, more than 20 years) may be less reliable than more contemporaneous data."). Similarly, even if Commerce were to inflate Bulgarian 2007 data, which predate the period of review by almost 15 years, the inflated data from 2007 may be significantly less reliable than more contemporaneous data.

Dingsheng also misconstrues Commerce's position. Dingsheng correctly states that 19 C.F.R. § 351.408(c)(2) does not require that Commerce limit its choice of the primary surrogate country to only a country that proffers surrogate value data for all factors of production. Dingsheng Br. at 9-10. But Commerce did not select Romania solely because it was the only country that had available surrogate value data for all factors of production. Commerce may lawfully consider and weigh this fact when making its *overall determination* of which country provides the best available information. IDM at 6-8 (discussing all of the factors and arguments that Commerce considered).

Dingsheng also argues that Commerce could have correctly selected either Malaysia or Bulgaria as the primary surrogate country, and at the same time relied on Romanian surrogate values for labor and domestic insurance under 19 U.S.C. § 1677b(c)(1) and 19 C.F.R. § 351.408(c)(2). Dingsheng Br. at 11. But the Court has acknowledged the practice of selecting a primary surrogate country is a way "to minimize distortion." *Tri Union Frozen Prods., Inc. v. United States*, 227 F. Supp. 3d 1387, 1400 (Ct. Int'l Trade 2017); *see also Carbon Activated*

*Tianjin Co. v. United States*, 547 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2021) (discussing Commerce's preference to value all factors of production in a single surrogate country). Selecting Romania as the primary country and relying on its data rather than creating a patchwork of data from multiple countries serves to minimize distortion. Further, the Court has recognized that Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332–33 (Ct. Int'l Trade 2014) (citations omitted), *aff'd*, 822 F.3d 1289, 1293 (Fed. Cir. 2016). Because Commerce determined that the Romanian surrogate value data and financial statements were better than the same from Malaysia and Bulgaria, the Court need not reach Dingsheng's argument and otherwise should reject it.

### D. Commerce Properly Found the Alro S.A./Alro Group's Financial Statement Provided the Best Available Information

In the Final Results, Commerce properly determined that the Romanian Alro S.A./Alro Group's financial statement was the best available information on the record for calculating surrogate financial ratios because Alro S.A./Alro Group more closely reflects the integrated production process of Dingsheng. IDM at 7-8 (citing Commerce Memorandum to File – Dingsheng Analysis Memorandum for Preliminary Results (April 28, 2023) (C.R. 169) (P.R. 192)). This determination and analysis are supported by substantial evidence and in accordance with law.

Dingsheng disagrees, and begins its arguments on this point by discussing the organization and activities of the consolidated entity, Alro Group. Dingsheng Br. at 15-18. However, the financial statement that Commerce used for its calculation of financial ratios is the unconsolidated entity Alro S.A., which produces primary aluminum and processed aluminum products, and the structure of which Commerce found to be most similarly aligned with

Dingsheng IDM at 7 (citing Commerce Memorandum to File – Dingsheng Analysis Memorandum for Preliminary Results (April 28, 2023) (C.R. 169) (P.R. 192)). Alro Group has broader operations than Alro S.A. or Dingsheng's structure, so Commerce did not rely on Alro Group's financial statement to calculate the surrogate financial ratios. *Id.* Dingsheng's discussion of Alro Group's financial statement, as opposed to Alro S.A.'s financial statement, is irrelevant.

With respect to the relevant Alro S.A.'s financial statement, Dingsheng argues that Alro S.A. is chiefly engaged in the production of primary aluminum products as distinguished from the processed aluminum products that Dingsheng produces. Dingsheng Br. at 18-19. However, Commerce reasonably relied on the fact that Dingsheng's questionnaire responses indicate that it engages in smelting and refining of primary aluminum inputs, followed by casting and cold-rolling operations, indicating that Dingsheng is an integrated producer of aluminum products. IDM at 7 (citing Dingsheng Section D Questionnaire Response (Oct. 12, 2022) at Exhibit D-3 (P.R. 91)). This is in contrast to both UACJ Malaysia, which Commerce found does not engage in any smelting or casting operations, limited to rolling and finishing, and the Bulgarian Elena Group whose manufacturing is limited to downstream household foil products. IDM at 7 (citing Petitioner Surrogate Value Comments (Nov. 21, 2022) at Exhibit MY-9 (P.R. 110-111). Dingsheng contends that Commerce incorrectly concluded that UACJ Malaysia and the Elena Group were limited in their production operations such that they were less suited to provide surrogate financial data. Dingsheng Br. at 24. But the record evidence shows that the website for UACJ Malaysia does not list that it has the capabilities for smelting or casting operations, instead listing "aluminum foil rolling machine," "polymerizer," "separator," "cutting machine,"

and "annealing furnace." *See* IDM at 7 (citing Petitioner Surrogate Value Comments (Nov. 21, 2022) at Exhibit MY-9 (P.R. 110-111).

With respect to the Elena Group, Commerce considered Dingsheng's own submissions highlighting the products produced by the Elena Group, showing that the Elena Group is engaged in the production of downstream household foil products, unlike Dingsheng. *See* Dingsheng Second Surrogate Value Comments (Dec. 2, 2022) at Exhibits 1-1B-1C (P.R. 116-117). Dingsheng claims that Commerce "cryptically reasoned that Elena Group's manufacturing was limited to downstream household foil(Dingsheng Br. at 24) but Commerce directly cited to Dingsheng's own documents showing what Elena Group produces to support its conclusions in the Final Results. IDM at 7 (citing Dingsheng Second Surrogate Value Comments (Dec. 2, 2022) at Exhibits 1-1B-1C (P.R. 116-117)). Dingsheng does not present any arguments undermining the content of the documents it provided to Commerce or raise any arguments as to why Commerce would be unreasonable in relying on them.

Dingsheng claims that Alro S.A./Alro Group is not engaged in the production of aluminum foil specifically, unlike UACJ Malaysia and the Bulgarian Elena Group, and that Alro S.A/Alro Group's production of aluminum products is more specialized and sophisticated than Dingsheng, making Alro S.A./Alro Group less suited for surrogate financial analysis. Dingsheng Br. at 22-27. However, Commerce found that Alro S.A./Alro Group was an integrated producer of aluminum products comparable to aluminum foil. IDM at 7 (citing Commerce Memorandum to File – Dingsheng Analysis Memorandum for Preliminary Results (April 28, 2023) (C.R. 169) (P.R. 192)). Commerce also found that the Elena Group was engaged in the production of downstream household foil products, dissimilar to the production experience of Dingsheng. *Id.* Although UACJ Malaysia is a producer of aluminum foil, as explained above, Commerce

reasonably determined that the production experience of Alro S.A./Alro Group more closely

mirrors that of Dingsheng in terms of integration, including smelting and casting, which weighed

more in favor of finding the Alro financial statement the best available information on the record.

*Id.* at 7-8.  Commerce's determination to weigh the level of integration more heavily than

whether the products produced are comparable or identical is reasonably discernible from

Commerce's evaluation of the record evidence.  *See In re Nuvasive, Inc.*, 842 F.3d 1376, 1383

(Fed. Cir. 2016) (citing *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285

(1974)); *see also SolarWorld Americas, Inc. v. United States*, 273 F. Supp. 3d 1254, 1275-76

n.24 (Ct. Int'l Trade 2017) (discussing that Commerce may consider other factors more relevant

than whether a producer produces identical merchandise when selecting the best available

financial statement(s) and that such considerations from Commerce are reasonably discernible

even if they were not clearly articulated in the record).

 Dingsheng also contends that the Alro financial statement may be distorted by

multinational operations.  Dingsheng Br. at 28.  In doing so, Dingsheng ignores that Commerce

addresses this concern in finding that the entirety of Alro S.A./Alro Group's sale and production

of primary and processed aluminum products is located in Romania, and moreover that

Commerce relied on the unconsolidated entity Alro S.A. rather than upon the broader operations

of the Alro Group, which Dingsheng does not distinguish in its arguments.  IDM at 7 (citing

Commerce Memorandum to File – Dingsheng Analysis Memorandum for Preliminary Results

(April 28, 2023) (C.R. 169) (P.R. 192)).

 Dingsheng argues that Alro's data is too disaggregated, that is, that the data do not

contain sufficient line items to provide quality data for a surrogate financial ratio calculation.

Dingsheng Br. at 35-36.  But, as Dingsheng correctly points out, Commerce found that UACJ

Malaysia's 2021 financial statements also provide no specific breakdown of cost of goods sold (COGS) and Elena Group's 2021 financial statements also did not contain specific line items relating to COGS and selling, general, and administrative (SG&A) expenses. IDM at 7-8 (citing Petitioner Surrogate Value Comments (Nov. 21, 2022) at Exhibit MY-7, 9 (P.R. 110-111); Dingsheng Second Surrogate Value Comments (Dec. 2, 2022) at Exhibits 1-1B (P.R. 116-117)). Therefore, Commerce properly recognized that the collective findings demonstrate that the Alro S.A. financial statement is not significantly less disaggregated, that is, broken down to show specific COGS or SG&A expenses than the other available financial statements, such that it would compel Commerce to reconsider its selection based on the totality of the evidence. *Id.* Further, Commerce has also relied on Alro's financial statement in other proceedings when Commerce concluded that the Alro statements were sufficiently detailed to calculate financial ratios for use in the proceeding. *See Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 87 Fed. Reg. 54,975 (Dep't of Commerce Sept. 8, 2022), and accompanying IDM at 21.

Dingsheng also contends that Alro financial statements are not usable because they reflect receipt of subsidies that have allegedly been found to be countervailable in other Commerce proceedings, specifically grants under the EU Emissions Trading Scheme. Dingsheng Br. at 31-35. Dingsheng specifically claims that this ETS program has repeatedly been determined to be countervailable in Commerce's countervailing duty proceedings. Dingsheng Br. at 31 (citing *Forged Steel Fluid End Blocks from Germany*, 85 Fed. Reg. 80,011 (Dec. 11, 2020) (final determination), and accompanying IDM at Comments 10-11). However, as Commerce explained, "{a}lthough the financial statements show that Alro S.A./Alro Group participated in the EU ETS program, there is no evidence that Alro S.A./Alro Group received the

*additional* ETS allowances that Commerce found countervailable in *Fluid End Blocks from Germany*." IDM at 8 (emphasis added) (citing Petitioner Second Surrogate Value Comments (Mar. 29, 2023) at Exhibit RO-7 and RU-7 (P.R. 146-150)). In prior cases, Commerce did not find that the ETS *itself* provided a countervailable subsidy; Commerce found specifically that only the additional free allowances provided by the German government under the program were countervailable. Dingsheng does not explain how the record could support concluding that Alro S.A. received additional free allowances, specifically those free additional allowances from the government of Germany that Commerce examined in *Fluid End Blocks from Germany*. Dingsheng Br. at 33. Accordingly, Commerce's conclusion that the Alro S.A. financial statement did not indicate specific subsidies that Commerce has found to be countervailable is supported by substantial evidence.

Dingsheng additionally argues that Commerce erred in its preference of the Alro financial statements because they do not contain an independent auditor's report, citing Commerce's past practice of citing this as a reason weighing against selecting a financial statement. Dingsheng Br. at 38-39. However, Commerce found that record evidence, such as an auditor's fee to Ernst & Young Assurance Services SR, indicated that the Alro financial statement was audited. IDM at 8 (citing Petitioner Second Surrogate Value Comments (Mar. 29, 2023) at Exhibit RO-7 (P.R. 146-150)). Although there may not be a separate report, based on this record, Commerce is reasonable in concluding that record evidence supports that the Alro financial statement had been audited such that it can reliably be used for calculating financial ratios.

Dingsheng next turns to surrogate values for truck freight and brokerage and handling (B&H) to contend that the Romanian data are worse than the data for Malaysia and Bulgaria. Dingsheng Br. at 40. First Dingsheng contends that the data for truck freight from the 2020

World Bank Doing Business in Romania report are not reliable because the data underlying the report are collected the year prior to the period of review. *Id.* However, even though the 2020 Report's underlying data was gathered in 2019, those data are more contemporaneous than the 2017 published data proffered for Malaysia that Dingsheng advocates. Dingsheng's criticism thus establishes that Commerce did not err in concluding that the Romania data was more contemporaneous.

Dingsheng claims that the record supports that the 2017 Malaysia rate is still applicable in 2023, while arguing that the Romania rate from 2019 could not have been static over 5 years and "may simply have been copied." Dingsheng Br. at 40-41. Nothing in the record supports that contention. Dingsheng cannot support its contention that, on one hand, it is reasonable to conclude that the freight rate for Malaysia is unchanged from 2017 to 2023 (6 years) and that Commerce should use that data, but on the other hand, the 2019 Romania freight data being consistent over 5 years must demonstrate flawed and disqualifying data.

With respect to the B&H rate, Dingsheng argues that the Romania report's listing the B&H rate as zero indicates the lack of data from Romania. Dingsheng Br. at 42. But Comemrce found that the fact that the reported value was zero did not call into question the reliability of Romanian sourced surrogate values for either Dingsheng's primary aluminum production inputs, nor for the viability of Romanian-sourced financial ratios that Commerce utilized in this proceeding. IDM at 6-8. Additionally, petitioners explained why this value may have reasonably been reported as zero in the report. *See* Petitioners Rebuttal Case Br. at 36.

In conclusion, on the record evidence in this proceeding, Commerce properly selected Romania as the primary surrogate country because it provides equally good or better surrogate values than the alternatives on the record, and the Romanian financial statement more closely

reflects the integrated production experience of Dingsheng. The Court should sustain Commerce's choice of Romania as the primary surrogate country.

## III.     Commerce Properly Declined to Make a Double Remedies Adjustment

In the Final Results, Commerce's determination that Dingsheng failed to demonstrate that a double remedies adjustment was warranted pursuant to 19 U.S.C. § 1677f-1(f) is supported by substantial evidence and in accordance with law.

To avoid the imposition of a double remedy, the statute directs Commerce to make a requisite reduction to antidumping duties if a countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period. 19 U.S.C. § 1677f-1(f). In applying 19 U.S.C. § 1677f-1(f), Commerce examines (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of normal value determined pursuant to 19 U.S.C. § 1677b(c), has increased the weighted-average dumping margin for the class or kind of merchandise. For a subsidy meeting these criteria, the statute requires Commerce to reduce the antidumping cash deposit rate by the estimated amount of the increase in the weighted-average dumping margin subject to a specified cap.

Under 19 U.S.C. § 1677f-1(f)(1)(B), Commerce considers whether there is record evidence that demonstrates that the countervailable subsidies reduced the average price of imports of the class or kind of merchandise, and then under 19 U.S.C. § 1677f-1(f)(1)(C) whether the programs identified in Dingsheng's double remedies response led to a decrease in

cost of manufacture, a "subsidies-to-cost link," or that any such decrease (if it occurred) would have resulted in a change in prices charged to the customer, a "cost-to-price link."  IDM at 10-11 (citing Dingsheng's Section D Response (October 12, 2022) (P.R. 89-91)).  Dingsheng's failure to demonstrate any one of these criteria would support Commerce's determination not to provide the requested double-remedy adjustment.  *See Vincentin S.A.I.C. v. United States*, 503 F.Supp.3d 1255, 1263 (Ct. Int'l Trade 2021) (finding that, in administering 19 U.S.C. § 1677f-1(f)(1), Commerce requires the producer or exporter to demonstrate both a "subsidies-to-cost link" and a "cost-to-price link," as well as inquires whether countervailable subsidies have been demonstrated to have reduced the average price of imports during the period under examination).

In this proceeding, Commerce first examined whether import data show a reduction in the price of imports of the class or kind of merchandise during the relevant period.  Commerce found that no evidence on the record suggests that Dingsheng's average unit values for aluminum foil decreased during the period of review, and in fact, that record evidence indicates that Dingsheng's monthly sales prices of subject merchandise increased.  IDM at 10 (citing Dingsheng Supplemental A & C Response (Mar. 16, 2023) at Exhibit SA-8 (P.R. 133)).  Dingsheng does not dispute this.  Dingsheng instead argues that 19 U.S.C. § 1677f-1(f)(1)(B)'s language, "such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period," should be modified and instead read "such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period *from what they would have been had there been no countervailable subsidy*."  Dingsheng Br. at 43-44.  But Commerce applied the plain language of the statute, which does not include the additional proposed modification from Dingsheng above, when Commerce concluded that the average price

of imports increased over the period of review rather than fell; accordingly the Court could sustain that interpretation. But if the Court were to adopt Dingsheng's modification of the statutory language, which goes beyond the plain language that Congress enacted, Commerce's subsidy-to-cost and cost-to-price analyses described below further demonstrate that Dingsheng does not prevail.

With respect to the subsidy-to-cost link, Dingsheng contends that its records demonstrate that it incorporates its input prices into the cost of manufacturing for the merchandise under consideration. Dingsheng Br. at 44-45. However, Commerce found that Dingsheng's accounting records do not demonstrate that subsidy programs overall led to a decrease in the cost of manufacturing. IDM at 11 (citing Dingsheng's Section D Response (October 12, 2022) (P.R. 89-91)). None of the reporting that Dingsheng recounts provides an actual link between a Chinese government subsidy and Dingsheng's reported costs, but only that Dingsheng considers reduced input costs in its overall cost of manufacturing. *Id.* Without demonstrating a link between the subsidy and decreased cost of manufacturing, Commerce correctly concluded that a double-remedy adjustment was not warranted under 19 U.S.C. § 1677f-1(f)(1)(B).

With respect to the cost-to-price link, Commerce found that Dingsheng's pricing is governed by international market indices and customer negotiation. IDM at 11 (citing Dingsheng Supplemental A & C Response (Mar. 16, 2023) (P.R. 133)). Further, Dingsheng indicates that it periodically undertakes a cost analysis and that it meets with sales executives to undertake possible price changes in aluminum foil, but that there is no "threshold" that governs Dingsheng's setting of aluminum foil prices. PDM at 23. Thus, the record supports Commerce's finding that Dingsheng's price of its aluminum foil was linked to periodic

fluctuations in aluminum foil prices based on international market indices rather than to Dingsheng's own cost of manufacturing.

In other administrative reviews involving aluminum products, Commerce likewise found that the incorporation of international market indices into a party's ultimate sales price indicates the lack of a link necessary to make a double remedies adjustment. *See Common Alloy Aluminum Sheet From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 54,975 (Sept. 8, 2022), and accompanying IDM at 40-42.

The Court need only find that any one of the bases for denial of an adjustment has been met to sustain Commerce's determination with respect to this issue. On the record, Commerce supplied several. Accordingly, Commerce's ultimate denial of a double remedy adjustment in this case is supported by substantial evidence and in accordance with law. The Court should sustain Commerce's determination.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's determination and deny plaintiff's motion for judgment on the agency record.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

28

JONZACHARY FORBES
U.S. Department of Commerce
Office of Chief Counsel for
Trade Enforcement and Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
Telephone: (240) 449-5906
Facsimile: (202) 482-8184
Email: JonZachary.Forbes@trade.gov


November 27, 2024

/s/Christopher A. Berridge
Christopher A. Berridge
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-0537
Email: Christopher.Berridge@usdoj.gov

*Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 8,016 words, including text, footnotes, and headings.


/s/Christopher A. Berridge