**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

—————————————————————————x
                                                      :
JIANGSU DINGSHENG NEW MATERIALS            :
JOINT-STOCK CO., LTD.; DINGSHENG           :
ALUMINIUM INDUSTRIES (HONG KONG)           :
TRADING CO., LIMITED (DINGSHENG            :
ALUMINIUM INDUSTRIES (HONG KONG)           :
TRADING CO., LTD.); HANGZHOU               :    Court No. 23-00264
DINGSHENG IMPORT & EXPORT CO., LTD.        :
(HANGZHOU DINGSHENG IMPORT AND             :    **PUBLIC VERSION**
EXPORT CO., LTD.); HANGZHOU FIVE STAR      :
ALUMINIUM CO., LTD.; HANGZHOU              :
TEEMFUL ALUMINIUM CO., LTD.; INNER         :
MONGOLIA LIANSHENG NEW ENERGY              :
MATERIAL CO., LTD.; and INNER              :
MONGOLIA XINXING NEW ENERGY                :
MATERIAL CO., LTD.,                        :
                                                      :
                  Plaintiffs,              :
                                                      :
          v.                               :
                                                      :
UNITED STATES,                             :
                                                      :
                  Defendant,               :
                                                      :
          and                              :
                                                      :
ALUMINUM ASSOCIATION TRADE                 :
ENFORCEMENT WORKING GROUP AND ITS          :
INDIVIDUAL MEMBERS, *et al.*,              :
                                                      :
                  Defendant-Intervenors.   :
—————————————————————————x

**PLAINTIFFS' REPLY TO DEFENDANT AND
DEFENDANT-INTERVENORS' RESPONSES TO
PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

                              Ned H. Marshak*
                              Dharmendra N. Choudhary
                              Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*599 Lexington Ave FL 36,
New York, NY 10022
(212) 557-4000

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Jiangsu Dingsheng New
Materials Joint-Stock Co., Ltd., Dingsheng
Aluminium Industries (Hong Kong) Trading Co.,
Limited (Dingsheng Aluminium Industries (Hong
Kong) Trading Co., Ltd.), Hangzhou Dingsheng
Import & Export Co., Ltd. (Hangzhou Dingsheng
Import and Export Co., Ltd.), Hangzhou Five Star
Aluminium Co., Ltd., Hangzhou Teemful Aluminium
Co., Ltd., Inner Mongolia Liansheng New Energy
Material Co., Ltd., and Inner Mongolia Xinxing
New Energy Material Co., Ltd.*

Dated: January 29, 2025

## <u>TABLE OF CONTENTS</u>

I.   COMMERCE'S SELECTION OF ROMANIA INSTEAD OF MALAYSIA OR
     BULGARIA AS THE PRIMARY SURROGATE COUNTRY IS UNLAWFUL AND
     UNSUPPORTED BY SUBSTANTIAL EVIDENCE ........................................................ 1

  A.   Loper Bright Alters the Deference Previously Afforded to Commerce's Surrogate
       Country Selection ............................................................................................... 2

  B.   Commerce Unlawfully Relied on SV Data for Minor FOPs—Labor and Domestic
       Insurance—to Select Romania ........................................................................... 5

  C.   Commerce Unlawfully Chose Alro's Non-Comparable and Unreliable Financial
       Statement to Select Romania ............................................................................. 9

  D.   Commerce Unlawfully Used Unreliable Romanian Truck Freight and B&H SV Data
       to Select Romania ............................................................................................. 18

II.   COMMERCE IMPROPERLY DECLINED TO MAKE A DOUBLE REMEDIES
      OFFSET ..................................................................................................................... 20

CONCLUSION ..................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    882 F.Supp.2d 1366 (CIT 2012) .................................................................5

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    102 F.4th 1252 (Fed. Cir. 2024) ...............................................................4

*BGH Edelstahl Siegen GmbH v. United States*,
    600 F.Supp.3d 1241 (CIT 2022) ..............................................................16

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ..................................................................................8

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) .............................................................................3, 4

*Dorbest Ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ................................................................2

*Goldlink Indus. Co. v. United States*,
    431 F.Supp.2d 1323 (CIT 2006) ..............................................................3

*JBF RAK LLC v. United States*,
    961 F.Supp.2d 1274 (CIT 2014) ........................................................17, 18

*Jiangsu Zhongji Lamination Mats. Co. v. United States*,
    2023 WL 3863201 (CIT June 7, 2023) .....................................................22

*Jiaxing Brother Fastener Co. v. United States*,
    11 F.Supp.3d 1326 (CIT 2014) ............................................................8, 9

*Jiaxing Brother Fastener Co. v. United States*,
    751 F.Supp.2d 1345 (CIT 2010) .........................................................2, 13

*Jinxiang Infang Fruit & Vegetable Co. v. United States*,
    476 F.Supp.3d 1415 (CIT 2020) ..............................................................18

*Loper Bright Enterprises v. Raimondo*,
    144 S.Ct. 2244 (2024) ........................................................................2, 3, 4

*LTV Steel Co. v. United States*,
    21 CIT 838 (1997) ...................................................................................16

*In re Nuvasive, Inc.*,
  842 F.3d 1376 (Fed. Cir. 2016) .......................................................................12

*Shanghai Foreign Trade Enters. Co. v. United States*,
  28 CIT 480 (2004) ...........................................................................................11

*SolarWorld Americas, Inc. v. United States*,
  273 F.Supp.3d 1254 (CIT 2017) ...............................................................11, 12

*Vicentin S.A.I.C. v. United States*,
  42 F.4th 1372 (Fed. Cir. 2022) .......................................................................22

*Zhengzhou Huachao Indus. Co. v. United States*,
  37 CIT 677 (CIT 2013) .....................................................................................17

**Statutes**

19 U.S.C. § 1677 ..................................................................................2, 4, 13, 20

**Administrative Decisions**

*Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 76,734
  (Nov. 7, 2023) .........................................................................................1, 16, 24

*Common Alloy Aluminum Sheet from China*, 87 Fed. Reg. 54,975 (Sept. 8, 2022) ..........14, 15, 23

*Raw Honey From India*, 87 Fed. Reg. 22,188 (Apr. 14, 2022) .....................................15

*Tool Chests and Cabinets from China,* 83 Fed. Reg. 15,365 (Apr. 10, 2018)..............................22

Plaintiffs Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd., Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited (Dingsheng Aluminium Industries (Hong Kong) Trading Co., Ltd.), Hangzhou Dingsheng Import & Export Co., Ltd. (Hangzhou Dingsheng Import and Export Co., Ltd.), Hangzhou Five Star Aluminium Co., Ltd., Hangzhou Teemful Aluminium Co., Ltd., Inner Mongolia Liansheng New Energy Material Co., Ltd., and Inner Mongolia Xinxing New Energy Material Co., Ltd. (collectively, "Dingsheng") reply to the Responses filed on November 27, 2024, by Defendant United States, ECF32 ("Def. Br.") and Defendant-Intervenor Aluminum Association Trade Enforcement Working Group, *et al.* (collectively, "Petitioners"), ECF30-31 ("D-I Br."), opposing Dingsheng's Rule 56.2 Motion for Judgment on the Agency Record (July 29, 2024), ECF26-27 ("Pl. Br."). Plaintiffs established that the U.S. Department of Commerce ("Commerce" or "Department") erred in the fourth administrative review ("AR4") of the antidumping duty ("ADD") order on *Aluminum Foil from the People's Republic of China* ("China"), 88 Fed. Reg. 76,734 (Nov. 7, 2023), PR213 ("*Final Results*"). Pl. Br. As discussed below, Commerce's legal errors in AR4 are not rehabilitated by the Defendant and Petitioners (collectively, "Defendants") arguments, as detailed below.

## I.    COMMERCE'S SELECTION OF ROMANIA INSTEAD OF MALAYSIA OR BULGARIA AS THE PRIMARY SURROGATE COUNTRY IS UNLAWFUL AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

In selecting Romania over Malaysia and Bulgaria as its primary surrogate country ("SC"), Commerce reasoned "that Romania data represented the best available information to value Dingsheng's FOPs." Issues and Decision Memorandum, PR242 ("IDM") at 6. Commerce advanced three reasons for this conclusion: (1) Romania, unlike Malaysia or Bulgaria, afforded domestic insurance surrogate value ("SV") and contemporaneous labor SV data; (2) Romania, unlike Malaysia, afforded contemporaneous freight and brokerage and handling ("B&H") SV data; and (3) Romanian Alro's financial statements, compared to Malaysian and Bulgarian

financials, were more specific to Dingsheng's integrated production process. *Id*. at 6-7. Dingsheng refuted each of the above Commerce's findings and conclusions. Pl. Br. 6-48. These arguments fail.

### A. *Loper Bright* Alters the Deference Previously Afforded to Commerce's Surrogate Country Selection

In response to Dingsheng's arguments that "this Court must exercise its independent judgment in deciding whether Commerce's methodology resulted in reliance on the 'best available information,'" Pl. Br. at 9 (quoting 19 U.S.C. § 1677b(c)(1)), Defendant asserts that "Dingsheng's arguments regarding Commerce's selection of a primary {SC} do not raise a statutory interpretation question affected by *Loper Bright*" *Enterprises v. Raimondo*, 144 S.Ct. 2244, 2263 (2024). Def. Br. at 12; D-I Br. at 13. As explained below, Defendant has improperly constructed *Loper Bright*.

Initially, Defendant argues that "*Loper Bright* addresses the issue of whether an agency's *statutory interpretations* of ambiguous statutes are entitled to judicial deference." Def. Br. at 12 (emphasis in original). Defendant then concedes, as it must, that "there is no real dispute over the statutory interpretation of what 'best available information' means under 19 U.S.C. § 1677b(c)(1)(B), namely that the information Commerce relies on must be available on the record of the proceeding and **better than (even if marginally) than other available information**." Def. Br. at 12 (emphasis added).

Defendant's attempts to limit this Court's review is unavailing since "the Court of Appeals for the Federal Circuit ('CAFC') has recently stated that **the requirement in § 1677b(c)(1) that Commerce use the best available information 'is ambiguous**,'" *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1373 (Fed. Cir. 2010)." *Jiaxing Brother Fastener Co. v. United States*, 751 F.Supp.2d 1345, 1353 (CIT 2010) (emphasis added). Thus, post *Loper Bright*,

Commerce's selection of "best available information" is no longer entitled to blanket judicial deference.

Moreover, Defendant's statutory interpretation undercuts its proffered conclusions. Dingsheng has established that—as compared to Romanian financial statements and SV data for major factors of production ("FOP") (truck freight and B&H)—the corresponding Malaysian (or, Bulgarian) data are superior. This fact renders unlawful Commerce's primary SC choice of Romania over Malaysia (or, Bulgaria). Pl. Br. at 6-42. Thus, Defendant cannot reconcile the correct statutory interpretation of "best available information" with Commerce's rejection of Malaysia (or, Bulgaria), since both countries have better available information and data quality than Romania. Consequently, there is no merit to Defendant's reliance of precedents based on *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). *See, e.g.,* Def. Br. at 10 (citing *Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323, 1326 (CIT 2006) ("the Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*")). Post *Loper Bright*, Commerce's selection of Romania is not afforded deference because record evidence establishes that Romania lacks the best available information.

Moreover, *Loper Bright* decrees that even "when the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, *to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.*" 144 S. Ct. at 2263. (emphasis added). In the context of selection of the primary SC, since judicial review of Commerce's statutory interpretation of the "best available information" is necessarily intertwined with the underlying facts, the two aspects are inseparable

3

and cannot be divorced. Therefore, there is no merit to Defendant's arguments that "the Court should reject Dingsheng's attempt to portray its run-of-the-mill challenge to the sufficiency of evidence as a statutory interpretation question that is plainly a question of fact to be reviewed under the substantial evidence standard." Def. Br. at 14.

Consequently, post *Loper Bright* judicial review of the "best available information" standard in the context of Commerce's selection of the SV and SC does not allow the Court to defer to Commerce, unlike in the *Chevron* era.

Defendant further argues that "even if this Court decides it is necessary to interpret what 'best available information' means, the text of 19 U.S.C. § 1677b(c)(1)(B) authorizes Commerce's discretion." *Id*. at 13 (citing *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024) ("*Asemesa*")). Yet *Asemesa* is not on point because there "Congress's use of the term 'substantially dependent' in section 1677–2 gives Commerce considerable discretion in determining whether particular facts meet that standard." 102 F.4th at 1259. Defendant engages in a false equivalence of "substantially dependent" with "best available information" because the former does not involve a comparison of two available facts; instead, it merely entails analysis of one fact situation to determine if it satisfies the criteria of "substantially dependent." *See* Def. Br. at 10-11. *Asemesa* deferred to Commerce's interpretation of "substantially dependent" in the context of such non-comparative analysis. In contrast, because the "best available information" analysis necessarily entails a comparative evaluation of two or more available SV choices, the selected SV data and primary SC must be "better than (even if marginally) than other available information" as Defendant concedes. Def. Br. at 12. Thus, Defendant unpersuasively attempts to extend the agency discretion affirmed in *Asemesa* to 19 U.S.C. § 1677b(c)(1)(B).

**B. Commerce Unlawfully Relied on SV Data for Minor FOPs—Labor and Domestic Insurance—to Select Romania**

Dingsheng established that "Commerce unlawfully relied on minor FOPs – labor and domestic insurance—to select Romania." Pl. Br. at 9. As explained below, Defendant's support of Commerce's reliance on minor FOPs' SV data to select Romania is without merit.

First, Defendant argues that "there is nothing in the law, whether the statute or Commerce's regulations, that prevents Commerce from considering the data quality and availability of certain {FOPs} that may not constitute a substantial portion of a respondent's normal value build up." Def. Br. at 14. Defendant overlooks the fact that "the law"—in addition to statute and regulations—includes relevant judicial and agency precedents. These cases unequivocally discount the role of minor FOPs in selecting the primary SC. Pl. Br. at 9-14. Moreover, this Court has held that "the absence of an express statutory prohibition does not render permissible all that is not expressly prohibited. . . . A policy that, though not expressly prohibited, is nevertheless unreasonable, cannot serve as a basis for Commerce's reasoned decision-making." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F.Supp.2d 1366 (CIT 2012).

Second, Defendant contradicts itself while claiming that "the administrative cases that Dingsheng cites do not stand for that proposition." Def. Br. at 15. Defendant concedes that: (1) "those cases establish that Commerce will normally *weigh* surrogate values for major inputs or financial statements more than those for minor inputs"; and (2) "Commerce did not weigh labor and domestic insurance data more than other major inputs or financial statement." *Id*. at 15 (emphasis in original). Additionally, Defendant fails to explain the consideration that Commerce attached to minor FOPs such that they outweigh major FOPs' SVs and financial statements in the choice of the primary SC. The following Commerce statements do not support its having

accorded more weight to minor factors than to major factors in AR4:

> "when Commerce is tasked with selecting 'the best' available information, it is proper to consider quality and availability of all factors, including minor factors"; and

> "Commerce has recognized that in its analysis certain factors may be afforded more weight than others, not that Commerce acts unlawfully by simply considering certain factors that may weigh in favor of selecting a certain {SC}".

*Id*. at 15.

Specifically, Defendant fails to explain what agency considerations were applied to Romanian labor SV (accounting for [   ] of Dingsheng's normal value ("NV")) and domestic insurance SV data (accounting for [   ] of Dingsheng's NV) to select Romania, despite the Romanian financial statement (accounting for [   ] of Dingsheng's NV, Pl. Br. Attachment), truck freight, and B&H SV data being of inferior quality as compared to the corresponding Malaysian financial statement and SV data. Petitioners argue that "the fact that labor accounts for [       ] . . . percent of Dingsheng's normal value indicates labor is not a 'minor' value." D-I Br. at 38. However, labor is a minor FOP in comparison to financial ratios that account for [   ] of NV. As such, relative to Malaysia, Romania's arguably minor edge on labor is outweighed by its qualitatively inferior financial statement, as detailed below.

Third, in response to Dingsheng's arguments that Malaysian labor SV data are only slightly non-contemporaneous (*i.e.*, by 3 months only), Defendant retorts that "it is not unlawful or arbitrary for Commerce to rely on the fact that certain data are *more* contemporaneous than other data, regardless the degree of temporal differences." Def. Br. at 16. Contrary to Defendant's argument, contemporaneity is not a binary determination. Instead, the degree of non-contemporaneity is a relevant consideration in the selection of SV data. Moreover, Defendant does not dispute the fact that non-contemporaneity (unlike certain other factors such as public availability, specificity) is correctable. Pl. Br. at 12. As such, slightly better

contemporaneity of Romanian labor SV data (relative to Malaysian labor SV data) is insufficient for selection of Romania as the primary SC.

Fourth, Defendant does not counter Dingsheng's reliance on the final determination in the investigation of aluminum foil from China that bypassed Bulgaria in favor of South Africa as the primary SC notwithstanding the vastly more non-contemporaneous (by four years) South African labor SV data. Defendant argues that "Commerce found that nitrogen and argon inputs were significant components of the normal value calculation for one of the mandatory respondents and that there was no available Bulgaria data." Def. Br. at 16. In addition, Defendant argues "South Africa had publicly available information for valuing ocean freight, and Bulgaria did not." *Id*. Defendant misconstrues Commerce's rationale. Commerce precedent does not require that key inputs' SV data from a country be <u>unavailable</u> before Commerce selects another SC and thereafter value minor FOPs based on such another country's non-contemporaneous SV data (after suitably inflating it). Instead, this precedent extends to situations involving inferior quality SV data of key inputs and financial statements in a country, in which case, Commerce— per its established practice—will select another SC (having superior SV data for key inputs and financial statements) and then, if necessary, rely on non-contemporaneous SV data for valuing minor inputs. Applying this rationale, the slight non-contemporaneity of Malaysian SV data should not have prejudiced its selection as the primary SC given the inferior Romanian SV data of key FOPs like truck freight, B&H, and the financial statement (relative to the corresponding Malaysian SV data).

Fifth, in response to Dingsheng's demonstration that availability of SV data for all FOPs is not a legal requirement for selection of a primary SC, Defendant argues that "Commerce did not select Romania solely because it was the only country that had available surrogate value data

for all factors of production." Def. Br. at 17. However, such *post hoc* rationalization is

unpersuasive given Commerce's proffered rationale to select Romania. IDM at 6; Pl. Br. at 10-

11; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (the Court may

not accept "post hoc rationalizations for agency action," and may only sustain agency decisions

"on the same basis articulated . . . by the agency itself."). Likewise, Defendant's argument that

"Commerce may lawfully consider and weigh this fact when making its *overall determination* of

which country provides the best available information," Def. Br. at 17 (emphasis in original),

misses the crux of Dingsheng's argument that Commerce never weighed this fact—that Romania

affords SV data for all FOPs—against the inferior Romanian SV data quality for major FOPs and

financial statements.

Sixth, Defendant fails to adequately respond to Dingsheng's argument that Commerce

could have used Romanian SV data for labor and domestic insurance after selecting Malaysia

(or, Bulgaria) as its primary SC. Defendant argues that "selecting Romania as the primary

country and relying on its data rather than creating a patchwork of data from multiple countries

serves to minimize distortion." Def. Br. at 18. This argument is contradicted by substantial

evidence. In fact, using unreliable Romanian SV data for truck freight, B&H, and financial

statement results in a significant distortion; in contrast, using reliable Malaysian SV data and

financial statement to value all FOPs except labor and domestic insurance, both of which can be

valued in Romania, would result in minimal distortion and a far more accurate ADD calculation.

Finally, Defendant misconstrues this Court's holding in *Jiaxing Brother Fastener Co. v.

United States*, 11 F.Supp.3d 1326, 1332-33 (CIT 2014). Defendant cites the proposition "that

Commerce will 'only resort to a secondary {SC} if data from the primary {SC} are unavailable

or unreliable'" to improperly infer that "because Commerce determined that the Romanian

surrogate value data and financial statements were better than the same from Malaysia and Bulgaria, this Court need not reach Dingsheng's argument and otherwise should reject it." Def. Br. at 18. In fact, *Jiaxing* addressed the choice of SV data for an input <u>after</u> a primary SC had already been selected. Here, the issue is selection of a primary SC based on a comparative evaluation of all SV data. Thus, *Jiaxing* is not on point. Further, as Dingsheng established, because Romanian SV data and financial statement are inferior to those from Malaysia, Romania was improperly selected as the primary SC.

### C. Commerce Unlawfully Chose Alro's Non-Comparable and Unreliable Financial Statement to Select Romania

Dingsheng established that Commerce improperly relied on Alro S.A.'s financial statement to support its choice of Romania as the primary SC. Pl. Br. at 15-39. Defendant asserts that "Commerce properly found the Alro S.A./Alro Group's financial statement provided the best available information." Def. Br. at 18. As shown below, Defendant fails in its attempt to resurrect Alro's qualitatively inferior financial statement, its lynchpin for selection of Romania.

First, Defendant concedes Dingsheng's main argument to disqualify Romanian Alro's financial statement—that Alro, unlike Malaysian UACJ, is not a producer of aluminum foil but instead is focused on the production of primary aluminum products, upstream inputs to aluminum foil. Pl. Br. at 18-19. Nonetheless, Defendant argues that "although UACJ Malaysia is a producer of aluminum foil, . . . Commerce reasonably determined that the production experience of Alro S.A./Alro Group more closely mirrors that of Dingsheng in terms of integration, including smelting and casting, {and} Commerce's determination to weigh the level of integration more heavily than whether the products produced are comparable or identical is reasonabl{e}." Def. Br. at 20-21. Defendant further argues that unlike Alro, "UACJ Malaysia … does not engage in any smelting or casting operations, {being} limited to rolling and finishing."

*Id*. at 19. On this issue, Petitioners surmise that "none of the machines identified on UACJ's website – an aluminum foil rolling machine, a polymerizer, a separator, a cutting machine, and an annealing furnace – is capable of melting or casting aluminum." D-I Br. at 25.

Defendant and Petitioners comparable production experience argument to support Alro S.A. over UACJ fails. Their sole argument against UACJ—that it does not process primary aluminum inputs (aluminum ingots) into secondary aluminum products (aluminum sheets) but processes aluminum sheets directly into aluminum foil—is speculative. For example, Petitioners simply presume that the list of equipment on UACJ website is comprehensive and not merely illustrative. *Id*. at 24-25. They also fail to cite any evidence to support their claim that equipment like polymerizers or separators are unrelated to melting or casting operations. *Id*. at 25.

Moreover, even if such speculation were credible, UACJ's production experiences are more comparable to Dingsheng, than are Alro's experience. This is because, unlike UACJ and Dingsheng, Alro: (1) lacks the last critical processing step involving production of aluminum foil; and (2) has an additional first processing step to produce primary aluminum products, accounting for 77% of its total production. Pl. Br. at 18.

Consequently, that Alro shares with Dingsheng one production step involving conversion of aluminum ingot to aluminum sheet is outweighed by the facts that Alro: (1) has no aluminum foil production; and (2) focuses its production on upstream primary aluminum inputs. As such, besides lacking production of the identical merchandise, aluminum foil, Alro primarily produces upstream inputs to aluminum foil (*i.e.*, primary aluminum products like aluminum ingot). UACJ, while less integrated than Dingsheng, matches it in terms of production of aluminum foil, the most important criteria for comparability of production experiences.

Petitioners unpersuasively showcase Alro's aluminum sheet production as a comparable

10

production experience reasoning that "Dingsheng sells some of the aluminum sheet it produces without further rolling it to a thinner, foil gauge." D-I Br. at 23. However, this fact is irrelevant because Commerce is valuing Dingsheng's aluminum foil, not its aluminum sheet. Moreover, record evidence shows that 12 out of 16 Dingsheng's finished products are aluminum foil while only one product is aluminum sheet. Dingsheng's Section D Response (Oct. 12, 2022), CR54-63, PR89-91, Exhibit D-5. Thus, Dingsheng is predominantly an aluminum foil producer with aluminum sheet being a secondary finished product. Therefore, the most reliable and representative surrogate ratios for Dingsheng require reliance on the financial statement of an aluminum foil producer (*i.e.*, UACJ) instead of an aluminum sheet producer (*i.e.*, Alro).

Accordingly, there is no evidentiary support for Defendant's claim that "Commerce found that Alro S.A./Alro Group was an integrated producer of aluminum products comparable to aluminum foil." Def. Br. at 20. Neither Commerce nor Defendants demonstrate how primary aluminum products like aluminum ingots (an input to the input to aluminum foil) or secondary aluminum products like aluminum sheet (an input for aluminum foil) are comparable to aluminum foil using Commerce's three-part test (comparing physical characteristics, production process, and end-use). *See Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 490 (2004). Assuming *arguendo* that Alro produces comparable merchandise, its financial statement cannot be preferred over that of a producer of identical merchandise, UACJ. Pl. Br. 22-26.

Moreover, even assuming that relative to Dingsheng, UACJ's level of integration is less than Alro's (which is unsupported on this record), judicial precedent supports the choice of UACJ. *SeAH Steel VINA Corp. v. United States*, 269 F.Supp.3d 1335, 1350 (CIT 2017), *aff'd*, 950 F.3d 833, 840-41 (Fed. Cir. 2020) ("It was reasonable for Commerce to prioritize a company

that produces OCTG, even if the company is integrated at a different level.").

In sum, relative to UACJ (or Elena), Alro's production process is less comparable to Dingsheng.

Further, to support its argument that Alro shares comparable production experiences with Dingsheng, Defendant unpersuasively relies on two judicial precedents.

First, *In re Nuvasive, Inc.*, relied upon by Defendant, Def. Br. at 21 is a patent case that does not involve analysis of a surrogate financial statement:

> Appellant NuVasive . . . appeals the final written decision of the U.S. Patent and Trademark Office's . . . Patent Trial and Appeal Board . . . , finding claims . . . of U.S. Patent No. 8,361,156 ("the '156 patent") invalid as obvious. . . .
>
> ."

842 F.3d 1376, 1378-79 (Fed. Cir. 2016). As such, *Nuvasive* is inapposite.

Second, Defendant misplaces reliance on *SolarWorld Americas, Inc. v. United States*, 273 F.Supp.3d 1254 (CIT 2017). Def. Br. at 21. In *SolarWorld*, where both surrogate companies produced comparable merchandise only, Commerce preferred a non-subsidized financial by rejecting a financial statement distorted by countervailable subsidies:

> Commerce identified six producers of comparable merchandise while stating that the record lacked financial statements for a producer of merchandise identical to the subject merchandise. . . . Of the six producers under consideration from the primary {SC}, including Ekarat, Commerce explained that Styromatic was the only company whose statement did not evidence receipt of a countervailable subsidy. . . . Therefore, Commerce determined that Styromatic's statements constitute the best available information. . . . This determination is reasonable, as evidence of countervailable subsidies would render the statements unrepresentative and accordingly would not provide an accurate {SV}.

*Id*. at 1275-76.

*SolarWorld* is distinguishable because neither the UACJ or Alro statements are distorted by subsidies. Additionally, while UACJ is a producer of aluminum foil, Alro is not—producing predominantly non-comparable merchandise, primary aluminum products. As such, Commerce's

practice and judicially approved agency precedent support UACJ over Alro. Even so, Petitioners

argue that in *Jiaxing*, "the Court noted that there is 'no support for any preference between

identical versus comparable merchandise' as '{t}he statute does not speak to this distinction.'"

D-I Br. at 28 (quoting Jiaxing, 751 F.Supp.2d at 1353; 19 U.S.C. § 1677b(c)). However,

Petitioners misconstrue *Jiaxing*, where this Court first stated the underlying facts:

> Commerce rejected the financial statements of Deepak, an Indian producer of
> merchandise identical to the subject merchandise, because Commerce found that
> Deepak might have benefitted from countervailable subsidies and had submitted
> incomplete financial statements.

*Jiaxing*, 751 F.Supp.2d at 1349. This Court then endorsed Commerce's decision based on the

following rationale:

> Commerce's stated practice is to exclude "financial statements where there is
> evidence that the company received countervailable subsidies and there are other
> sufficient reliable and representative data on the record"; **when determining
> whether there are other sufficient reliable and representative data on the
> record, Commerce appears to treat data regarding identical and comparable
> merchandise as equally adequate alternatives to data reflecting subsidies.**

*Id.* at 1353 (emphasis added)

    *Jiaxing*'s stated lack of preference between identical merchandise and comparable

merchandise producers' financial statements was thereby rendered in the context of its approval

of Commerce's rejection of a subsidized identical merchandise producer financial statement—in

favor of a non-subsidized comparable merchandise producer's financial statement. Therefore,

Petitioners improperly seek to extend *Jiaxing* because the financial statement of UACJ, an

identical merchandise producer, is not subsidy-distorted.

    Second, responding to Dingsheng's demonstration "that the Alro financial statement may

be distorted by multinational operations," Defendant wrongly argues that "Commerce relied on

the unconsolidated entity Alro S.A. rather than upon the broader operations of the Alro Group."

Def. Br. at 21. Although Alro prepares a separate financial statement, it is a subsidiary of Alro

group—a multinational conglomerate with disparate business activities. Consequently, Alro's

financial performance, though separately reported, is inevitably intertwined with those of its

parent company. Alro's financial statement is accordingly distorted by the overall financial

performance of the Alro Group. Defendant fails to address this critical deficiency.

Third, Defendant counters Alro's insufficient disaggregation of cost, claiming "that the

Alro S.A. financial statement is not significantly less disaggregated, that is, broken down to show

specific COGS or SG&A expenses." Def. Br. at 22. Conversely, Defendant attempts a false

equivalence, asserting that "UACJ Malaysia's 2021 financial statements also provide no specific

breakdown of cost of goods sold (COGS) and Elena Group's 2021 financial statements also did

not contain specific line items relating to COGS and selling, general, and {SG&A} expenses."

*Id*. at 21-22 (citing IDM at 7-8). Defendant's arguments are contradicted by substantial evidence.

As Dingsheng demonstrated, unlike Alro that reports a basket category line item, COGS, both

UACJ and Elena provide discrete breakouts for raw material, labor and energy costs. Pl. Br. at

35-36. As Defendant fails to address such contrary record evidence, its arguments are meritless.

Further, Defendant argues that "Commerce has also relied on Alro's financial statement

in other proceedings when Commerce concluded that the Alro statements were sufficiently

detailed to calculate financial ratios for use in the proceeding." Def Br. at 22. However, in the

proceeding relied upon, Commerce determined that the alternative "Alcomet's financial

statement {wa}s non-contemporaneous with the POR and {wa}s insufficiently detailed for the

line item "materials, fuels, electricity, and hired services." *Common Alloy Aluminum Sheet from

China*, 87 Fed. Reg. 54,975 (Sept. 8, 2022) (final results) ("*CAAS from China*"), IDM at 26.

Unlike Alcomet, on this record, both alternative financials—UACJ and Elena—are sufficiently

detailed, having discrete line items for raw materials, labor and energy; in contrast, Alro is

insufficiently detailed, having a basket category line item, COGS. Therefore, *CAAS from China* is inapposite.

Fourth, regarding the omission of an auditor's report, Defendant argues that "Commerce found . . . an auditor's fee to Ernst & Young Assurance Services SR, indicated that the Alro financial statement was audited." Def. Br. at 23. Defendant surmises that "although there may not be a separate report, based on this record, Commerce is reasonable in concluding that record evidence supports that the Alro financial statement had been audited such that it **can reliably be used** for calculating financial ratios." *Id*. (emphasis added). These arguments are without merit. Assuming as correct Defendant's inference that Alro's financial statement was audited, it is perplexing why a copy of the auditor's report was not placed on the record. Absent such auditor's report—which could have revealed potential deficiencies or deviations in Alro's accounting keeping and expense/revenue reporting—Defendant's assertion that Alro's financial statement can still be reliably used for ratio calculations is without merit.

Petitioners misplace reliance on precedent to argue that "Commerce has previously relied on financial statements that lack an auditor's report when the financial statements otherwise indicate they were audited and reliable." D-I Br. at 36 (citing *Raw Honey From India*, 87 Fed. Reg. 22,188 (Apr. 14, 2022) (final determination), IDM at 32. In *Honey from India*, a market economy ADD proceeding, Commerce's "verification questionnaire requested the audited 'financial statements,' but did not explicitly specify that the accompanying audit report be provided. . . . Therefore, the respondents did not withhold or fail to report the requested information." *Honey from India*, 87 Fed. Reg. 22,188, IDM at 32. In nonmarket economy ADD proceedings, Commerce's longstanding practice requires audited surrogate financial statements and it did not exempt Alro from this requirement in this review. Pl. Br. at 39. As such, *Honey*

*from India* fails to support Petitioners' arguments.

Fifth, Defendant unpersuasively counters Dingsheng's argument that Alro's financial is distorted by countervailable subsidies. According to Defendant, "in prior cases, Commerce did not find that the ETS *itself* provided a countervailable subsidy; Commerce found specifically that only the additional free allowances provided by the German government under the program were countervailable {and that} Dingsheng does not explain how the record could support concluding that Alro S.A. received additional free allowances." Def. Br. at 23. However, Dingsheng demonstrated that Alro is expressly included in the Appendix containing a shortlist of Romanian companies, akin to the carbon leakage list in *Fluid End Blocks from Germany*, which this Court held were *de jure* specific subsidies and therefore countervailable. *BGH Edelstahl Siegen GmbH v. United States*, 600 F.Supp.3d 1241, 1262-63 (CIT 2022); Pl. Br. at 32-33. Defendant fails to explain why the Romanian government had to specifically name Alro on a short list of companies if Alro was not eligible for a preferential treatment, *i.e.*, receive additional free allowances. Therefore, Defendant's arguments are unpersuasive.

On this issue, Petitioners mount a procedural challenge, alleging that "Dingsheng failed to exhaust its administrative remedies," reasoning that "Dingsheng did not argue that Alro S.A. received the *additional* allowances under the ETS schemes that Commerce determined were countervailable." D-I Br. at 29-30 (emphasis in original). However, Petitioners overlook that the "additional allowances" rationale was introduced for the first time in the *Final Results*. IDM at 8. As such, Dingsheng had no reason to brief this issue. This Court has held that "because Commerce did not address the issue challenged before the Court until its final decision, plaintiff had no opportunity to raise the issue at the administrative level and the exhaustion doctrine did not preclude judicial review." *LTV Steel Co. v. United States*, 21 CIT 838, 868-69 (1997);

*Zhengzhou Huachao Indus. Co. v. United States*, 37 CIT 677, 686 (CIT 2013). Therefore,

Petitioners' arguments are without merit.

Finally, Petitioners' "Hail Mary" to avoid consideration of Dingsheng's arguments is

meritless. Specifically, they claim that in its opening brief, "Dingsheng's arguments regarding

the comparability of its production experience to that of Alro S.A. is largely lifted from its

administrative brief . . . without adapting them for consideration by this Court." D-I Br. at 14.

They argue that consequently "Dingsheng fails to address whether Commerce's decision is

unsupported by substantial evidence or otherwise not in accordance with law." Id. at 14.

Petitioners then cite *JBF RAK LLC v. United States*, 961 F.Supp.2d 1274 (CIT 2014), to argue

that Dingsheng waived this issue reasoning that it "'simply recycled its argument from its

administrative case brief' ('almost verbatim'), 'never address{ing} Commerce's findings and

conclusions in the {IDM} . . . just repeat{ing} the same arguments made prior to the Final

Results without any consideration of Commerce's response and rejection of those very same

arguments in the Final Results')." *Id*. at 14-15 (quoting *JBF*, 961 F.Supp.2d at1282-83). As

explained below, Petitioners' arguments are contradicted by record evidence.

In its analysis on comparable production experiences, Commerce practically ignored

Dingsheng's case brief arguments at pages 15-31. *Compare* IDM at 7 *with* Dingsheng Case Brief

(June 5, 2023), CR83, PR198 (Commerce making no reference at all to Dingsheng's arguments

at pages 15-31). Because Commerce did not address Dingsheng's arguments, Dingsheng

properly restated those arguments in its opening brief. Moreover, contrary to Petitioners' claim,

Dingsheng did not just copy and paste its prior arguments. Instead, it laid out those arguments to

rebut specific IDM findings. Pl. Br. at 22, 24. Dingsheng also supplemented its Case Brief

arguments. *See*, *e.g*., Pl. Br. at 20-21 (production process comparison table and chart on main

products produced). As such, Dingsheng's arguments were properly made and established that Commerce's decision was unsupported by substantial evidence. *JBF* is thereby readily distinguishable. Likewise, Petitioners misplace reliance on *Jinxiang Infang Fruit & Vegetable Co. v. United States*, 476 F.Supp.3d 1415, 1416-18 (CIT 2020). D-I Br. at 15. This precedent is inapposite because there is no evidence suggesting that Commerce avoided consideration of case brief arguments in that case.

In sum, Defendant fails to establish that Alro's selection over UACJ (or Elena) is supported by substantial evidence or established precedent.

## D. Commerce Unlawfully Used Unreliable Romanian Truck Freight and B&H SV Data to Select Romania

Dingsheng established that Commerce's choice of Romanian SV data for truck freight and B&H are unreliable and inferior compared to the corresponding Malaysia and Bulgarian SV data. Pl. Br. at 39-42. As explained below, Defendant has not provided a basis supporting Commerce's choice.

To support the non-contemporaneous DOING BUSINESS ROMANIA 2020 truck freight data, Defendant argues that "even though the 2020 Report's underlying data was gathered in 2019, those data are more contemporaneous than the 2017 published data proffered for Malaysia." Def. Br. at 24. However, record evidence establishes that Malaysian Rani truck freight data, initially published in 2017, was not revised thereafter and the same rate list was applicable for 2023. Pl. Br. at 41. As such, contrary to Defendant's claim, Rani SV data is contemporaneous with the April 1, 2021—March 31, 2022 period of review ("POR").

Likewise, Defendant fails to support the unrealistically static DOING BUSINESS ROMANIA truck freight data. Defendant counters that "Dingsheng cannot support its contention that, on one hand, it is reasonable to conclude that the freight rate for Malaysia is unchanged from 2017 to

18

2023 (6 years) . . . but on the other hand, the 2019 Romania freight data being consistent over 5 years must demonstrate flawed and disqualifying data." Def. Br. at 24. Defendant's false equivalence of the two different types of data sets improperly ignores evidence establishing that Malaysian Rani price data, controlled by one company, was not revised between 2017 and 2023. Pl. Br. at 41 (citing Dingsheng Final SV Comments Part 1 (Mar. 29, 2023), PR155-59, Exhibit 5A at Exhibit III).

In contrast, the record lacks explanation of how DOING BUSINESS truck freight data, an average price based on multiple data from several stakeholders, remained static for five consecutive years. Additionally, independent record evidence impeaches this static SV data. *Id*. at 40 (citing Dingsheng's Final SV Rebuttal (Apr. 10, 2023), PR179-84, Exhibit 8). Defendant's speculative arguments are therefore without merit. Moreover, by failing to counter Dingsheng's arguments the DOING BUSINESS ROMANIA freight data is potentially not specific to truck freight and its single route data lacks broad market average, Defendant implicitly concedes two critical criteria required to support a reliable SV: product specificity; and broad market average.

In sum, Defendant fails to support Commerce's choice of DOING BUSINESS ROMANIA truck freight SV data. As to Dingsheng's demonstration that Romanian B&H data of zero is facially absurd and unreliable, Pl. Br. at 24, Defendant responds "that the fact that the reported value was zero did not call into question the reliability of Romanian sourced surrogate values for either Dingsheng's primary aluminum production inputs, nor for the viability of Romanian-sourced financial ratios." Def. Br. at 24. These muddled arguments should be rejected. Petitioners argue that Commerce correctly discounted the significance attached to the Romanian B&H SV, reasoning that "B&H and domestic insurance each represent [     ] percent of Dingsheng's U.S. net adjusted sale price." D-I Br. at 41. This argument is facially absurd since

B&H's [    ] NV contribution is a derivative of the unreliable zero B&H cost reported in DOING

BUSINESS ROMANIA. Finally, Petitioners argue that Bulgarian B&H data is flawed. D-I Br. at 42

(citing Dingsheng's First SV Comments (Nov. 21, 2022), PR102-08, Exhibit 7B). However, this

argument is moot because Dingsheng in its final SV comments proposed to value B&H based on

DOING BUSINESS MALAYSIA. Dingsheng's Final 30-day SV Comments (Mar. 29, 2023), PR155-

59, Exhibit 1.

In short, Defendants fail to impeach Dingsheng's arguments that Commerce's primary

SC selection of Romania instead of Malaysia is unlawfully unsupported by substantial evidence.

## II.    COMMERCE IMPROPERLY DECLINED TO MAKE A DOUBLE REMEDIES OFFSET

Commerce's decision to deny Dingheng's double remedies offset is not supported by

substantial evidence because Dingsheng demonstrated both a subsidies-to-cost link and a cost-to-

price link. Pl. Br. at 43-48. As explained below, Defendants' arguments in support of

Commerce's decision should be rejected.

First, Defendant claims that "Dingsheng . . . argues that 19 U.S.C. § 1677f-1(f)(1)(B)'s

language . . . should be modified and instead read "such countervailable subsidy has been

demonstrated to have reduced the average price of imports of the class or kind of merchandise

during the relevant period *from what they would have been had there been no countervailable

subsidy*." Def. Br. at 26 (emphasis in original). Defendant mischaracterizes Dingsheng's

arguments. Dingsheng did not propose any modification of the statutory language; it simply

advanced a purposive construction of this provision. Defendant's further argument that

"Commerce applied the plain language of the statute, which does not include the additional

proposed modification from Dingsheng above, when Commerce concluded that the average price

of imports increased over the {POR} rather than fell," *id*., has already been discredited by

Dingsheng. Pl. Br. at 44, 48. Defendant fails to address Dingsheng's argument that the statute does not require an absolute continuous decline in prices through the POR, but only that subsidy benefits led to a reduction in the sale prices. *Id*. Thus, Defendant fails to support Commerce's literal construction of the statute, which can lead to absurd results.

Second, to impugn Dingsheng's subsidy-to-cost link, Defendant asserts that "none of the reporting that Dingsheng recounts provides an actual link between a Chinese government subsidy and Dingsheng's reported costs." Def. Br. at 27. However, Defendant then undercuts its argument when admitting "that Dingsheng considers reduced input costs in its overall cost of manufacturing," *id*. at 27, since reduced input costs are obtained by subtracting subsidies from the full price of inputs.

Third, notwithstanding Dingsheng's demonstration of its cost-to-price link, *see* Pl. Br. at 45-48, Defendant claims "that Dingsheng's pricing is governed by international market indices and customer negotiation." Def. Br. at 27. Contrary to Defendant's assertion, pursuant to its dynamic internal pricing system where export prices are determined on a spot sales basis, Dingsheng periodically undertakes cost analysis of its key inputs and electricity to establish revised cost of manufacture ("COM"). Based on these analyses, Dingsheng determines new export prices. Further, as Dingsheng explained, international market conditions constitute secondary pricing factors, and they too are affected by raw material costs. Pl. Br. at 47. Therefore, Defendant improperly infers that Dingsheng's export prices were linked to other market factors rather than to Dingsheng's COM.

Defendants next misconstrue Dingsheng's reporting "that there is no 'threshold' that governs Dingsheng's setting of aluminum foil prices," Def. Br. at 27; D-I Br. at 48, to incorrectly infer that Dingsheng lacks a defined metric to revise its export prices. Contrary to Defendants'

claim, the lack of a threshold does not mean that Dingsheng's price revisions are not linked to costs.

Petitioners claim that Dingsheng in setting its export prices consider three other factors—U.S. market conditions, expected profit, and relationship with customer—in addition to cost of production that "are entirely unrelated to the cost of production or any government subsidy." D-I Br. at 48. However, Petitioners' concerns are allayed by Commerce's pass-through adjustment (while granting the double remedies offset) that accounts for other factors influencing the export prices. Commerce's explanation in its ADD investigation of *Tool Chests and Cabinets from China* is instructive:

> {W}e continue to rely on the Bloomberg data to calculate the domestic pass-through rate…
>
> The pass-through concept relates total variable cost to price and concerns how changes in the former affect the latter; . . .
>
> {W}e use the Bloomberg ratio to measure the extent to which: (1) factors in addition to variable cost changes, such as global demand, affect price, and (2) these conditions would likely affect the domestic and export markets.

83 Fed. Reg. 15,365 (Apr. 10, 2018) (final determination), IDM Comment 15.

Further, Petitioners misplace reliance on distinguishable precedents. D-I Br. at 46-47 (citing *Jiangsu Zhongji Lamination Mats. Co. v. United States*, 2023 WL 3863201, *11-15 (CIT June 7, 2023); *Vicentin S.A.I.C.* v. *United States*, 42 F.4th 1372, 1381-82 (Fed. Cir. 2022)). Unlike both cases, Dingsheng established that its export prices are linked to its COM, which, in turn, is linked to underlying input costs (and their subsidies).

Additionally, citing certain price quotes Dingsheng issued to its customers, Petitioners argue that "because [

                                              ] Dingsheng has not demonstrated and

22

cost-to-price link." D-I Br. at 47-48. However, Petitioners do not contest that those LME prices were divorced from Dingsheng's actual procurement prices. Absent that showing, Dingsheng's COM is deemed to be linked to both its actual procurement prices and LME prices of aluminum inputs. Consequently, Petitioners fail to impeach Dingsheng's cost-to-price link. Commerce's explanation in *CAAS from China* is instructive:

> Alcha failed to provide any analysis demonstrating how its subsidized cost of primary aluminum related to the prices it sets for aluminum sheet. Therefore, we continue to find that for the provision of primary aluminum for LTAR, Alcha failed to demonstrate the cost-to-price link. . . .

> Alcha's Double Remedies Questionnaire response demonstrates that there are multiple months during the POR where the trend of Alcha's cost of primary aluminum did not match the trend in LME aluminum prices (*i.e.*, Alcha's cost of primary aluminum went up while the LME aluminum price went down, or vice versa).

*CAAS from China,* 87 Fed. Reg. 54,975, IDM Comment 4.

In contrast, Dingsheng established a direct correlation between its aluminum input procurement prices and its COM. As Petitioners fail to show a disconnect between Dingsheng's purchase prices and LME prices, their arguments are unsupported by record evidence.

PUBLIC VERSION

## CONCLUSION

For the foregoing reasons, Dingsheng respectfully requests that this Court remand the

*Final Results* for reconsideration by Commerce.

Respectfully submitted,

*/s/* Dharmendra N. Choudhary
Ned H. Marshak*
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
*599 Lexington Avenue FL 36
New York, NY 10022
-and-
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs Jiangsu Dingsheng New
Materials Joint-Stock Co., Ltd., Dingsheng
Aluminium Industries (Hong Kong) Trading Co.,
Limited (Dingsheng Aluminium Industries (Hong
Kong) Trading Co., Ltd.), Hangzhou Dingsheng
Import & Export Co., Ltd. (Hangzhou Dingsheng
Import and Export Co., Ltd.), Hangzhou Five Star
Aluminium Co., Ltd., Hangzhou Teemful Aluminium
Co., Ltd., Inner Mongolia Liansheng New Energy
Material Co., Ltd., and Inner Mongolia Xinxing
New Energy Material Co., Ltd.*

Dated: January 29, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Reply contains 6,877 words including footnotes, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's Microsoft Word processing system, and is less than the 7,000 word limit.


*/s/ Jordan C. Kahn*
Jordan C. Kahn
*Counsel for Plaintiffs*

Dated: January 29, 2025