Slip Op. 25-93

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIANGSU DINGSHENG NEW MATERIALS JOINT-STOCK CO., LTD. ET AL., | |
|      Plaintiffs, | |
| v. | |
| UNITED STATES, | Before: Claire R. Kelly, Judge |
|      Defendant, | Court No. 23-00264 |
| and | PUBLIC VERSION |
| ALUMINUM ASSOCIATION TRADE ENFORCEMENT WORKING GROUP AND ITS INDIVIDUAL MEMBERS, ET AL., | |
|      Defendant-Intervenors. | |

## OPINION AND ORDER

[Granting in part and denying in part Plaintiffs' motion for judgment on the agency record.]

Dated: July 21, 2025

Ned H. Marshak, Dharmendra N. Choudhary, and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, and Washington, D.C., for Plaintiffs Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd., Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited, Hangzhou Dingsheng Import & Export Co., Ltd., Hangzhou Five Star Aluminium Co., Ltd., Hangzhou Teemful Aluminium Co., Ltd., Inner Mongolia Liansheng New Energy Material Co., Ltd., and Inner Mongolia Xinxing New Energy Material Co., Ltd.

Christopher A. Berridge, Trial Attorney, Commercial Litigation Branch, Civil Division, of Washington, D.C., for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel was JonZachary Forbes, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

John M. Herrmann, II, Joshua R. Morey, Matthew G. Pereira, and Paul C. Rosenthal, Kelley Drye & Warren, LLP, of Washington, D.C., for Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its Individual Members, JW Aluminum Company, Novelis Corporation, and Reynolds Consumer Products LLC.

Kelly, Judge: Before the Court is Plaintiffs' motion for judgment on the agency record, challenging the U.S. Department of Commerce's ("Commerce") final results in the antidumping duty ("ADD") administrative review published as Certain Aluminum Foil from the People's Republic of China: Final Results of Antidumping Administrative Review and Final Determination of No Shipments; 2021-2022, 88 Fed. Reg. 76,734 (Nov. 7, 2023), and accompanying Issues and Decisions Memorandum ("IDM"). See Plaintiffs' Mot. for J. on the Agency Rec. Pursuant to R. 56.2, Jul. 29, 2024, ECF No. 26 ("Pl. 56.2 Mot."); Plaintiffs' Reply to Defendant and Defendant-Intervenors' Responses to Plaintiffs' Mot. for J. on the Agency Rec., Jan. 29, 2025, ECF No. 35 ("Pl. Reply"). Defendant and Defendant-Intervenors argue that Commerce's final results are supported by substantial evidence and in accordance with law. See Defendant's Opp'n to Plaintiffs' R. 56.2 Motion for J. on the Agency Rec., Nov. 27, 2024, ECF No. 32 ("Def. Resp."); Defendant Intervenors' Resp. Brief in Opp'n to Plaintiffs' Memorandum in Supp. of R. 56.2 Mot. for J. on the Agency Rec.,

Nov. 27, 2024, ECF No. 30 ("Def. Intv. Resp.").  For the reasons that follow, Plaintiffs'

motion is denied in part and granted in part.

## BACKGROUND

On June 9, 2022, the U.S. Department of Commerce ("Commerce") initiated

the fourth administrative review of the antidumping duty ("ADD") order on

aluminum foil from the People's Republic of China for the period of review ("POR")

2021–2022.  <u>Initiation of Antidumping and Countervailing Duty Administrative</u>

<u>Reviews</u>, 87 Fed. Reg. 35,165-02 (Dep't Commerce Jun. 9, 2022).  Commerce selected

Dingsheng Aluminum Industries Group ("Dingsheng") as a mandatory respondent.

U.S. Dep't Comm. Second Respondent Selection Memo., PD 53, CD 21 bar code

4274937-01 (Aug. 16, 2022).[1]

In accordance with the procedures applicable to nonmarket economy ("NME")

cases, Commerce requested surrogate country and surrogate value information on

September 29, 2022.  U.S. Dep't Comm. SC/SV Request, PD 79-82, bar code 4289970-

01 (Sept. 29, 2022).  Commerce identified Romania, Panama, Costa Rica, Malaysia,

Bulgaria, and Turkey as potential surrogate countries at a comparable level of

economic development as China.  <u>Id.</u> at Attach. 1.  On October 6, 2022, Dingsheng

submitted comments affirming that all six countries met the statutory criterion of

---

[1] Citations to administrative record documents in this opinion are to the numbers
Commerce assigned to such documents in the indices, and all references to such
documents are preceded by "PD" or "CD" to denote public or confidential documents.

economic comparability. Dingsheng Economically Comparable Countries Cmts., PD 85, bar code 4292708-01 (Oct. 6, 2022). On October 18, 2022, Dingsheng submitted further comments confirming that Romania, Turkey, Bulgaria, and Malaysia also satisfied the requirement of significant production of comparable merchandise. Dingsheng Surrogate Country Cmts., PD 92, bar code 4301342-01 (Oct. 18, 2022).

On November 21, 2022, Dingsheng submitted surrogate value data from Bulgaria, including financial statements from Alcomet AD and Elena Group. Dingsheng First SV Cmts., PD 102-07, bar code 4312705 (Nov. 21, 2022). Petitioners submitted surrogate value data from Malaysia on the same date. Petitioner Prelim. SV Cmts., PD 110-11, bar code 4313001-01 (Nov. 21, 2022). Dingsheng later submitted rebuttal comments, including Bulgarian financial data, Dingsheng Final SV Cmts., PD 116-17, bar code 4315801-01 (Dec. 1, 2022), and subsequently provided Malaysian surrogate value data in March 2023. Dingsheng Final SV Cmts., PD 155-59, bar code 4359609-01 (Mar. 29, 2023). Petitioners submitted Romanian surrogate value data, including financial statements from Alro S.A./Alro Group. Petitioner Final SV Cmts., PD 146-51, bar code 4359394-01 (Mar. 29, 2023). In April 2023, Dingsheng rebutted Petitioners' Romanian surrogate value data and reiterated their support for either Malaysia or Bulgaria as the primary surrogate country. Dingsheng Final SV Rebuttal, PD 179-84, bar code 4363824-01 (Apr. 10, 2023).

Court No. 23-00264                                                                           Page 5
**PUBLIC VERSION**

On May 5, 2023, Commerce published its preliminary results, <u>Aluminum Foil
from China</u>, 88 Fed. Reg. 29,092 (Dep't Commerce May 5, 2023), determining that
Romania, Bulgaria, and Malaysia were all at a comparable level of economic
development to China and each qualified as a significant producer of comparable
merchandise under 19 U.S.C. § 1677b(c)(4)(A)–(B).

In accordance with its policy bulletin, <u>see</u> Import Admin., U.S. Dep't
Commerce, Non-Market Economy Surrogate Country Selection Process, Policy
Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html
(last visited Jul. 17, 2025) ("Policy Bulletin 04.1"), Commerce evaluated data
availability and reliability and found that both Dingsheng and Petitioners had
submitted nearly complete surrogate value information.  Decision Memorandum for
the Preliminary Results of the 2021-2022 Antidumping Duty Administrative Review
of Certain Aluminum Foil From the People's Republic of China at 13—14, PD 189,
bar code 4371458-02 (Apr. 28, 2023) ("Prelim. IDM").   Commerce preliminarily
determined that the Romanian data constituted the best available information on the
record.  <u>Id.</u> at 14—15.  The Romanian surrogate value data were found to be publicly
available, contemporaneous, tax- and duty-exclusive, and specific to Dingsheng's
inputs.  <u>Id.</u> at 14—22.  Romanian labor data were more contemporaneous than that
of Bulgaria or Malaysia and included domestic insurance data, which was absent
from the other countries' submissions.  <u>Id.</u> at 14.  Commerce also found Alro's 2021
financial statements more contemporaneous and more reflective of Dingsheng's level

of integration compared to the financial statements from the Bulgarian and Malaysian producers.  Id.

Additionally, Commerce preliminarily determined that Dingsheng had not provided sufficient evidence to warrant a double remedies adjustment under 19 U.S.C. § 1677f-1(f)(1)(B).  Id. at 23.  Specifically, the record lacked evidence of a link between the subsidies and the cost of manufacturing, and between cost changes and price changes.  Id.  Commerce assigned a weighted-average dumping margin of 32.81 percent to Dingsheng in the Preliminary Results.  See Certain Aluminum Foil From People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022, 88 Fed. Reg. 76,734-01; Prelim. IDM at 2.

On November 7, 2023, Commerce issued its Final Results.  Certain Aluminum Foil From People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022, 88 Fed. Reg. 76,734 (Nov. 7, 2023) ("Final Results") and accompanying final issues and decisions memorandum, see ECF No. 19-4 ("IDM").  Commerce affirmed its selection of Romania as the primary surrogate country, citing superior data quality and specificity.  Id. at 6.  Further, Commerce assigned Dingsheng a weighted-average dumping margin of 32.81 percent in the Final Results.  Final Results at 76,735.  Plaintiffs initiated this action on December 7, 2023.  See Summons, Dec. 7, 2023, ECF No. 1.

## JURISDICTION AND STANDARD OF REVIEW

This Court exercises jurisdiction in accordance with 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grants the court authority to review actions contesting the final determination in an administrative review of an ADD order. The Court shall uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.§ 1516a(b)(1)(B)(i). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Crawfish Processors Alliance v. United States, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court reviews the record as a whole made before the agency and may not supply a reasoned basis for the agency's action that the agency itself has not given. See 19 U.S.C. § 1516a(b)(1)– (2); SEC v. Chenery Corp., 332 U. S. 194, 196 (1947). The Court will, nevertheless "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

## DISCUSSION

### I.   Primary Surrogate Country

Plaintiffs ask this Court to find unlawful Commerce's selection of Romania as the primary surrogate country, with little or no deference to Commerce, because 19 U.S.C. § 1677b(c)(1)(B) requires this Court to identify "the best available information"

and both Malaysia and Bulgaria have "better available information and data quality."[2]  Pl. Reply at 2—5; see also Pl. 56.2 Mot. at 8—9, 48.  Specifically, Plaintiffs argue that Commerce (1) improperly relied on the minor FOPs of labor and insurance when selecting Romania, Pl. 56.2 Mot. at 9—15, (2) unlawfully relied on Alro's financial data to support its selection of Romania as Alro's production was vastly different than Plaintiffs', id. at 15—31, (3) ignored the facts that Alro's financial statements were distorted by countervailable subsidies, insufficiently disaggregated, and did not have an auditor's report, id. at 31—39, and (4) ignored that the Romanian

---

[2] Although Plaintiffs argue Commerce's selection of Romania is contrary to law, their arguments do not raise questions of law but rather ask that the Court reweigh the evidence, proffering conclusory statements without explaining why Commerce's selection of Romania is unlawful.  For example, in their reply brief Plaintiffs argue that

> Dingsheng has established that—as compared to Romanian financial statements and SV data for major factors of production ("FOP") (truck freight and B&H)—the corresponding Malaysian (or, Bulgarian) data are superior. This fact renders unlawful Commerce's primary [surrogate country] choice of Romania over Malaysia (or, Bulgaria).

Pl. Reply at 3.  Thus, Plaintiffs argue Defendant cannot reconcile the correct statutory interpretation of "best available information" with Commerce's rejection of Malaysia (or, Bulgaria), since both countries have better available information and data quality than Romania."  Pl. Reply at 8, 13 (arguing "using unreliable Romanian SV data for truck freight, B&H, and financial statement results in a significant distortion; in contrast, using reliable Malaysian SV data and financial statement to value all FOPs except labor and domestic insurance, both of which can be valued in Romania, would result in minimal distortion and a far more accurate ADD calculation.").  These arguments are not arguments about what law, rather they challenge how Commerce weighed the evidence in applying the law.

data for truck freight and brokerage were unreliable or absent from the record. Id.
at 39—42. Defendant and Defendant-Intervenors argue that Plaintiffs' position
misconstrues Loper Bright, asks this Court to reweigh the evidence, and that
Commerce's choice is reasonable. Def. Resp. at 12—14; see also Def. Intv. Resp. at
13—14.

Dumping occurs when merchandise is imported into the United States and sold
at a price lower than its "normal value." 19 U.S.C. §§ 1673, 1677b(a). Normal value
is typically the price paid for the goods in the home market. 19 U.S.C.
§ 1677b(a)(1). Where the exporting country is an NME Commerce identifies one or
more market economy countries to serve as a surrogate and "determine[s] the normal
value of the subject merchandise on the basis of the value of the factors of production"
in the relevant surrogate country or countries, including "an amount for general
expenses and profit plus the cost of containers, coverings, and other expenses." See
19 U.S.C. § 1677b(c)(1), (4). Commerce values the factors of production using "the
best available information." 19 U.S.C. § 1677b(c)(1). "Commerce generally selects,
to the extent practicable, surrogate values that are publicly available, are product-
specific, reflect a broad market average, and are contemporaneous with the period of
review." Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed.
Cir. 2014); see also Policy Bulletin 04.1. Commerce has a regulatory preference to
use one surrogate country, (the "primary surrogate country"). See 19 C.F.R.
§ 351.408(c)(2). Thus, when several countries are at a level of economic development

comparable to the NME country and significant producers of comparable

merchandise, Commerce evaluates the data in the surrogate countries to select the

one with the best data as the primary surrogate country.  Id.

As a preliminary matter, Plaintiffs' argument that the statutory requirement

to select the "best available information" somehow strips Commerce of any deference

to its determination in this case is without merit.[3]  See Pl. 56.2 Mot at 8; Pl. Reply

2—5 (arguing "this Court no longer defers to Commerce's analysis").  Although the

meaning of a statutory term is a legal question, see Loper Bright Enters. v. Raimondo,

603 U.S. 369, 391–392 (2024), the application of that term to the record is a factual

determination for the agency.   Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,

Colorado, 145 S. Ct. 1497, 1504 (2025); see also Loper Bright, 603 U.S. at 391–392

---

[3] During oral argument Plaintiffs' counsel retreated from the position put forth in its brief.  Oral Arg. Rec. at 6:38, Jun. 12, 2025, ECF No. 51 ("Oral Arg. Rec.") (noting the Court's written questions to parties had given the Plaintiffs the opportunity to think further on the meaning of Loper Bright).  Instead, Plaintiffs argued under Loper Bright the term "best information available" meant Commerce needed to have a methodology to evaluate information and the Court would evaluate the agency's methodology to ensure it was the best methodology.  See id. at 11:35—11:47 ("There has to be methodology and it has to be the best methodology . . . there is some discretion but we are not talking about substantial evidence.").  The Court cannot agree with Plaintiffs' proposal for the meaning of Loper Bright or the "the best available information" as provided for in 19 U.S.C. § 1677b(c)(1)1677b(c).  Loper Bright requires that courts exercise "their independent judgment in deciding whether an agency has acted within its statutory authority" and courts will not defer to an agency interpretation of the statute "simply because the statute is ambiguous." Loper Bright, 603 U.S. at 412–13.  As discussed more fully below, the phrase "best available information" means information that is better than all other information on the record.

(citing <u>Gray v. Powell</u>, 314 U.S. 402 (1941) and <u>NLRB v. Hearst Publications, Inc.</u>,

322 U.S. 111 (1944)).  Commerce must select the best available information, meaning

it must choose the information available to it that is better than all other information

on the record.  The phrase "best available information" means that which is better

than all other information available.  "Best" is an adjective defined as "excelling all

others."  <u>See</u> <u>Best</u>, https://www.merriam-webster.com/dictionary/best (last visited

Jul. 17, 2025).  Commerce's task is a mixed question of law and fact requiring it to

apply the statutory term to the record information.  <u>See</u> <u>Loper Bright</u>, 603 U.S. at

388-389 (citing <u>Gray</u>, 314 U.S. 402 and <u>Hearst</u>, 322 U.S. 111); <u>Seven Cnty.</u>

<u>Infrastructure Coal.</u>, 145 S. Ct. at 1504.  Thus, the Court reviews whether

Commerce's selection of Romania as the primary surrogate country, because its

information is better than all other information available, is supported by substantial

evidence, i.e., reasonable on this record.[4]  <u>See</u> <u>Consol. Edison Co.</u>, 305 U.S. at  229

(holding that substantial evidence is more than a mere scintilla and must be relevant

---

[4] Defendant-Intervenors argue Plaintiffs' "arguments regarding the comparability of its production experience to that of Alro S.A. is largely lifted from its administrative brief and largely fails to consider the standard of review applied by this Court" and consequently "[t]his Court should deem waived any attempt by Dingsheng to restructure its arguments to address the applicable standard of review in its reply brief."  Def Intv. Cmts. at 14—15.  Although Plaintiffs' brief adopts many of the arguments in its administrative case brief and misunderstands the implication of <u>Loper Bright</u>, it adequately addresses and adopts the substantial evidence standard throughout its moving brief, therefore Plaintiffs have not waived their right to address this Court's standard of review.  <u>See</u> Pl. 56.2 Mot. at 2, 7, 12, 14, 24, 35, 37, 39—41, 48.

evidence such that a reasonable mind believes the evidence is adequate to support the conclusion).

Here, Commerce's selection of Romania as the primary surrogate country is supported by substantial evidence. Commerce relied in part on its conclusion that the financial statements from Romania were superior to those from Bulgaria and Malaysia. See IDM at 7—8. Commerce's conclusion that Alro's financial statements are more specific than either the Bulgarian or Malaysian companies' statements because Dingsheng and Alro are both integrated producers of aluminum products is reasonable on this record. See id. at 7 (citing Dingsheng's Letter, "Dingsheng's third SV Comments," dated March 29, 2023, at Exhibit 1; Dingsheng's Letter, "Dingsheng Second SV Comments," dates December 2, 2022 (Dingsheng's Second SV Comments); Dingsheng's Letter, "Section D Response," dated October 12, 2022 (Dingsheng's SDQR), at Exhibit D-3). Commerce notes that Dingsheng's level of vertical integration exceeds that of the Malaysian and Bulgarian companies surveyed during the primary surrogate selection process as well, thus making Alro S.A.'s production levels most similar to Dingsheng's rather than the Malaysian or Bulgarian companies surveyed. See id. (explaining Dingsheng's level of vertical integration to be higher than that of either UACJ Malaysia which is limited to rolling and finishing or Elena Group which is limited to downstream household products).

Further, Commerce addresses record information which could be viewed as detracting from its determination.  Specifically, Commerce explains that it based its calculations on the unconsolidated entity of Alro S.A., answering Plaintiffs' argument that the activities of other Alro Group companies rendered Alro an unsuitable choice. See id.; Pl. 56.2 Mot. at 28.  Commerce also addresses the concern that the Alro financial statements were distorted by subsidies, explaining that the record lacks evidence Alro received countervailable subsidies.  IDM at 8 (explaining that record evidence shows Alro participated in the countervailable EU subsidies program, but never received the additional countervailable funds).  Although Plaintiffs claim the lack of an auditor's report leads to the conclusion that the financial statements were not audited, Commerce reached a different conclusion based on the existence of an auditor's fee.  See id.; Petitioners' Second SV Comments at Attachment RO-7.  That Plaintiffs disagree with Commerce's weighing of the record evidence is insufficient to conclude the determination is unsupported by substantial evidence. See Matsushita Elec. Indus. Co., Ltd. v. U.S., 750 F.2d 927, 933 (Fed. Cir. 1984) (holding that the possibility of drawing two inconsistent conclusions from the evidence does not mean it is unsupported by substantial evidence) (internal citations omitted).

In reaching its determination, Commerce weighs the available values for labor and domestic insurance and found that the "Malaysian and Bulgarian data for labor and domestic insurance are either non-contemporaneous or unavailable."  IDM at 6. That these inputs are minor inputs does not render them irrelevant as Plaintiffs

seem to argue.[5]  Commerce acknowledges the significance of these inputs and notes

its regulatory preference for valuing all FOPs in a single surrogate country.  IDM at

6 (citing 19 CFR 351.408(c)(2)). Finally, Commerce rejects Plaintiffs' argument that

Malaysian or Bulgarian freight or brokerage data are superior to the Romanian

freight or brokerage data.  See IDM at 6—7.  Commerce explains all the freight and

brokerage data are derived from World Bank data and that the Romanian data is

more contemporaneous for the POR when compared to the Malaysian freight rates

which were published in 2017.  See id. at 7.  Commerce supports its determination

with record evidence and addresses evidence which may detract from its

determination.  Thus, Commerce's selection of Romania as the primary surrogate

country is reasonable and sustained.

## II.    **Double Remedies Offset**

Plaintiffs argue that Commerce's denial of a double remedies offset is contrary

to law and not supported by substantial evidence.  Pl. 56.2 Mot. at 43.  Specifically,

Plaintiffs argue that (1) Commerce's rejection of a double remedies offset because

prices increased during the POR is contrary to law, (2)  record evidence demonstrates

---

[5] Plaintiffs argue a previous Commerce decision binds Commerce to disregard
information concerning minor FOPs.  See Pl. 56.2 Mot. at 9.  However, past decisions
by Commerce to disregard minor FOPs do not make it unlawful or unreasonable for
Commerce to consider minor FOPs where Commerce provides a reasonable
explanation for its departure from past decisions.  See Save Dom. Oil, Inc. v. U.S.,
357 F.3d 1278, 1283—84 (Fed. Cir. 2004) (holding that if Commerce has a routine
practice of addressing like situations and it departs from that practice Commerce
must provide a reasonable explanation for doing so).

its cost of manufacturing was proportionately lowered by its purchases of Less-Than-

Adequate Remuneration ("LTAR") inputs and (3) Commerce improperly inferred that

Plaintiffs' aluminum foil price revisions were linked to market factors other than its

cost of manufacturing. Id. at 43—48. Defendant and Defendant-Intervenors argue

Commerce's determination is in accordance with law and supported by substantial

evidence. Def. Resp. at 25—28; Def. Intv. Resp. at 44—49.

Commerce imposes antidumping duties when it determines that foreign

merchandise is being sold in the United States at less than its fair value and

determines the rate of the duty by analyzing the extent to which the normal value

exceeds the export price. 19 U.S.C. § 1673. Separately, Commerce imposes

countervailing duties on foreign merchandise if it determines those imports received

a countervailable subsidy with respect to the goods manufacture, production, or

export. 19 U.S.C. § 1671(a). When Commerce determines the normal value of subject

merchandise in a market economy, it looks to the price at which the merchandise is

first sold in the home market. See 19 U.S.C. §1677b(a)(1). However, in NME

countries Commerce determines normal value using surrogate values. See 19 U.S.C.

§1677b(c). Thus, in a market economy presumably normal value and export price

will reflect the impact of a subsidy alike while in an NME normal value will be

unaffected by a subsidy.[6] Therefore, concurrent dumping and subsidy investigations

---

[6] While not an issue here, the statute also provides an adjustment for export subsidies
subject to certain conditions. See 19 U.S.C. § 1677b(c).

Court No. 23-00264                                                Page 16
**PUBLIC VERSION**

in NMEs pose a risk of remedying the same unfair trade act twice.  Consequently, in

2012 Congress amended 19 U.S.C. § 1677f-1 by adding subsection (f) which provides

that:

> (1) In general
>
>> If the administering authority determines, with respect to a class or kind
>> of merchandise from a nonmarket economy country for which an
>> antidumping duty is determined using normal value pursuant to section
>> 1677b(c) of this title, that—
>
> (A) pursuant to section 1671(a)(1) of this title, a countervailable subsidy
>> (other than an export subsidy referred to in section 1677a(c)(1)(C) of this
>> title) has been provided with respect to the class or kind of merchandise,
> (B) such countervailable subsidy has been demonstrated to have reduced
>> the average price of imports of the class or kind of merchandise during
>> the relevant period, and
> (C) the administering authority can reasonably estimate the extent to which
>> the countervailable subsidy referred to in subparagraph (B), in
>> combination with the use of normal value determined pursuant
>> to section 1677b(c) of this title, has increased the weighted average
>> dumping margin for the class or kind of merchandise,
>
>> the administering authority shall, except as provided in paragraph (2),
>> reduce the antidumping duty by the amount of the increase in the
>> weighted average dumping margin estimated by the administering
>> authority under subparagraph (C).

19 U.S.C. § 1677f-1(f)(1).  As a matter of practice Commerce implements the statute

with a pass-through analysis, i.e., a subsidies-to-cost link (the subsidy's effect on cost

of manufacture) and a cost-to-price link (the cost of manufacture effect on the price).

See Vicentin S.A.I.C. v. United States, 503 F. Supp. 3d 1255, 1263 (Ct. Int'l Trade

2021), aff'd, 42 F.4th 1372 (Fed. Cir. 2022); see also IDM at 10—11.

As discussed, courts exercise their independent judgment in deciding statutory meaning.  Loper Bright, 603 U.S. at 412.  In doing so, courts use traditional tools of statutory interpretation, specifically courts examine the "statute's text, structure, and legislative history, and apply the relevant canons of interpretation." Delverde, Srl. v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000).  The plain meaning of statutory terms are ascertained in context and dictionary definitions, while helpful, must be assessed considering the statute as a whole.  Yates v. United States, 135 S. Ct. 1074, 1081—1082 (2015).  Courts may determine that Congress expressly authorized an agency to exercise discretion, Loper Bright, 603 U.S. at 394—95 (citing Batterton v. Francis, 97 S. Ct. 2399, 2405 (1977)), or that Congress has supplied an open-ended term or phrase such as "reasonable" or "appropriate" that "leave agencies with flexibility."  Id. at 395 (citing Michigan v. EPA, 135 S. Ct. 2699, 2707 (2015)). However, for a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity." Id.  Even where a statute implicates technical expertise, "Congress expects Courts to handle technical statutory questions." Id. at 402.  Nonetheless, as Loper Bright acknowledges, statutes may empower agencies to make "fact bound determinations." Id. at 388—91 (discussing Gray, 62 S. Ct. 326 (1941); Hearst, 64 S. Ct. 851 (1944); and 5 U.S.C. §706(2)(E)); see also Seven Cnty. Infrastructure Coal., 145 S. Ct. at 1504. A court reviews a fact-bound determination subject to the relevant standard of

**PUBLIC VERSION**

review, here substantial evidence review.    See <u>Loper Bright</u>, 603 U.S. at 392

(discussing the APA's codification of standards of review and that "judicial review of

agency policymaking and factfinding be deferential."); <u>see</u> 5 U.S.C. § 706(2); <u>see also</u>

19 U.S.C. § 1516.

The operative language here is "if the administering authority determines . . .

that," inter alia, the countervailable subsidy "has been demonstrated to have reduced

the average price of imports . . . during the relevant period," then the antidumping

duty should be adjusted.   19 U.S.C. § 1677f-1(f)(1).[7]   "Demonstrated to have reduced

the average prices . . . during the relevant period"[8] is ambiguous.    It could either

mean that during the relevant period prices declined, from one time point within the

period to another time point within the period; or the phrase could mean that looking

at the relevant period the subsidy's effect was to decrease prices from what those

prices would have been without the subsidy.   The following subsection makes clear,

however, that the former option makes no sense.

---

[7] Commerce determines whether it "has been demonstrated" that the countervailable
subsidy reduced the average price of imports during the relevant period.  Something
is demonstrated when it can be clearly shown by evidence on the record.  <u>See</u>
<u>Demonstrate</u>,     Merriam-Webster's     Dictionary,     https://www.merriam-
webster.com/dictionary/demonstrate (last visited Jul. 17, 2025) ("to show clearly; to
prove or make clear by reasoning or evidence").

[8] The meaning of reduced is "to diminish in size, amount, extent, or number."
<u>Reduced</u>,     Merriam-Webster's     Dictionary,     https://www.merriam-
webster.com/dictionary/reduced (last visited Jul. 17, 2025).

Subsection (C) requires that Commerce assess whether and to what extent a subsidy "in subparagraph (B), in combination with the use of normal value determined pursuant to Section 1677b(c) of this title, increased the weighted average dumping margin." 19 U.S.C. § 1677f-1(f)(1)(C). When Commerce determines normal value pursuant to Section 1677b(c) of this title it uses a surrogate value rather than an invoice price. 19 U.S.C. § 1677b(c). A market driven invoice price would presumably reflect the subsidy, i.e., it would be cheaper. A surrogate value would not reflect the subsidy and would therefore likely result in a higher dumping margin. Thus, the purpose of identifying whether there has been a reduction in price during the period of review is to measure to what extent using a surrogate value for normal value in NME for the relevant period masked the effect of the subsidy. Therefore, 19 U.S.C. § 1677f-1(f)(1)(B) reflects a concern not for a reduction in price from one point in the relevant period to another, but rather for a relative reduction in price as compared to a price that would exist without a subsidy.[9]

In applying the statute here Commerce has acted contrary to law and has failed to support its determination with substantial evidence. First, Commerce's cost-to-price analysis is contrary to law because Commerce misinterprets the statute. Commerce concludes that Dingsheng cannot show a reduction in prices during the

---

[9] Commerce's view that an adjustment under 19 U.S.C. § 1677f-1(f)(1)(b) can only occur where prices decrease in absolute terms is illogical. If a subsidy exists for multiple years, the adjustment would only be allowed in year one even though the subsidy could have the same affect in years following year one.

relevant period because prices increased during the POR.  IDM at 10.  Contrary to

Commerce's view, subsection (B) does not require a reduction in the average cost of

the imports from one moment of the relevant period to another moment within the

same period, rather subsection (B) requires that the subsidy reduced average prices

during the relevant period, as compared to what the prices would have been without

the subsidy.  Therefore, on remand Commerce must consider whether the subsidy has

been demonstrated to have reduced the average price of imports, meaning whether

the average price of imports was less than it would have been without the subsidy.

Secondly, Commerce's analysis is not supported by substantial evidence.

Commerce did not address record evidence that detracts from its determination on

any subsidy-to-cost link.  Although Commerce addressed certain record evidence

related to the subsidy-to-cost link which shows LTAR accounting records related to

Dingsheng's use of steam coal, aluminum plate and/or sheet and strip, and

aluminum,[10]  <u>see</u>  Dingsheng's  Double  Remedies  Questionnaire  Response:

Administrative Review of the Antidumping Duty Order on Aluminum Foil from the

People's Republic of China (A-570-053) at Exh. DR3—DR4, PD 130, CD 67, bar code

4349609-01 ("Dingsheng DRQR"), Commerce failed to address record evidence,

specifically exhibits DR1 and DR2, which show decreases and increases from month-

to-month over the POR of electricity costs and steam coal, primary aluminum, and

---

[10] The exhibits Commerce cites in its IDM purport to show an increase in Dingshneg's
cost for energy inputs during the POR.  <u>See</u> Dingsheng DRQR at Exh. DR3—DR4.

sheet strip costs.  See id. at Exh. DR1—DR2.  Commerce's conclusion that the "cost for energy inputs increased during the POR" seems conclusory as arguably record evidence shows that costs fluctuated throughout the POR.  IDM at 11.

Likewise, Commerce also fails to address record evidence which may detract from its determination related to the cost-to-price link.  Although Commerce points to the fact that Dingsheng's pricing is governed by international market indices and customer negotiation, see IDM at 11 (citing Dingsheng Supplemental A & C Response, PD 133, bar code 4354244-01 (Mar. 16, 2023)), Commerce did not address DR5, which displays minutes from a company meeting concerning pricing.[11]  See Dingsheng DRQR at Exh. DR 5.  Commerce has failed to address evidence which may detract from its determination, thus Commerce's denial of Dingsheng's double remedies offset is remanded for reconsideration or further explanation consistent with this opinion.[12]

---

[11] Specifically discussing [[                                                    ]].

[12] Defendant-Intervenors argue that Jiangsu Zhongji Lamination Materials Co., (HK) v. United States, No. 21-00138, 2023 WL 3863201, (Ct. Int'l Trade, 2023) "easily disposes" of Plaintiffs' argument regarding cost-to-price link because in a prior administrative review Jiangsu Zhongji admitted that it does not necessarily adjust prices when input prices change.  Jiangsu Zhongji Lamination Materials Co., (HK) v. United States, No. 21-00138, 2023 WL 3863201 at 14.  However, that case dealt with a different administrative review and was decided on a different record than the record before this Court.  As discussed above, the record in this case contains evidence, that Commerce did not address, which may detract from Commerce's denial of Dingsheng's double remedies offset.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for judgment on the agency record is denied in part and granted in part. Specifically, Commerce's selection of Romania as the primary surrogate country is sustained and Commerce's denial of Plaintiffs' double remedies offset is remanded for further explanation or reconsideration consistent with this opinion. Therefore, it is

**ORDERED** that Commerce's <u>Final Results</u>, <u>see</u> ECF No. 19-4, is remanded for further explanation or reconsideration consistent with this opinion, and it is further

**ORDERED** that Commerce shall file its remand redetermination with the Court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix, inclusive of the entire confidential record, within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

Court No. 23-00264                                                                                            Page 23
**PUBLIC VERSION**

     **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:      July 21, 2025
           New York, New York