A-570-053
Remand
Slip Op. 25-93
POR: 04/01/21 – 03/31/22
**Public Version**
E&C/OVI: JF

***Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd. v. United States*,
Court No. 23-00264, Slip Op. 25-93 (CIT July 21, 2025)
Certain Aluminum Foil from the People's Republic of China***

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (CIT or the Court), in *Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd. et al. v.*

*United States*, issued on July 21, 2025.[1]  This action arises out of the final results of the 2021-

2022 administrative review of the antidumping duty (AD) order on certain aluminum foil

(aluminum foil) from the People's Republic of China.[2]  The period of review (POR) is April 1,

2021, through March 31, 2022.

On July 21, 2025, the Court sustained Commerce on the issue of the selection of

Romania, rather than Malaysia or Bulgaria, as the primary surrogate country for the source of

surrogate values (SVs).[3]  The Court remanded to Commerce to reconsider or further explain its

---

[1] *See Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd.  v. United States*, 794 F.Supp.3d 1334 (CIT 2025)
(*Remand Order*).
[2] *See Certain Aluminum Foil from People's Republic of China:  Final Results of Antidumping Duty Administrative
Review and Final Determination of No Shipments*, 88 FR 76734 (November 7, 2023) (*Final Results*), and
accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order*, 794 F.Supp.3d at 1343-44.

denial of the double remedies offset requested by Dingsheng Aluminum Industries Group (Dingsheng).[4]

After considering comments submitted by parties and further analyzing the record, for the purposes of these final results of redetermination, pursuant to the Court's *Remand Order*, Commerce has maintained and further explained its determination in the *Final Results* regarding Dingsheng's ability to establish a subsidy-to-cost link and cost-to-price link and, accordingly, its denial of Dingsheng's double remedies offset.

## II.    BACKGROUND

On May 5, 2023, Commerce published the *Preliminary Results* in which it determined that Dingsheng had not provided sufficient evidence to warrant a double remedies adjustment.[5] Specifically, Commerce determined that Dingsheng failed to demonstrate that its cost of manufacturing was linked to the price of its aluminum foil.[6]  In the *Final Results*, Commerce continued to find that an adjustment for double remedies was not warranted.[7]  Commerce further found that Dingsheng failed to demonstrate both a subsidy-to-cost link and a cost-to-price link, noting that Dingsheng's cost for energy inputs increased during the POR and that the prices Dingsheng set were governed by market indices and customer negotiation, rather than fabrication or metal cost pass-through analysis.[8]  Following publication of the *Final Results*, certain parties challenged Commerce's findings before the Court.

---

[4] *Id.* at 21-22.  The Dingsheng Aluminum Industries Group consists of:  Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd.; Dingsheng Aluminium Industries (Hong Kong) Trading Co., Limited; Hangzhou Dingsheng Import&Export Co., Ltd.; Hangzhou Five Star Aluminium Co., Ltd.; Hangzhou Teemful Aluminium Co., Ltd.; Inner Mongolia Liansheng New Energy Material Co.; and Inner Mongolia Xinxing New Energy Material Co., Ltd.
[5] *See Certain Aluminum Foil from People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments*, 88 FR 29092 (May 5, 2023) (*Preliminary Results*), and accompanying Preliminary Issues and Decision Memorandum (PDM).
[6] *See Preliminary Results* PDM at 23.
[7] *See Final Results* IDM at 9-11.
[8] *Id.* at 11.

First, in its opinion sustaining, in part, and remanding, in part, Commerce's *Final Results*, the Court concluded that Commerce misapplied section 777A(f)(1) of the Tariff Act of 1930, as amended (the Act), by concluding that Dingsheng did not show an absolute reduction in prices during the relevant period because prices increased during the POR.[9]  The Court further concluded that Commerce's analysis is not supported by substantial evidence, noting that Commerce failed to address record evidence that detracted from the determination in the *Final Results* as it relates to a subsidy-to-cost link as well as a cost-to-price link.[10]  Specifically, information showing fluctuation of certain costs over the POR and minutes from a company meeting concerning pricing decisions.[11]  Therefore, the Court remanded Commerce's determination to not adjust for alleged double remedies for reconsideration or further explanation consistent with the Court's opinion.[12]  On September 30, 2025, we released our Draft Results of Redetermination to interested parties.[13]  On October 7, 2025, the Aluminum Association Trade Enforcement Working Group and its individual members[14] (the petitioners) provided comments.[15]  On November 17, 2025, Dingsheng provided comments.[16]  We respond to parties' comments below.

---

[9] *See Remand Order*, 794 F.Supp.3d at 1346.

[10] *Id*.

[11] *Id.* at 1346-47.

[12] *Id.* at 1347.

[13] *See* Draft Results of Redetermination, *Jiangsu Dingsheng New Materials Joint-Stock Co., Ltd. et al. v. United States*, 794 F.Supp.3d 1334 (CIT 2025) (Draft Results).

[14] The individual members of the Aluminum Association Trade Enforcement Working Group are JW Aluminum Company; Novelis Corporation; and Reynolds Consumer Products, LLC.

[15] *See* Petitioners' Letter, "Petitioners' Comments on Draft Results of Remand Redetermination," dated October 7, 2025 (Petitioners' Comments).

[16] *See* Dingsheng's Letter, "Dingsheng's Comments on Draft Remand," dated November 17, 2025 (Dingsheng's Comments).

### III.    ANALYSIS

In the *Final Results*, Commerce found "no evidence on the record to suggest that Dingsheng's average unit values (AUVs) for aluminum foil decreased during the POR due to export subsidies."[17]  As discussed above, in its *Remand Order*, the Court held that Commerce did not sufficiently address evidence placed on the record that detracts from its determination on a subsidy-to-cost link.  Specifically, the Court noted that although Commerce addressed record evidence of accounting records demonstrating increasing costs for energy inputs during the POR, Commerce failed to address record evidence that demonstrated month-to-month increases and decreases in the costs of electricity, steam coal, primary aluminum, and aluminum plate and/or sheet and strip.[18]  Further, in its *Remand Order*, the Court held that Commerce did not address evidence which may detract from its determination as it relates to Dingsheng's cost-to-price link.[19]

In applying section 777A(f) of the Act, Commerce examines:  (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined, pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[20]

---

[17] *See Final Results* IDM at 10.
[18] *See Remand Order*, 794 F.Supp.3d at 1346-47; *see also* Dingsheng's Letter, "Dingsheng's Double Remedies Questionnaire Response," dated March 3, 2023 (Dingsheng DRQR), at DR-1 and DR-2.
[19] *See Remand Order* at 21.
[20] *See* section 777A(f)(1)(A)-(C) of the Act.

In the *Remand Order*, the Court found Commerce to have misapplied section 777A(f)(1) of the Act, stating that, "subsection (B) does not require a reduction in the average cost of the imports from one moment of the relevant period to another moment within the same period, rather subsection (B) requires that the subsidy reduced average prices during the relevant period, as compared to what the prices would have been without the subsidy."[21]  On remand, consistent with the Court's opinion, Commerce finds that it is not sufficient to find that Dingsheng has failed to establish a subsidy-to-cost link simply because the cost of energy inputs increased over the POR.

We next examine whether Dingsheng demonstrated:  (1) a subsidies-to-cost link, and (2) a cost-to-price link.  As noted in *Wooden Cabinets and Vanities from China*, a "subsidy-to-cost link" occurs where there exists a subsidy effect to the cost of manufacturing regarding the merchandise under consideration.[22]  Additionally, a "cost-to-price link" occurs where a change in the cost of manufacturing results in a change to the prices charged to the customer.

To ascertain whether Dingsheng established a subsidy-to-cost link, Commerce requested in the Double Remedies Questionnaire[23] that Dingsheng identify which of the subsidy programs under review in the concurrent countervailing duty administrative review impacted its cost of manufacturing, and to cite to its accounting records and provide supporting documentation.[24]  Further, Commerce requested that for each aforementioned subsidy program, Dingsheng explain

---

[21] *See Remand Order*, 794 F.Supp.3d at 1346.

[22] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019), and accompanying PDM at 48, unchanged in *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 11953 (February 28, 2020) (*Wooden Cabinets and Vanities from China*).

[23] *See* Commerce's Letter, "Double Remedies Questionnaire," dated February 10, 2023 (Double Remedies Questionnaire).

[24] *Id.* at 7.

5

how many times it identified a change in the relevant cost item during the POR and provide full documentary support.[25]  In its response, Dingsheng identified four less-than-adequate-remuneration (LTAR) subsidy programs under review which it claimed impacted its cost of manufacturing, and provided sample accounting vouchers as support for its claims.[26]  The accounting vouchers show [                                                        ]; however, Dingsheng did not demonstrate how these accounting records specifically relate to the provision of these goods for LTAR.[27]  Further, with respect to the provision of aluminum plate and/or sheet and strip for LTAR, Dingsheng reported that this program impacted its cost of manufacturing;[28] however, Dingsheng's accounting records refer to [

                                   ].[29] While Dingsheng clarified that the [

      ] materials refer to intermediate products produced from the raw materials subject to LTAR provisions,[30] we find that Dingsheng failed to sufficiently explain how the [

                                   ] identified in its accounting records demonstrates that its cost of manufacturing is impacted by the government provision of aluminum plate and/or sheet and strip for LTAR.

Finally, Dingsheng did not adequately respond to Commerce's requests for information and documentary support with respect to its use of the four subsidy programs that it claimed impacted its cost of manufacturing.  The Double Remedies Questionnaire instructed Dingsheng to explain how many times it identified a change in each cost item during the POR, and to provide full documentary support for its response.[31]  We find that Dingsheng responded with a

---

[25] *Id.*
[26] *Id.* at 5, DR-3, and DR-4.
[27] *Id.* at DR-3 and DR4.
[28] *Id.* at 5.
[29] *Id.* at DR-3B.
[30] *See* Dingsheng's Comments at 10-11.
[31] *See* Double Remedies Questionnaire at 7.

general statement that the "prices of major inputs {. . .} continuously fluctuate according to the prevailing market conditions," and that "the sales manager and other managers review and update the sales prices, particularly when there are significant changes in the price of major inputs."[32]  Dingsheng's response failed to explain how many times it identified a change in each cost item during the POR, and Dingsheng failed to provide any documentary support for its response to this question, as required by question nine of the Double Remedies Questionnaire, which instructed, "Please explain how many times you identified a change in this cost item during the relevant time period," and specified, "Please provide full documentary support for each of your responses."[33]

Dingsheng's consumption of raw material and electricity inputs which Dingsheng reported to have been impacted by countervailable subsidies does not by itself sufficiently establish evidence of a subsidy-to-cost link.  While Dingsheng provided accounting records to demonstrate expenses incurred for inputs that it claimed were provided for LTAR, it failed to provide any additional documentation to demonstrate the extent to which input costs were affected by subsidies and did not explain how its accounting vouchers showing [

                      ] demonstrates that its cost of manufacturing was impacted by the government provision of aluminum plate and/or sheet and strip for LTAR.

Separately, in a supplemental questionnaire, Commerce made inquiries into Dingsheng's U.S. sales process, specifically requesting that Dingsheng provide "terms, dates, and the other details relating to establishing the selling price" involving "orders placed within a given time period and/or for aluminum prices that are determined based on a benchmark formula."[34]

---

[32] *See* Dingsheng DRQR at 5-6.
[33] *Id.*; *see also* Double Remedies Questionnaire at 7.
[34] *See* Commerce's Letter, "Supplemental Questionnaire for Sections A, C, and D," dated February 16, 2023, at 6.

Dingsheng subsequently responded, providing examples of correspondence with its customers which established terms of these sales.[35]  In several of the sales quotes, Dingsheng includes [

].[36]  Commerce has found in a previous segment of this proceeding that changes in a party's cost of manufacturing resulting from changes in [                                    ] rather than receipt of a subsidy are not sufficient to establish a subsidy-to-cost link.[37]  Because of the insufficient supporting information in Dingsheng's DRQR, and because Dingsheng did not establish that changes to the cost of manufacturing are based on the receipt of a subsidy rather than [

], we continue to find that Dingsheng has not established a subsidy-to-cost link.

    With respect to the cost-to-price link, we continue to find that Dingsheng did not adequately address all of Commerce's inquiries and provided insufficient evidence to corroborate its claims.

    To support its claims regarding pricing decisions, Dingsheng provided minutes from a production and sales meeting, dated December 6, 2021.[38]  The minutes include [

] and concludes with [

].[39]  To corroborate its claims, Dingsheng also submitted charts of its average raw material

---

[35] *See* Dingsheng's Letter, "Dingsheng First Supplemental Sections A and C Questionnaire Response," dated March 16, 2023 (Dingsheng SQR), at 4 and SA-6.
[36] *Id*. at SA-6.
[37] *See Certain Aluminum Foil from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2019–2020, 87 FR 935 (January 7, 2022), and accompanying IDM at Comment 4.
[38] *See* Dingsheng DRQR at DR-5.
[39] *Id*.

costs for the POR, which it claimed illustrate declining primary aluminum, aluminum strip/sheet,

and coal costs during the POR.[40]  Dingsheng refers to its reported costs for primary aluminum,

aluminum sheet/strip, and coal only for the months of October through December 2021, and its

subsequent meeting minutes from December 2021, to illustrate the drop in prices of these

inputs.[41]  However, the input costs reported by Dingsheng show [          ] in the prices of

these inputs for the rest of the POR.[42]  Specifically, Dingsheng's reported average steam coal

purchase prices [          ] between April and October 2021, and its reported average primary

aluminum and aluminum sheet/strip purchase prices [          ] between April and October

2021 and again between December 2021 and March 2022.[43]  Dingsheng stated that its "policy is

to adjust the price when the key raw materials prices show a downward trend,"[44] but it did not

explain the cost-to-price link when raw material prices [          ] instead, [

          ].

      Dingsheng further referred to its previously submitted U.S. sales database to corroborate

its claims regarding pricing decisions established in the minutes of the sales meeting.[45]

Specifically, Dingsheng compared the average price of sales to one of its customers under a

specific control number (CONNUM) between January 2022 and February 2022 to demonstrate

that its prices declined following the sales meeting.[46]  Although not specified in Dingsheng's

DRQR, Dingsheng appears to have calculated the averages for the gross unit price for the

aforementioned CONNUM and customer based on the date of shipment for each transaction,

---

[40] *See* Dingsheng DRQR at 8, DR-1, and DR-2.
[41] *Id.* at 8.
[42] *Id.* at DR-2.
[43] *Id.*
[44] *Id.* at 7.
[45] *Id.*; *see also* Dingsheng SQR at SA-8.
[46] *See* Dingsheng DRQR at 8.

rather than the sales invoice date.[47]  However, the average of these same prices according to the invoice date, which Dingsheng reported as the date of sale in all of its questionnaire responses, [          ] between December 2021 and January 2022, contrary to Dingsheng's claims.[48]  In its comments on the Draft Results, Dingsheng claimed that these higher prices in January 2022 were attributable to a lag between the pricing decisions established in the December 2021 sales meeting and the time it took for the price changes to take effect.[49]  However, as discussed in detail below, we continue to find that even if taking this lag into consideration, Dingsheng's reported U.S. sales do not support its claim of a decreasing trend in prices following the December 2021 sales meeting.  Therefore, although Dingsheng provided meeting minutes discussing reducing prices in response to declining input costs, and corroborated its claim regarding declining input costs, we find that Dingsheng not only failed to provide sufficient evidence to corroborate its claims regarding the pricing decisions discussed in the meeting minutes, but that the average monthly prices reported in its U.S. sales database detract from those claims.[50]  As such, because sufficient evidence regarding Dingsheng's pricing decisions is missing from the record, we find that the exhibits Dingsheng submitted regarding input cost trends and its December 6, 2021, sales meeting do not sufficiently establish a cost-to-price link.

Additionally, in the Double Remedies Questionnaire, Commerce requested Dingsheng report how many cost changes for each subsidy-impacted item resulted in price changes during the POR, and how many cost changes for each item did not result in a price change.[51] Commerce also required Dingsheng to "provide full documentary support for each of {its}

---

[47] *See* Dingsheng SQR at SA-8.
[48] *Id.*; *see also* Dingsheng's Letters, "Dingsheng Section A Response," dated September 13, 2022, at 11; and "Dingsheng Section C Response," dated October 12, 2022, at 9.
[49] *See* Dingsheng's Comments at 14.
[50] *See* Dingsheng SQR at SA-8.
[51] *See* Double Remedies Questionnaire at 7.

responses."[52]  Dingsheng stated only that "the cost analysis is undertaken periodically, and sales prices are revised accordingly," and that it "adjusts prices based on several factors such as the direct and indirect costs, market conditions, and customer requirements."[53]  Dingsheng provided no documentation in response to this question.  Because Dingsheng failed to report the number of cost changes for each item that resulted in price changes during the POR, we find that Dingsheng has failed to provide sufficient information to support its claim that a subsidy-to-cost link exists.

Finally, as noted above, in a supplemental questionnaire, Commerce made inquiries into Dingsheng's U.S. sales process, specifically requesting that Dingsheng provide "terms, dates, and the other details relating to establishing the selling price" involving "orders placed within a given time period and/or for aluminum prices that are determined based on a benchmark formula."[54]  Dingsheng subsequently responded, providing correspondences with its customers which established terms of these sales.[55]  In several of the sales quotes, Dingsheng includes

[

].[56]  We find that changes in a respondent's pricing resulting from changes in [                                        ] rather than changes in cost of production detract from a finding that respondent has established a cost-to-price link.

Because record evidence does not adequately support and in part detracts from Dingsheng's claims, and because Dingsheng provided incomplete and vague responses to the Double Remedies Questionnaire, we continue to find that Dingsheng has failed to establish a

---

[52] *Id.*
[53] *Id.*
[54] *See* Commerce's Letter, "Supplemental Questionnaire for Sections A, C, and D," dated February 16, 2023, at 6.
[55] *See* Dingsheng's Letter, "Dingsheng First Supplemental Sections A and C Questionnaire Response," (Dingsheng SQR) dated March 16, 2023, at 4 and SA-6.
[56] *Id.* at SA-6.

cost-to-price link with respect to Commerce's pass-through analysis.[57]  Further, because

Dingsheng has not established either a subsidy-to-cost link or a cost-to-price link, we continue to

find that it is not entitled to an adjustment under section 777A(f) of the Act on the basis that it

failed to meet the requirement of sections 777A(f)(1)(C) of the Act.

## IV.     INTERESTED PARTY COMMENTS ON DRAFT RESULTS

On September 30, 2025, we released our Draft Results to interested parties.[58]  On

October 7, 2025, the petitioners provided comments.[59]  On November 17, 2025, Dingsheng

provided comments.[60]  We respond to parties' comments below.

### Issue 1: Reliance on Insufficiencies in Dingsheng's DRQR

*Dingsheng's Comments*:

> The Draft Remand violates {section 782}(d) {of the Act} by denying Dingsheng's
> requested double remedies offset based upon identifying a host of alleged
> deficiencies, when {Commerce} has not previously provided Dingsheng with
> notice of, and an opportunity to correct, such deficiencies.  The statute and
> extensive precedent plainly require that Dingsheng be given such notice and
> opportunity.  The lone statutory exception, based on insufficient time, is
> inapplicable because {Commerce} had ample time to issue Dingsheng a
> supplemental double remedies questionnaire before the preliminary results, before
> the final results, and on remand.

*Petitioners' Comments:*

> Petitioners agree with {Commerce's} continued denial of Dingsheng's request for
> a double remedies adjustment.  However, in the final results of redetermination
> pursuant to Court remand, Petitioners urge {Commerce} to further bolster its
> explanation for denying the adjustment requested by Dingsheng by: (1) Citing to
> 19 CFR 351.401(b)(1), which places the burden of establishing eligibility for, and
> the amount of, a particular adjustment on the interested party in possession of the
> relevant information (*i.e*., in this case Dingsheng).

**Commerce's Position:**

---

[57] *See Final Results* IDM at 11.
[58] *See* Draft Results.
[59] *See* Petitioners' Comments.
[60] *See* Dingsheng's Comments.

We agree with the petitioners that 19 CFR 351.401(b)(1) provides that Dingsheng has the burden of establishing to the satisfaction of Commerce the amount and nature of a particular requested adjustment. Further Commerce's denial of Dingsheng's requested double remedy adjustment is not done pursuant to the application of facts otherwise available under section 776 of the Act, necessitating the procedural requirements of section 782(d) of the Act consistent with the U.S. Court of Appeals for the Federal Circuit's decision in *American Tubular Products*.[61] Rather, Commerce has determined that the information provided by Dingsheng to support its claim for a requested adjustment does not sufficiently demonstrate entitlement to said adjustment. Courts have held that the requirements of section 782(d) of the Act are not applicable in situations where a plaintiff is affirmatively seeking an adjustment in its favor.[62] The cases cited by Dingsheng in its comments on the Draft Results all are inapposite, as they do not establish that Commerce must identify deficiencies and provide an opportunity to remedy before denying adjustments consistent with 19 CFR 351.401(b)(1). Instead, the cases cited by Dingsheng establish the requirement where Commerce is applying facts otherwise available under section 776 of the Act.[63]

---

[61] *See American Tubular Products, LLC v. United States*, 847 F.3d 1354, 1360-62 (Fed. Cir. 2017) ("Lastly, we agree with the Appellees that Commerce did not apply any adverse inference in its denial of scrap offset. Rather, Chengde simply failed to satisfy its evidentiary burden of establishing the requested offset, as the regulation requires.) (citing 19 CFR 351.401(b)).

[62] *See, e.g.*, *Dong-A Steel Co. v. United States*, 475 F.Supp.3d 1317, 1347 n. 22 (CIT 2020) ("That Commerce did not request any additional information beyond what was provided by DOSCO does not discredit the validity of the conclusion drawn from that evidence. Furthermore, Commerce had no obligation under {section 782(d) of the Act} to work with DOSCO to correct for "deficiencies" in the record, since as discussed above, it does not appear that deficiencies existed in the first place. Rather, the fundamental difference in conclusions reached by DOSCO and Commerce derived not from any shortcomings in the data, but rather from differing yet equally reasonable interpretations of the evidence.") (internal citations omitted).

[63] *See* Dingsheng's Comments at 5-6 (citing *Meihua Group Int'l Trading (Hong Kong) Limited v. United States*, 633 F.Supp.3d 1203 (CIT 2023) (involving the application of facts otherwise available); *PT. Zinus Global Indonesia v. United States*, 686 F.Supp.3d. 1349, 1354-56 (CIT 2024) (involving the application of facts otherwise available); *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1385-86 (Fed. Cir. 2022) (involving the application of facts otherwise available). Additionally, certain of the cases cited establish the opposite conclusion. *See also* Dingsheng's Comments at 5 (citing *inter alia American Tubular Products, LLC v. United States*, 2014 WL 4977626 at *11 (CIT Sept. 26, 2014) (*American Tubular Products CIT*); *see also American Tubular Products CIT*, 2014 WL

Dingsheng further erroneously states that Commerce established for the first time in the Draft Results that the information submitted by Dingsheng failed to sufficiently demonstrate entitlement to a double remedy adjustment.[64]  However, in the *Preliminary Results* and *Final Results*, Commerce found that Dingsheng's responses did not sufficiently demonstrate a basis to make an adjustment.[65]  Even if Dingsheng's statement was consistent with the proceeding, it does not disturb the fact that Commerce is not applying facts otherwise available under section 776 of the Act in denying the adjustment.  Accordingly, the requirements of section 782(d) of the Act have not been triggered since Commerce is not identifying "deficiencies" within the meaning of section 782(d) of the Act, but is, instead, explaining why Dingsheng has not met its burden of proof.  To the extent Dingsheng wished to make arguments based on section 782(d) of the Act, rather than raise such arguments for the first time in its comments on Commerce's Draft Results, it should have made these arguments either before Commerce in its administrative case brief concerning the *Preliminary Results* or in its briefing before the Court.  It did not raise this issue in either instance.

Consistent with the above, Commerce has not applied facts otherwise available in denying Dingsheng's adjustment request and accordingly Dingsheng's invocation of section 782(d) of the Act is inapplicable here.

**Issue 2: Dingsheng's Ability to Establish a Subsidy-to-Cost Link**

*Dingsheng's Comments*:

> The Draft Remand's denial of Dingsheng's requested double remedies offset is unsupported by substantial evidence because Dingsheng established both subsidy-to-cost and cost-to-price linkages.  Based on the final results of the 2021 administrative review of the CVD order, Commerce already determined and

---

4977626 at *11 ("The court also disagrees that Commerce needed to identify shortcomings in Chengde's responses before denying the offset.").

[64] *See* Dingsheng's Comments at 6.

[65] *See Preliminary Results* PDM at 23; *see also Final Results* IDM at 10-11.

quantified the subsidies contained in the less-than-adequate-remuneration ("LTAR") inputs. The subsidy-depressed prices of the LTAR inputs in Dingsheng's accounting records formed the basis of the resulting cost of manufacturing ("COM"). Dingsheng's accounting of the critical input cost represents the cost of its purchased primary aluminum inputs – thereby establish a subsidy-to-cost linkage between LTAR inputs and COM. Dingsheng could not identify every cost change since the prices of LTAR inputs were continuously fluctuating. LTAR prices are market index prices as downwardly adjusted by subsidies. The fact that COM is also based on market index prices of inputs does not negate that COM is linked to the subsidies tagged to the market index prices.

*Petitioners' Comments:*

Petitioners agree with {Commerce's} continued denial of Dingsheng's request for a double remedies adjustment. However, in the final results of redetermination pursuant to Court remand, Petitioners urge {Commerce} to further bolster its explanation for denying the adjustment requested by Dingsheng by: . . . (2) Providing additional analysis regarding why the meeting minutes submitted by Dingsheng do not establish a subsidy-to-cost link.

**Commerce's Position:**

We continue to find that Dingsheng has failed to establish a subsidy-to-cost link. First, contrary to Dingsheng's claims, Commerce did not assert that Dingsheng's raw material purchases were necessarily unrelated to the provisions of the materials for LTAR in the Draft Results. Commerce stated that while Dingsheng provided accounting records to demonstrate expenses incurred for inputs that it claimed were provided for LTAR, it failed to provide any additional documentation to demonstrate the extent to which input costs were affected by subsidies. Dingsheng did not provide anything in the accounting records submitted with its DRQR to specifically tie provision of goods for LTAR to the costs of raw material purchases. Rather, Dingsheng only listed [

].[66] While Dingsheng refers to Commerce's findings in the final results of the parallel countervailing duty administrative review on certain aluminum foil from China, we

---

[66] *See* DRQR at DR-3 and DR-4.

continue to find that Dingsheng has not sufficiently connected the accounting records it submitted with its DRQR and how the subsidies specifically impacted Dingsheng's COM.[67]  In its comments, Dingsheng argues that the subsidy-depressed prices of its LTAR inputs proportionately lowered the COM, but contrary to its claims in its comments,[68] did not provide a "direct link" between procurement prices of inputs for LTAR and the resulting COM in its DRQR, but rather relied on indirect inferences made from the parallel countervailing duty proceeding.  Dingsheng states in its comments that Commerce cannot reject a double remedies offset based on the fact that a company received LTAR subsidies prior to the beginning of the POR.[69]  However, Commerce did not conclude in the Draft Results that Dingsheng was ineligible for a double remedies offset due to the LTAR subsidies predating the POR, but rather concluded that Dingsheng was ineligible because Dingsheng did not sufficiently establish a link between the subsidies and its COM, as explained above.

    In its comments, Dingsheng clarified that the [                                        ] materials referenced in its DRQR refer to intermediate products produced from inputs provided at LTAR and later converted to aluminum foil.[70]  We find Dingsheng's explanation sufficient to explain how [                                        ] might be impacted by the provision of materials for LTAR.  However, this explanation also exacerbates the insufficiencies in Dingsheng's accounting records noted above, as it is even less clear how the provision of raw materials for LTAR impact Dingsheng's cost of manufacturing when the accounting records provided by Dingsheng list intermediate goods produced from these raw materials, rather than the raw materials themselves.  By including the semi-finished materials in the accounting records and not

---

[67] *Id.*
[68] *See* Dingsheng's Comments at 10.
[69] *Id.*
[70] *Id.* at 10-11.

distinguishing between these materials and the raw material inputs (directly impacted by LTAR subsidies), Dingsheng further obfuscates how the accounting records supposedly establish a subsidy-to-cost link, in addition to the other issues with the accounting records identified above.

Dingsheng states that it "also disclosed that only significant changes in the prices of LTAR inputs resulted in a resetting of sale prices," and argued that "{a}lthough the Draft Remand acknowledges both statements, it inexplicably rejects Dingsheng's commercially-sound practices and unfairly requires that Dingsheng provide a detailed reporting of each and every input cost change."[71]  In the DRQR, and cited in both the Draft Results and in Dingsheng's Comments, Dingsheng stated that the "prices of major inputs - Al ingot, Al Liquid, Purchased Al Strip - continuously fluctuate according to the prevailing market conditions," and that "the sales manager and other managers review and update the sales prices, particularly when there are significant changes in the price of major inputs."[72]  In the DRQR, Dingsheng also stated that it updated sales prices "particularly when there are significant changes in  the price of major inputs," but did not indicate in the DRQR that "only" significant cost changes in LTAR inputs resulted in changing sales prices as it claims in its comments on the Draft Results.[73]  Further, Dingsheng did not indicate what would constitute a "significant" change in an input cost, and even stated in its DRQR that there is no threshold for changes in input cost under which it would not adjust prices.[74]  Dingsheng additionally stated in its case brief for the administrative review that, "Dingsheng's policy is to revise prices regardless of the quantum of change in the COM, which means that even minute changes in COM can result in change in prices."[75]

---

[71] *Id.* at 11.
[72] *Id*.; *see also* DRQR at 6 and Draft Results at 6.
[73] *Id*.
[74] *See* DRQR at 6.
[75] *See* Dingsheng's Letter, "Dingsheng's Case Brief," dated June 5, 2023 at 48.

Dingsheng further argues in its comments that its reliance on fluctuating market index prices does not detract from its ability to meet the subsidy-to-cost link because its LTAR input costs are formulaically derived as the difference between market index prices and the amount of the subsidies.[76]  Dingsheng states that "Commerce {sic} well established pass-through adjustment (while granting the double remedies offset) accounts for other factors such as LME index that also may influence the export sale prices," and that, "Commerce's well established practice is to apply a Bloomberg pass-through adjustment factor to the double remedies offset in order to account for other factors influencing the price."[77]  However, the instances that Dingsheng cites are cases in which the offset has been applied after Commerce has found the necessary subsidy-to-cost and cost-to-price links have been met.  Here, independent of the question of market index prices, Commerce continues to find that Dingsheng has not demonstrated a subsidy-to-cost link, as explained above.

Regarding the petitioners' claims related to Dingsheng's meeting minutes and its ability to establish a subsidy-to-cost or cost-to-price link, we agree that statements within the minutes regarding [                    ] detract from Dingsheng's arguments concerning its eligibility for the offset.  Although Dingsheng's [                    ] specifically mentions [

], the [

].[78] In response to this, Dingsheng's [

].[79]

---

[76] *See* Dingsheng's Comments at 12.
[77] *Id.* at 15-16 (citing *Certain Tool Chests and Cabinets from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 15365 (April 10, 2018) (*Tool Chests and Cabinets from China*)).
[78] *See* DRQR at DR-5.
[79] *Id.*

Because Dingsheng's [



], we find this indicates

[



] and further detracts from Dingsheng's claims.

**Issue 3: Dingsheng's Ability to Establish a Cost-to-Price Link**

*Dingsheng's Comments*:

> Record evidence establishes that, following a reduction in LTAR input prices
> between October and December 2021 resulting in lower cost of manufacturing
> (COM), Dingsheng lowered its prices in the latter half of January 2022. The record
> further establishes a cost-to-price change following a time period when LTAR input
> prices trended up. Since Commerce applies a Bloomberg pass-through adjustment
> factor to the double remedies offset in order to account for other factors influencing
> the price, {Commerce} cannot deny Dingsheng's cost-to-price linkage based
> simply on changes in price also resulting from changes in the London Metal
> Exchange ("LME") index.

**Commerce's Position:**

We continue to find that Dingsheng did not establish a cost-to-price link. Dingsheng

references question 11 of the Double Remedies Questionnaire, instructing it to describe its

policies regarding price reductions, claiming that, "{i}t is disingenuous for the Draft Remand to

fault Dingsheng's response when Commerce never asked that Dingsheng provide an illustration

of cost-price linkages during a time period after the input cost trended up."[80] While question 11

of the Double Remedies Questionnaire specifically asks about price reductions, question 4 asks

about the "overall process, or procedure" that Dingsheng follows in instances where prices

change in response to changes in cost.[81] Dingsheng responded to this question regarding cost

---

[80] *See* Dingsheng's Comments at 13; *see also* Double Remedies Questionnaire at 9.
[81] *See* Double Remedies Questionnaire at 4.

fluctuations, but did not specifically mention whether this procedure varied between increases and decreases.[82]  Dingsheng argues:

> Commerce's rejection of the significance of the downward price trend because the entries Dingsheng selected for price comparison purposes are based on the date of shipment rather than the date of invoice is unavailing.  For the post-December 2021 month-to-month price comparison, Dingsheng considered an entry with shipment date of February 1, 2022, only because there were no dates of invoice falling in February 2022.

Dingsheng further claims that there was a time lag before the lower prices established in its December 2021 sales meeting took effect, and that prices were still higher in early January 2022 but trended downward, stating, "{t}he downward price trend in January 2022 is evident from the fact that average prices dropped from [       ] (January 1-15, 2022) to [       ] (January 16-31, 2022)."  Finally, with respect to the price increase in March 2022, Dingsheng states that this increase is consistent with the rise in LTAR input costs in March 2022.[83]

We agree with Dingsheng's reasoning regarding the March 2022 price increase.  However, regarding Dingsheng's recalculation of pricing trends between December 2021 and February 2022, we do not agree with Dingsheng's claim that the prices in its sales database reflect a downward price trend in late January and February.  First, Dingsheng did not initially identify the lag in prices following the December 2021 sales meeting in the DRQR, explain why the lag occurred, or provide documentation in the DRQR or its comments to provide context.  However, taking the lag into consideration, Dingsheng calculates the average price of [       ] sales in the latter half of January 2022 in comparison to the average price of [       ] sales in early January and in December 2021 following the aforementioned sales meeting to support its claim that prices trended downward in the latter half of January.[84]  While the December to early

---

[82] *See* DRQR at 2-3.
[83] *See* Dingsheng's Comments at 14.
[84] *Id.*

January average is higher than the late January average, this is primarily due to a single sale

[

]. Further, [

].[85]  We find that Dingsheng's argument regarding declining price trends is

not persuasive.  Even taking into account its comments regarding the early-January time lag and

the March 2022 sale, the argument relies entirely on a single sale, which may be an outlier, that

occurred over a month after the December meeting where pricing was discussed.  Moreover,

[                                                                                                                                           ].

Based on the lack of correlation and support, as evidenced by Dingsheng's recalculation of

pricing trends between December 2021 and February 2022, and pricing trends in late January

and February, we continue to find that Dingsheng did not substantiate its claim that price

changes were dependent on changes in the COM.  Consequently, we continue to find that

Dingsheng did not establish a cost-to-price link.

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the *Remand Order*, and consistent with the instructions of the Court,

Commerce continues to find that Dingsheng did not establish a subsidy-to-cost link or a cost-to-

price link and is not eligible for a double remedies adjustment under section 777A(f) of the Act

on the basis that it failed to meet the requirement of sections 777A(f)(1)(C) of the Act.

Consistent with the *Remand Order* from the Court, Commerce has provided further explanation

for its initial denial.  Upon a final and conclusive decision in this litigation, Commerce will issue

---

[85] *See* Dingsheng's Letter, "Dingsheng First Supplemental Sections A and C Questionnaire Response," dated March 16, 2023, at SA-8.

appropriate instructions to U.S. Customs and Border Protection consistent with the final results

of redetermination.

12/15/2025

X _Jerry J. Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance